### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

Jolene Anderson,
1614 Betty Street,
Marrero, LA 70072

Candace Johnson,
1612 Julie Street,
Marrero, LA 70072

Kedra James,
1704 Julie Street,
Marrero, LA 70072, and

Marrero Tenants Organization, Inc.,
1731 Betty Street,
Marrero, LA 70072

           Plaintiffs,

   v.

United States Department of Housing and
Urban Development,
451 7th Street, S.W.,
Washington, D.C. 20410, and

Marcia L. Fudge, Secretary of the Department
of Housing and Urban Development, in her
official capacity,
451 7th Street, S.W.,
Washington, D.C. 20410

           Defendants.

Civil Action No. _____

**COMPLAINT**

### INTRODUCTION

1.     Plaintiffs Jolene Anderson, Candace Johnson, Kedra James, and Marrero Tenants

Organization, Inc., bring this action against United States Department of Housing and Urban

Development ("HUD") and Marcia L. Fudge, Secretary of HUD, for violating the Administrative

Procedure Act ("APA") by approving the conversion of Acre Road, a nearly 100% Black public

housing development in Marrero, Jefferson Parish, Louisiana, to tenant-based housing voucher

assistance pursuant to a Streamlined Voluntary Conversion ("SVC") process established by

Defendants that was promulgated without first providing notice and an opportunity for interested

parties to comment.

2.      The SVC process waives a statutorily-required conversion assessment that is

required to be conducted by public housing agencies ("PHAs") seeking to convert their public

housing inventory to tenant-based Housing Choice Vouchers ("HCVs"). The statute, 42 U.S.C. §

1437t, and its implementing regulations, at 24 C.F.R. part 972, require PHAs to complete a

conversion assessment that, among other things, demonstrates that rental market conditions favor

the likely success of the use of tenant-based assistance by displaced public housing residents, and

that the conversion will not result in neighborhoods with greater concentrations of poverty, or

negatively impact the availability of affordable housing. The SVC process effects substantive

changes to the voluntary conversion process, and its waiver of the conversion assessment

conflicts with the applicable statutory and regulatory framework, in violation of the APA.

3.      Defendants' approval of the Acre Road SVC ignored record data showing that the

SVC will displace Acre Road tenants to neighborhoods that are more racially segregated, have

lower income levels, lower rates of homeownership, and higher rates of unemployment than

Marrero and Jefferson Parish as a whole, and the greater New Orleans, Louisiana, metropolitan

region, in contravention of Defendants' mandate to further fair housing under the Fair Housing

Act. Moreover, had a conversion assessment been performed as is required by the applicable

statute and regulations, Defendants' decision on the Acre Road SVC would have been informed

by data demonstrating that only 57% of individuals issued vouchers by the relevant Jefferson Parish housing authority have successfully used them to secure alternative housing in the private rental market due to high rents that exceed the maximum voucher payment standard, discrimination, and lack of affordable housing stock within the Parish. Indeed, only one plaintiff, Kedra James, has been able to find housing with her voucher. That housing is outside of Jefferson Parish, located in a neighborhood that has higher crime rates, and is more expensive than Ms. James's housing in Acre Road. Defendants' approval of the SVC conversion is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the APA.

4.      Defendants' approval of the Acre Road SVC authorizes its administrator, the Housing Authority of Jefferson Parish ("HAJP"), a PHA serving all of Jefferson Parish except for the cities of Kenner and Westwego, to issue at any time notices to Acre Road's approximately 50 low-income families that they have 90 days to vacate their homes.

5.      The remaining tenants at Acre Road, including plaintiffs Jolene Anderson and Candace Johnson, will become homeless if they are unable to find housing with their vouchers. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' APA violations and to ensure the SVC process complies with the U.S Housing Act of 1937 ("Housing Act") and Defendants' mandate to promote fair housing under the Fair Housing Act ("FHA").

## PARTIES

## PLAINTIFFS

12.    Plaintiff Jolene Anderson is a Black woman with disabilities who resides in a three-bedroom unit at 1614 Betty Street, Marrero, Louisiana. She has been a tenant in the Acre Road development for 9 years. Since receiving an HCV in or around July 2021, Ms. Anderson

has looked at over 30 units, but the properties either did not accept vouchers or charged rent that exceeded her voucher amount. She has been unable to secure a new place to live.

13.     Plaintiff Candace Johnson is a Black woman who resides at 1612 Julie Street, Marrero, Louisiana. She has been a tenant in the Acre Road development for 14 years. Since receiving an HCV in or around summer 2021, Ms. Johnson has looked at over 25 rental units, most of which either do not accept vouchers or are located in areas with high crime levels in which she would not feel safe. She has been unable to find any rental units that will accept her voucher and has been unable to secure a new place to live.

14.     Plaintiff Kedra James is a Black woman who resides at 1704 Julie Street, Marrero, Louisiana. She has been a tenant in the Acre Road development for approximately 15 years. Since receiving an HCV at the end of 2021, Ms. James has been unable to locate housing in Jefferson Parish. To avoid homelessness, she is relocating to a unit in a neighborhood in Orleans Parish in which crime levels are significantly higher than at Acre Road.

15.     Plaintiff Marrero Tenants Organization, Inc. ("MTO") is the duly elected Tenant Council located at 1731 Betty Street, Marrero, Louisiana. The MTO represents the interests of all public housing tenants at the Acre Road development and meets regularly to advocate for tenants' rights. Its advocacy has included sending several letters to HUD officials and submitting comments to the Louisiana Housing Corporation in connection with the Acre Road conversion, citing its members' significant concerns about the displacement of Acre Road residents, and the lack of sufficient market availability to make the use of HCVs for relocation feasible.

16.     The MTO's bylaws state that all Acre Road tenants, including Plaintiffs Jolene Anderson, Candace Johnson, and Kedra James, are members of the MTO. Since HAJP announced plans to convert Acre Road on or about July 22, 2020, most of the MTO's members

4

have been displaced. As a result, the MTO has experienced increased difficulty organizing meetings, contacting members, and facilitating members' participation in the SVC process.

## DEFENDANTS

17.     Defendant U.S. Department of Housing and Urban Development ("HUD"), located at 451 7th Street, S.W., Washington, D.C. 20410, is a department of the Executive Branch of the United States Government.

18.     Defendant Marcia L. Fudge is the Secretary of HUD and is responsible for overseeing all HUD operations, including the promulgation of regulations, the development and implementation of programs, and compliance with and enforcement of governing statutes, including the Housing Act and FHA. Secretary Fudge is sued in her official capacity.

## JURISDICTION AND VENUE

19.     This Court has authority to review final agency action under the Administrative Procedure Act, 5 U.S.C. § 702, and jurisdiction over this action seeking such review under 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because HUD is domiciled in the District of Columbia. Venue is also proper pursuant to 5 U.S.C. § 703.

## FACTUAL BACKGROUND

Statutory & Regulatory Background

*Statutory Framework*

21.     The Housing Act created a system of public housing "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and "to address the shortage of housing affordable to low-income families." 42 U.S.C. § 1437(a)(1)(A)–(B).

22.     The Housing Act creates two forms of subsidized housing implemented and regulated by HUD and local PHAs. Section 9 provides for public housing for low-income individuals. Public housing developments are operated locally by PHAs and funded by the federal government and through tenants' rent payments. According to HUD, currently, approximately 970,000 households live in public housing units managed by about 3,300 PHAs throughout the United States.

23.     Individuals living in public housing pay a maximum rent of the highest of: 30% of their monthly adjusted income, 10% of monthly income, or a minimum rent set by the PHA, which may not be more than $50. 24 C.F.R. §§ 5.628; 5.630. The rent calculation includes a utility allowance.

24.     Section 8 of the Housing Act governs the HCV program, which provides a tenant-based subsidy that an individual may use to rent a unit on the private market. The individual's rent portion, inclusive of the utility allowance, is capped at 40% of the tenant's monthly adjusted income at initial occupancy. 24 C.F.R. § 982.508.

25.     An HCV participant is limited to units with rents below the maximum rent determined by the PHA. The PHA calculates the maximum rent based on the family's adjusted household income and a "payment standard" based on HUD-approved fair market rent ("FMR") for the relevant market area. A PHA is authorized to establish a payment standard between 90 to 110% FMR. 24 C.F.R. § 982.503(b).

26.     The payment standard is the maximum subsidy the PHA will pay for a unit leased in the HCV program by bedroom size, inclusive of a utility allowance.

27.     HUD publishes FMRs annually, based on the prior year's market data. 24 C.F.R. § 888.13. As such, in areas where rents are rapidly increasing, the FMR does not always reflect the current cost of rental housing.

28.     Once an HCV participant finds an apartment, it must be inspected by the PHA to ensure the unit complies with HUD's Housing Quality Standards for habitability. The PHA must also determine that the requested rent is reasonable. Once the PHA agrees to lease terms with the landlord, a tenant may move in to the unit.

29.     The Housing Act provides a process for voluntary conversion of Section 9 public housing by PHAs to Section 8 HCVs. 42 U.S.C. § 1437t.

30.     The statute and its implementing regulations, 24 C.F.R. part 972, set forth the procedural requirements with which a PHA must comply when converting public housing to tenant-based vouchers.

31.     Before the conversion may occur, the PHA must perform a conversion assessment pursuant to 42 U.S.C. § 1437t(b)(1), which must include at least five components.

32.     First, the conversion assessment must include a cost analysis that demonstrates whether the cost of providing HCVs for the same families in substantially similar dwellings over the same period of time is less expensive than continuing federal assistance for the public housing development.

33.     Second, the assessment must include an analysis of the market value of the public housing development before and after rehabilitation and before and after conversion.

34.     Third, the assessment must include an analysis of the rental market conditions with respect to the likely success of households in using HCVs in the relevant housing market for

residents of the public housing community, including an assessment of the availability of decent and safe dwellings renting at or below the established payment standard.

35.     Fourth, the assessment must evaluate the impact of the conversion to HCVs on the neighborhood in which the public housing development is located.

36.     Fifth, the assessment must include a plan that identifies actions to be taken by the PHA to convert a public housing development to HCVs.

37.     The PHA must demonstrate through the conversion assessment that the conversion—(1) will not be more expensive than continuing to operate the housing project (or portion thereof) as public housing; (2) will principally benefit the residents of the public housing project (or portion thereof) to be converted, the PHA, and the community; and (3) will not adversely affect the availability of affordable housing in such community. 42 U.S.C. § 1437t(c).

38.     A PHA must submit a conversion plan for evaluation by the Secretary. Among other things, a conversion plan must "describe the conversion and future use or disposition of the project (or portion thereof) and include an impact analysis on the affected community." 42 U.S.C. § 1437t(d)(3).

39.     The Secretary "shall disapprove a conversion plan only if—(1) the plan is plainly inconsistent with the conversion assessment for the agency developed under [Section 22(b)]; (2) there is reliable information and data available to the Secretary that contradicts that conversion assessment; or (3) the plan otherwise fails to meet the requirements of this section." 42 U.S.C. § 1437t(e).

*Regulatory Framework*

40.     Pursuant to these statutory provisions, on September 17, 2003, HUD promulgated regulations implementing 42 U.S.C. § 1437t after notice and comment. These regulations are

codified at 24 C.F.R. part 972. *See* Voluntary Conversion of Developments from Public Housing Stock, 68 Fed. Reg. 54,612 (Sept. 17, 2003).

41.     Those regulations specify the requirements for PHAs to obtain HUD approval to convert a public housing development to tenant-based assistance. They likewise confirm that a conversion assessment is required for all voluntary conversions pursuant to 42 U.S.C. § 1437t. *See* 24 C.F.R. § 972.209(a).

42.     The conversion assessment is a "necessary condition for HUD approval of a conversion." 24 C.F.R. § 972.224.

43.     The conversion assessment must include five elements: (1) a cost analysis; (2) analysis of the market value; (3) analysis of rental market conditions; (4) an impact analysis; and (5) a conversion implementation setting forth a "description of any actions the PHA intends to take in converting the development." 24 C.F.R. § 972.218(a)–(e).

44.     The market analysis component must include an "analysis of the likely success of using tenant-based assistance for the residents of the public housing development . . . [and] … an assessment of the availability of decent, safe, and sanitary dwelling units rented at or below the applicable Section 8 payment standard."  24 C.F.R. § 972.218(c).

45.     The "impact analysis" component is a description of the "likely impact of conversion of the public housing development on the neighborhood in which the public housing is located . . . [including] the impact on "the availability of public housing in the neighborhood . . . [and] the impact on the concentration of poverty in the neighborhood." 24 C.F.R. § 972.218(d).

46.     In addition to the conversion assessment, the PHA must also complete a conversion plan. The conversion plan must include, among other things, "an impact analysis of the conversion on the affected community . . .  [which may] include the description that is

required as part of the conversion assessment," "a description of how the conversion plan is consistent with the findings of the conversion assessment undertaken in accordance with [24 C.F.R.] § 972.218," and a summary of "why the conversion assessment for the public housing project supports the three conditions necessary for conversion described in [24 C.F.R.] § 972.224." *See* 24 C.F.R. § 972.230(b), (c), & (f).

47.     HUD may not disapprove a conversion plan under the regulations unless (1) the conversion plan is plainly inconsistent with the conversion assessment; (2) there is reliable information and data available to the Secretary that contradicts the conversion assessment; or (3) the conversion plan is incomplete or otherwise fails to meet the requirements under § 972.230. 24 C.F.R. § 972.239.

*PIH Notice 2019-05*

48.     On March 21, 2019, HUD released PIH Notice 2019-05 ("PIH Notice" or "Notice") to Regional Managers, Office of Public Housing Directors, Program Center Coordinators, Public Housing Agencies, and Resident Management Corporations, titled, "Streamlined Voluntary Conversions of Last Remaining Projects of Small Housing Agencies."

49.     The PIH Notice outlined the SVC process to allow small PHAs with fewer than 250 public housing units to convert their remaining public housing units or complexes to Section 8 HCVs without completing the conversion assessment required by 42 U.S.C § 1437t(b)(1) and the agency's implementing regulations, 24 C.F.R. § 972.209.

50.     HUD did not issue a public notice or take public comment in advance of publishing the Notice.

Jefferson Parish and the Acre Road Development

*Historical Background*

51.    Jefferson Parish, like the broader Greater New Orleans metropolitan region, is historically racially segregated, a dynamic that is dramatically punctuated by the fact that the Mississippi River divides the Parish into two halves, locally known as the "East Bank" and the "West Bank."

52.    The East Bank of Jefferson Parish, which is on the same side of the Mississippi River as most of the land within the formal boundaries of the City of New Orleans, includes the majority-white suburbs of Metairie and Kenner.

53.    The West Bank of Jefferson Parish, where Marrero and Acre Road are both located, is more racially and ethnically diverse than the East Bank. It is also generally more integrated than many majority-Black parts of Orleans Parish.

54.    Marrero is an unincorporated, census-designated place on the West Bank of Jefferson Parish.

55.    Acre Road is a historically significant public housing development located at 1718 Betty Street in Marrero, Jefferson Parish, Louisiana. The Acre Road development was built by the HAJP in 1963 and 1964 to house low-income families in Jefferson Parish.

56.    The development comprises 100 buildings, including 199 individual housing units, that are a combination of one-, two-, three-, and four-bedroom units, and one non-dwelling unit.

57.    From its conception in 1959, Acre Road was controversial, facing myriad opposition, including the Marrero Lions Club, Parish Council, parish residents, and even state legislators, maligning the proposal as a cancer to the community and a threat to entrenched racial

segregation. Local representatives sought assurances from HUD's predecessor, the Housing and Home Finance Agency, that the planned development would never be forced to integrate.

58.     Acre Road opened as a community that was open to tenants of all races between 1964 and 1965, just months after the Civil Rights Act of 1964 was passed. The Civil Rights Act prohibited discrimination on the basis of race, color, religion, sex, and national origin in programs and activities receiving federal financial assistance.

59.     Opposition to the prospect of an integrated development, however, was strong enough to effectively limit the racial composition of the complex almost exclusively to Black residents.

60.     By 1973, approximately 99% of residents served by the development were Black.

61.     As of the date of this action, Black families comprise over 99% of Acre Road's population.

*The Marrero Tenants Organization, Inc.*

62.     The MTO was formed in 1973 to represent the interests of tenants at Acre Road.

63.     In its five decades of existence, the MTO has advocated for maintenance and repairs, protested rent and utility charges, organized against pollution and environmental conditions, participated in the civil rights movement, sued HAJP and HUD over restrictions to access to public meetings, and won a seat on the HAJP Board of Commissioners.

64.     The MTO is credited with expanding tenant participation in public housing administration nationwide. After the MTO won a resident seat on the Board of Commissioners, HUD rules were changed to mandate resident appointments to public housing authority boards.

65.     In 1984, due to the MTO's advocacy, Beverly Epps, an Acre Road resident, was named HAJP Executive Director. She became the first Black woman to be named executive director of a PHA anywhere in the country.

66.     MTO's half-century of advocacy on behalf of Acre Road's Black residents led to Acre Road receiving a Determination of Eligibility to be listed on the National Registry of Historic Places in December 2020.

*Ongoing Patterns of Segregation in Jefferson Parish, Marrero, and the Broader New Orleans Region*

67.     Jefferson Parish remains racially segregated to this day, just like the broader Greater New Orleans region.

68.     According to 2020 Decennial Census data, Jefferson Parish is occupied by 440,781 residents. Of those residents, 47.3% are white, 26.3% are Black, 4.4% are Asian, and 17.9% are Latino.

69.     According to 2020 Decennial Census data, nearly 52% of Black Jefferson Parish residents would need to move in order for the racial demographics in the Parish to be equally distributed, a measure that is referred to as the dissimilarity index.

70.     A similar pattern is reflected in the isolation index levels provided in the 2020 Decennial Census data. The isolation index measures a group's share of the overall population in a jurisdiction to the average neighborhood share for members of that same group. Put simply, the isolation index describes the degree to which a typical person of a particular race in a geographic area is exposed only to other residents of the same race.

71.     Jefferson Parish's Black isolation index is .48, meaning that the average Black resident of the Parish lives in a census tract where there are 20% more Black residents as compared to the parish as a whole.

72.     Segregation in Jefferson Parish is starkly apparent when the differences between the East Bank and the West Bank are considered.

73.     The map below is based on 2020 Decennial Census data.  This map, in which census tracts with more red dots have higher concentrations of Black residents, those with more beige dots have higher concentrations of white residents, those with more blue dots have higher concentrations of Latino residents, and those with more purple dots have higher concentrations of Asian residents, is illustrative of the degree of segregation between the East Bank and the West Bank.



1 Dot = 20

○ White, Non-Hispanic
● Black, Non-Hispanic
● Asian, Non-Hispanic
● Hispanic

Source: U.S. Census Bureau, 2020 Redistricting Data. Table P2.

74.    The patterns described above with respect to Jefferson Parish are consistent with the demographic patterns in the New Orleans–Metairie metropolitan statistical area ("MSA"), which includes the Orleans, Jefferson, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, and St. Tammany parishes. The MSA has approximately 1.3 million residents, 48.3% of whom are white non-Hispanic and 32.9% of whom are Black.

75.    The dissimilarity index in the MSA is .60, a level in excess of HUD's own threshold for high segregation.

76.    The isolation index for Black residents of the MSA is .60.

77.     HCV holders in Jefferson Parish overall are more likely to live in more racially segregated and lower-income areas due to the constraints on using HCVs in higher income and typically more heavily white areas.

78.     Weighted 2021 American Communities Survey 5-Year Estimates data show that the average HCV holder in Jefferson Parish lives in a census tract where 28.9% of households earn less than $25,000 per year, which is nearly 15% higher than the share of families at that income threshold in Jefferson Parish overall.

79.     Weighted 2020 Census data further show that the average HCV holder in Jefferson Parish lives in a census tract where 45.6% of residents are Black and 21.1% Latino. Put simply, the average Jefferson Parish HCV holders live in areas comprising 68% people of color, despite the fact the people of color only comprise 53% of the population of Jefferson Parish overall.

80.     Although HCV holders are not precluded from using their vouchers anywhere within Jefferson Parish, residential patterns of HCV holders nonetheless follow existing patterns of segregation along the East Bank-West Bank divide. Among the East Bank's most heavily white census tracts, several have no voucher holders at all, while others have concentrations of voucher holders of only 3% or 4%.

81.     By contrast, concentrations of voucher holders in majority-Black census tracts on the West Bank are frequently in excess of 30%.

82.     These patterns are similar to those found throughout the MSA where, as in Jefferson Parish, there are disproportionately high concentrations of voucher holders in predominantly Black neighborhoods.

*Need for Affordable Housing*

83.    Available affordable housing in Jefferson Parish falls far short of the total need, which means that the disproportionately Black low-income population faces considerable obstacles.

84.    HUD considers a tenant to be cost-burdened if they are paying more than 30% of income in housing costs.

85.    According to HUD's 2015–2019 Comprehensive Housing Affordability Study data, 43% of Black households in Jefferson Parish are cost-burdened. By contrast, just 23% of white households are cost-burdened.

86.    Despite this clear need, HAJP proposes to demolish Acre Road, one of the last remaining permanently affordable public housing sites within Jefferson Parish.

*Deteriorating Living Conditions at Acre Road*

87.    Over the last decade, physical conditions of Acre Road's housing have declined significantly.

88.    In 2015, an estimate by a private company pursuant to HUD's Green Physical Needs Assessment ("PNA") program placed the cost of rehabilitating Acre Road at approximately $21.4 million. It estimated approximately $1.45 million for immediate repairs.

89.    HAJP has not conducted any significant capital improvement projects to address the issues identified by the 2015 PNA despite HAJP's legal obligation under 24 C.F.R. § 5.703 and 24 C.F.R. § 965.601 to maintain Acre Road in habitable condition.

The Acre Road SVC Application

90.    On October 23, 2020, HAJP submitted to HUD an SVC application and a conversion plan for all 199 public housing units in HAJP's inventory.

91.     The SVC application did not include a conversion assessment. The conversion plan contains no market analysis or analysis of the ability of Acre Road residents to use housing vouchers in Jefferson Parish.

92.     The conversion plan contains an "Impact Analysis" that states the neighborhood surrounding Acre Road will be positively impacted by the SVC because "[t]he development of new, affordable housing and low-density commercial uses in this area will serve to increase the stock of affordable housing for Jefferson Parish as the redevelopment of the Acre Road Project will allow for a greater density of residential uses than what is currently existing on site."

93.     However, the conversion plan contains no specific commitment to redevelop Acre Road.

94.     The impact analysis contains no discussion of the impact of the SVC on current Acre Road residents or any meaningful analysis of the impact on the concentration of poverty in the neighborhood.

95.     The SVC application does not contain any data to support a conclusion that the rental market local to Acre Road residents has sufficient availability for HCV holders to obtain housing comparable to their current homes at Acre Road. Upon information and belief, HUD staff did not request that HAJP provide data to confirm that sufficient private rental housing existed in local communities to support Acre Road residents.

96.     Upon information and belief, HUD did not request that HAJP provide data on the voucher success rate in Jefferson Parish.

97.     On March 9, 2023, HUD formally approved the Acre Road SVC Plan.

98.     HUD's March 9, 2023, approval found the conversion will "improve the neighborhood by allowing the HAJP and its partners to redevelopment [*sic*] of the site as new

housing, either through substantially rehabilitation [*sic*] of the existing units or demolition of the existing units and construction of new units."

99.      HUD's March 9, 2023, approval further provides that "there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based [HCV/TPV] . . . assistance." The approval cites no data to support this assertion.

100.     HUD's March 9, 2023, approval incorporates an earlier finding by HUD's Region VI Fair Housing and Equal Opportunity Office that found no civil rights concerns with the Acre Road SVC application.

101.     HUD's March 9, 2023, approval authorizes HAJP to immediately apply for 199 TPVs and issue 90-day notices to vacate to Acre Road residents.

102.     Upon information and belief, HAJP has not issued any 90-day notices to vacate to Acre Road residents.

103.     Approximately 50 households remain at Acre Road as of this filing.

*Opposition to the Acre Road SVC*

104.     On or about July 15, 2021, in part to mitigate resident safety concerns, HUD authorized HAJP to distribute HCVs to Acre Road tenants seeking to move pending approval of the SVC application.

105.     At the time, approximately 146 of the 199 units on site were occupied.

106.     Acre Road tenants who were issued vouchers immediately encountered significant difficulties using their vouchers in the private rental market.

107.     On October 8, 2021, MTO President Darin Collins submitted a letter to the HUD New Orleans field office, expressing concern that of the 117 vouchers issued to Acre Road

residents by that date, "only a handful" of residents had been able to use the vouchers to find suitable replacement housing due to a severe housing shortage in Jefferson Parish aggravated by Hurricane Ida.

108.    On November 22, 2022, the MTO, through counsel, sent a letter to HAJP, HUD, and Louisiana Housing Corporation ("LHC") to oppose the SVC.

109.    MTO's letter cited significant civil rights concerns arising out of fair housing testing and data analysis in connection with the proposed SVC. MTO's investigation revealed a substantial likelihood that Acre Road residents who had been issued HCVs would encounter significant difficulties using those vouchers in the Jefferson Parish housing market. Acre Road residents and families would likely be either displaced from Jefferson Parish entirely or confined to rentals located in equally if not more racially segregated and high-poverty areas. The MTO also objected to HAJP's failure to conduct a market analysis, part of the conversion assessment required by 42 U.S.C. § 1437t.

110.    On February 28, 2023, the MTO sent another letter to HAJP, HUD, and LHC restating its opposition and citing data showing individuals issued HCVs only have a 57% chance of successfully obtaining a lease in Jefferson Parish with their vouchers.

111.    At various times since HAJP began meeting with Acre Road residents about the proposed SVC conversion beginning in or around January 2020, MTO members have expressed concerns about tenants' ability to participate in the voucher program due to lack of income and tenants' inability to afford appliances because some landlords in the private rental market require tenants to purchase their own appliances.

112.    MTO members also requested that HAJP provide property listings of available housing where they could use HCVs. In response, HAJP stated it did not have a list of properties

and recommended that tenants use "gosection8.com," Zillow, and Trulia to find available housing.

113.    On January 26, 2023, HAJP convened meetings with Acre Road residents to discuss the status of the SVC Plan and next steps. At these meetings, dozens of Acre Road tenants shared their inability to find housing with HCVs due to high market rents and/or discrimination against voucher holders. Defendants' March 9, 2023, approval of the Acre Road SVC application did not address any of MTO's concerns.

*Jolene Anderson*

114.    In 2021, HAJP provided Ms. Anderson with an HCV voucher for a two-bedroom unit. The original voucher issued to her as part of the SVC plan did not account for her mother, who serves as Ms. Anderson's live-in caregiver.

115.    Ms. Anderson understood that she needed to move to avoid homelessness because Acre Road's SVC Plan would be approved and the development would be closed.

116.    It immediately became clear to Ms. Anderson that the HCV program would be more expensive for her than residing in public housing. In the HCV program, her rent portion could be up to 40% of her income, as opposed to 30% in public housing.

117.    In addition, because Ms. Anderson recently returned to work after a period of unemployment due to her disability, the PHA did not include her earned income in their calculation of her out-of-pocket rental portion for her public housing unit. But she was told that her income *would* be counted in the HCV program.

118.    Most of the units she viewed did not include utilities, unlike her unit at Acre Road. She would be responsible for paying those herself with a small utility allowance.

119.    Some properties she viewed did not have their own appliances, so she would have to purchase them.

120.    Many of the places had visible maintenance issues like those at issue at Acre Road.

121.    Ms. Anderson tried to find housing with her voucher. However, everywhere she looked was more expensive than the maximum rent she was permitted on her voucher. Her maximum rent was between $1,100 and $1,200 per month, but all of the two bedrooms she saw cost more than $1,300 per month.

122.    In the limited circumstances where a landlord did accept vouchers, the housing options tended to be located in neighborhoods with high levels of crime and pervasive poverty.

123.    Because of these significant roadblocks to securing housing, Ms. Anderson failed to find housing within the authorized time period. Her voucher expired before she could rent a new unit.

124.    Ms. Anderson's voucher was reissued in early 2023 as a three-bedroom voucher.

125.    Ms. Anderson has attempted to use her three-bedroom voucher, but still cannot locate a place she can afford. Her voucher is worth $1,646, but the three bedrooms she looked at cost more than her voucher.

126.    In total, Ms. Anderson contacted over 30 prospective rentals, with no success.

127.    Until recently, Ms. Anderson had no vehicle and relied on Uber to view prospective units. The $75 monthly stipend that HAJP provides her to assist with relocation expenses is insufficient because it costs her up to $40 round-trip just to view one unit. As a result, she was forced to lease a vehicle through Uber.

128.    Ms. Anderson relies on the community she has at Acre Road. She has a relationship with her neighbors and local business owners. She is close to grocery stores and public transportation. When her 18-year-old son goes to the corner store, the owners know him. She feels safe.

129.    Ms. Anderson has no family in the area to stay with. She cannot afford to pay rent on the private market.

130.    If HAJP were to issue a 90-day notice to vacate following HUD's March 9, 2023, approval, and Ms. Anderson remains unsuccessful in locating housing before the deadline, she and her family will have to stay in a homeless shelter.

*Candace Johnson*

131.    In 2021, HAJP issued Ms. Johnson a two-bedroom HCV.

132.    Ms. Johnson started looking for housing for herself and her 15-year-old daughter but quickly found that the maximum price listed on the voucher was less than what landlords were asking for a two-bedroom unit.

133.    She found that landlords in certain areas of the East Bank, like Metairie, and certain plurality-white areas of the West Bank, like Gretna, would not accept vouchers at all.

134.    The only properties she could find whose landlords would accept vouchers were in worse condition than her unit at Acre Road and were in areas with high crime rates. In total, Ms. Johnson looked at over 25 rental units with no success.

135.    Her voucher eventually expired.

136.    Ms. Johnson wants to live near Acre Road because her daughter attends a good high school in the area and is excelling. If she is forced to move to a new area, her daughter will have to switch schools. In addition, Ms. Johnson currently lives near her job, where she works

long hours as a supervisor at Sam's Club. Moving to a new area will disrupt her job and increase her transportation costs. If HAJP issues a 90-day notice to vacate as authorized by HUD's March 9, 2023, approval, and Ms. Johnson remains unsuccessful in locating housing before the deadline, she and her daughter will have to move in with her son, whose family occupies a two-bedroom apartment. Because Ms. Johnson's son's family occupies all the rooms in the apartment, Ms. Johnson and her high school-aged daughter will have to stay in her son's living room.

*Kedra James*

137.    Ms. James was issued a one-bedroom voucher at the end of 2021. She began looking for housing immediately.

138.    Ms. James looked at about 40 units all over the West Bank and the East Bank of Jefferson Parish. She also looked at six units in Orleans Parish.

139.    The landlords of the units about which she inquired either did not accept HCVs or charged rents that were too expensive for her voucher.

140.    Ms. James has finally located a unit in the Central City neighborhood of Orleans Parish. The area where the unit is located has high rates of crime and poverty. The crime is worse than in the Acre Road neighborhood. There are frequent shootings in the area where she is moving.

141.    Ms. James will be responsible for payment of water and sewer charges at the Central City unit, expenses she does not have to pay at Acre Road. Ms. James wants Acre Road to be redeveloped so that she can return to her home and community.

Defendants' Approval of HAJP's SVC Application Has Discriminatory Housing Effects on Acre Road Residents

142.    The FHA obligates HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of the [the FHA.]." 42 U.S.C. § 3608(e)(5).

143.    The FHA expressly forbids discriminatory practices that "make unavailable or deny, a dwelling to any person because of race." 42 U.S.C. § 3604(a).

144.    Current market conditions functionally confine Acre Road residents with vouchers to rental opportunities in census tracts that are more segregated.

## CLAIMS FOR RELIEF

145.    The APA requires federal agencies to publish a "general notice of proposed rulemaking . . . [to] give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments, [and] [a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(b)–(c).

146.    The APA requires courts to hold unlawful and set aside agency final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Further, under the APA, Section 706(2)(C), the Court may "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## COUNT I

### Defendants Improperly Promulgated Notice PIH 2019-05 Absent Compliance with Notice and Comment Procedures Required for Enacting Rules

#### (Violation of 5 U.S.C. § 553(b))

147.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

148.    Promulgation of Notice PIH 2019-05 was "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

149.    Defendants promulgated Notice PIH 2019-05 without notice and without opportunity for comment.

150.    Defendants' promulgation of Notice PIH 2019-05 was in violation of, and should be vacated under, 5 U.S.C. § 553(b).

## COUNT II

### Defendants' Notice PIH 2019-05 Conflicts with the Housing Act and Fair Housing Act

#### (Violation of 5 U.S.C. § 706(2)(A) )

151.    Plaintiffs repeat and reallege by reference the allegations in the preceding paragraphs.

152.    Notice PIH 2019-05 is a final agency action.

153.    The waiver of the conversion assessment by Notice PIH 2019-05 conflicts with the framework set forth in 42 U.S.C. § 1437t requiring PHAs to conduct conversion assessments in connection with applications for voluntary conversions of public housing developments.

154.     The waiver of the conversion assessment by Notice PIH 2019-05 conflicts with Defendants' mandate to affirmatively further fair housing in the administration of programs and activities relating to housing and urban development, *see* 42 U.S.C. § 3608(e)(5).

155.     Defendants' issuance of Notice PIH 2019-05 is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).

## COUNT III

### HUD's Approval of the Acre Road SVC Application Is Arbitrary and Capricious

(Violation of 5 U.S.C. § 706(2)(A))

156.     Plaintiffs repeat and reallege by reference the allegations in the preceding paragraphs.

157.     Defendants' approval of the Acre Road SVC application is a final agency action.

158.     Defendants failed to conduct a market analysis prior to concluding that there were no civil rights concerns raised by the Acre Road SVC. Defendants' approval of the Acre Road SVC application is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).

## COUNT IV

### Defendants' Approval of the Acre Road SVC Breached Their FHA Obligations

(Violation of 5 U.S.C. § 706(2)(C))

159.     Plaintiffs repeat and reallege by reference the allegations in the preceding paragraphs.

160.     Defendants' approval of the Acre Road SVC application is a final agency action.

161.    Defendants ignored data available to them concerning disproportionate adverse impact that the Acre Road conversion will have on its Black residents.

162.    Defendants ignored data available to them that provides that the Acre Road conversion will have the effect of perpetuating residential racial segregation within Jefferson Parish by displacing Acre Road's Black residents into areas with larger concentrations of Black residents, and higher poverty rates, than Marrero.

163.    Defendants' approval of the Acre Road SVC application fails their duty to affirmatively further fair housing in the administration of programs and activities relating to housing and urban development, *see* 42 U.S.C. § 3608(e)(5).

164.    Defendants' approval of the Acre Road SVC application is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and therefore is in violation of 5 U.S.C. § 706(2)(C).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to:

1.    Declare that Notice PIH 2019-05 is a substantive and legislative rule, improperly promulgated without notice and comment in violation of the Administrative Procedure Act. 5 U.S.C. § 553(b)–(c);

2.    Declare that Notice PIH 2019-05 conflicts with the authorizing statute, 42 U.S.C. § 1437t, and is unlawful because it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

3.    Declare that Defendants' approval of the Acre Road SVC application without a market analysis required by a conversion assessment violated the Administrative Procedure Act. 5 U.S.C. § 706(2)(A), (C);

4.      Declare that Defendants' approval of the Acre Road SVC application was contrary to their mandate under the Fair Housing Act. 5 U.S.C. § 706(2)(A), (C);

5.      Vacate and set aside Notice PIH 2019-05;

6.      Vacate and set aside Defendants' approval of the Acre Road SVC application;

7.      Enjoin the March 9, 2023, approval of the Acre Road SVC, and all procedures, actions, and timelines authorized in the March 9, 2023 approval letter, from taking effect;

8.      Enjoin Defendants from taking any action to further HAJP's implementation of the Acre Road SVC, including, but not limited to:

     a.  Approving the issuance of 90-day notices to vacate to remaining Acre Road tenants;

     b.  Approving or issuing Housing Choice Vouchers or Tenant Protection Vouchers to HAJP, its successors, and/or their third-party contractors for the purpose of forcing the relocation of remaining Acre Road tenants;

     c.  Communicating to remaining Acre Road residents that moving is required;

     d.  Suggesting, encouraging, or soliciting the relocation of any remaining residents of Acre Road;

     e.  Approving demolition or destruction of any structures at Acre Road; and/or

     f.  Taking any action, including approvals or disapprovals of PHA action, that would have the effect of further causing the deterioration of the site or lead to its demolition.

9.      Order Defendants to:

     a.  Approve a plan for the revitalization of the Acre Road housing projects that:

          i.   does not have a disparate impact on Black families; and

       ii.  does not result in the forced permanent displacement of the Black families

           currently residing at Acre Road to more segregated, higher poverty areas.

   b.  Ensure that HAJP complies with HUD regulations requiring that public housing

     developments be maintained in habitable condition consistent with 24 C.F.R.

     § 5.703 and 24 C.F.R. § 965.601.

10.     Award Plaintiffs their costs of suit and expenses, including reasonable attorneys' fees and

expert witness fees; and

11.     Grant other relief as this Court may deem just and proper.


Dated: May 3, 2023              Respectfully submitted,


                 /s/ Jehan A. Patterson

                 **DEBEVOISE & PLIMPTON LLP**
                 Jehan A. Patterson (D.C. Bar No. 1012119)
                 801 Pennsylvania Avenue N.W., Suite 500
                 Washington, D.C. 20004
                 Telephone: (202) 383-8000
                 Facsimile: (212) 383-8118
                 Email: jpatterson@debevoise.com

                 Anu Chugh (N.Y. Bar No. 6023667 - AD3) *(pro hac vice application pending)*
                 66 Hudson Boulevard
                 New York, NY 10001
                 Telephone: (212) 909-6000
                 Facsimile: (212) 909-6836
                 Email: achugh@debevoise.com

                 **LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
                 Thomas Silverstein (D.C. Bar No. 1552406)
                 Malcolm Peyton-Cook (D.C. Bar No. 90004726)
                 Anneke Dunbar-Gronke (D.C. Bar No. 90008670)
                 1500 K Street NW, Suite 900
                 Washington, D.C. 20005

Telephone: (202) 662-8600
Facsimile: (202) 783-0857
Email: tsilverstein@lawyerscommittee.org
      mpeyton-cook@lawyerscommittee.org
      adunbar-gronke@lawyerscommittee.org

**SOUTHEAST LOUISIANA LEGAL
SERVICES**

Hannah Adams (L.A. Bar No. 36343) *(pro hac vice
application pending)*
1340 Poydras St, #600
New Orleans, LA 70112
Telephone: (504) 529-1000 x. 258
Facsimile: (504) 596-2241
Email: hadams@slls.org