UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOLENE ANDERSON, et al.,

       Plaintiffs,

       v.

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.,

       Defendants.

Civil Action No. 23-1259 (DLF)

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

Table of Authorities ................................................................................................. iii

Introduction ........................................................................................................... 1

Background ............................................................................................................ 4

    I.      Statutory and Regulatory Framework ...................................................... 4

    II.     Acre Road Conversion ............................................................................. 9

Standard of Review ............................................................................................. 11

    I.      Preliminary Injunctive Relief ................................................................. 11

    II.     Administrative Procedures Act ............................................................... 12

Argument ............................................................................................................ 13

    I.      Plaintiffs Will Not Suffer Imminent Irreparable Harm In The Absence Of Injunctive Relief ................................................................................. 14

    II.     Plaintiffs Are Not Likely To Succeed On The Merits .......................... 16

            A.     Plaintiffs Lack Standing ................................................................. 16

            B.     The Discretionary Decision Not to Enforce the Conversion Assessment Requirement for Acre Road Is Unreviewable for Lack of Law to Apply. 21

            C.     Approval of the Conversion Approval Was Not Contrary to Law Nor Arbitrary Nor Capricious ............................................................... 23

            D.     Issuance of the 2019 Notice Was Not Subject to Notice and Comment Rulemaking, Is Not Reviewable, and, in Any Event, Was Neither Arbitrary Nor Capricious Nor Contrary to Law ...................................... 32

    III.    The Public Interest and the Equities Strongly Favor the Department .................. 42

Conclusion ......................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) ........................................................................... 14

*AFL-CIO v. NLRB*,
  57 F.4th 1023 (D.C. Cir. 2023) ......................................................................... 36

*Allen v. N.Y. City Hous. Auth., Civ. A.*
  No. 10-0168, 2010 WL 1644956 (S.D.N.Y. Apr. 20, 2010) ............................... 16

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................................................ 16

*Am. Disabled for Attendant Programs Today v. Dep't of Hous. & Urban Dev.*,
  170 F.3d 381 (3d Cir. 1999) .............................................................................. 22

*Animal Legal Def. Fund v. Perdue*,
  872 F.3d 602 (D.C. Cir. 2017) ........................................................................... 13

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  745 F.2d 677–84 (D.C. Cir. 1984) ..................................................................... 13

*AT&T Corp. v. FCC*,
  220 F.3d 607 (D.C. Cir. 2000) ..................................................................... 12, 30

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
  339 F. Supp. 2d 52 (D.D.C. 2004) ..................................................................... 35

*Butler v. Barnhart*,
  353 F.3d 992 (D.C. Cir. 2004) ........................................................................... 13

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 11, 14

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ........................................................................................... 24

*Chi. & Grand Trunk R. Co. v. Wellman*,
  143 U.S. 339 (1892) ........................................................................................... 16

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................. 14

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996) ................................................................. 22, 23, 40

*Colo. Wild Horse v. Jewell*,
  130 F. Supp. 3d 205 (D.D.C. 2015) ................................................................... 42

*Conf. Grp., LLC v. FCC,*
   720 F.3d 957 (D.C. Cir. 2013) .................................................................... 37

*Ctr. for Biological Diversity v. McAleenan,*
   404 F. Supp. 3d 218 (D.D.C. 2019) ........................................................... 35

*Damus v. Nielsen,*
   Civ. A. No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ............... 12

*Davis v. Pension Benefit Guar. Corp.,*
   571 F.3d 1288 (D.C. Cir. 2009) ................................................................ 12

*Defs. of Wildlife v. Chertoff,*
   527 F. Supp. 2d 119 (D.D.C. 2007) ........................................................... 35

*Doe v. Mattis,*
   889 F.3d 745 (D.C. Cir. 2018) .................................................................. 14

*Drake v. FAA,*
   291 F.3d 59 (D.C. Cir. 2002) .................................................................... 21

*Ex parte Crow Dog,*
   109 U.S. 556 (1883) ..................................................................... 33-34, 36

*Fisheries Survival Fund v. Jewell,*
   236 F. Supp. 3d 332 (D.D.C. 2017) ........................................................... 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.,*
   528 U.S. 167 (2000) ........................................................................ 17, 20

*Goodman v. FCC,*
   182 F.3d 987 (D.C. Cir. 1999) .................................................................. 37

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ........................................................................ 21, 22

*Hi-Tech Pharmacal Co. v. FDA,*
   587 F. Supp. 2d 13 (D.D.C. 2008) ............................................................ 12

*Hubbard v. United States,*
   496 F. Supp.2d 194 (D.D.C. 2007) ........................................................... 43

id. at § 1437c-1 ...................................................................................... 4

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 11

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 16, 17

*McGrath v. HUD,*
   722 F. Supp. 902 (D. Mass. 1989) ............................................................ 42

*Michigan v. EPA*,
  576 U.S. 743 (2015) ........................................................................................... 13

*Moore v. Cap. Realty Grp., Inc.*,
  Civ. A. No. 21-1099, 2022 WL 2352554 (W.D.N.Y. June 30, 2022) .................... 16

*Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................... 12, 13, 30, 32

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
  489 F.3d 1221 (D.C. Cir. 2007) ..................................................... 24, 25

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
  Civ. A. No. 15-1582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016) ........ 14, 15

*Nitro-Lift Techs., L.L.C. v. Howard*,
  568 U.S. 17 (2012) ....................................................................... 33, 36

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 42

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759–66 (1969) ............................................................... 37, 38

*Nw. Bank Minn. Nat'l Ass'n v. FDIC*,
  312 F.3d 447 (D.C. Cir. 2002) ................................................................. 36

*Oliva v. Brookwood Coram I, LLC*,
  Civ. A. No. 14-2513, 2015 WL 13745439 (E.D.N.Y. Nov. 30, 2015) ................ 15

*Oryszak v. Sullivan*,
  576 F.3d 522 (D.C. Cir. 2009) ................................................................. 21

*Pursuing Am.'s Greatness*,
  831 F.3d ..................................................................................................... 42

*Samma v. Dep't of Def.*,
  486 F. Supp. 3d 240 (D.D.C. 2020) ........................................................... 35

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................... 42

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ................................................................................. 17

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) ................................................................. 43

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ................................................................. 12

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................................. 16

*Sluss v. Dep't of Just.*,
    898 F.3d 1242 (D.C. Cir. 2018) ............................................................................ 21

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................................. 20

*Stewart v. McPherson*,
    955 F.3d 1102 (D.C. Cir. 2020) ............................................................................ 21

*Town of Barnstable v. FAA*,
    659 F.3d 28 (D.C. Cir. 2011) ................................................................ 17, 18, 20

*United States v. Est. of Romani*,
    523 U.S. 517 (1998) ............................................................................................... 36

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................................... 21

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................... 43

*Weyerhaeuser Co. v. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) ............................................................................................ 22

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) .................................................................................. 11, 14, 45

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ................................................ 14, 15

**Statutes and Regulations**

5 U.S.C. § 551 ........................................................................................................ 37, 39

5 U.S.C. § 553, Section 1437t ....................................................................................... 36

5 U.S.C. § 701 ................................................................................................. 21, 32, 40

5 U.S.C. § 706 .................................................................................................... 12, 27

42 U.S.C.  § 3604 .......................................................................................................... 27

42 U.S.C. § 1437 .............................................................................................................. 4

42 U.S.C. § 1437c-1 ......................................................................................................... 4

42 U.S.C. § 1437f .......................................................................................................... 4-5

42 U.S.C. § 1437t ............................................. 19, 20, 26, 34, 36, 40, 41, 5, 6, 8

42 U.S.C. § 2000d ............................................................................................................ 4

42 U.S.C. § 3535 ............................................................................................................ 35

42 U.S.C. § 3601 ............................................................................................................ 4

42 U.S.C. § 3608 ................................................................................................... 23, 24

42 U.S.C. § 13603 ...................................................................................................... 35

42 U.S.C. § 13661 ...................................................................................................... 35

24 C.F.R. part 972, subpart B ...................................................................................... 5

24 C.F.R. § 5.151 ................................................................................................. 24, 26

24 C.F.R. § 100.500 ...................................................................................... 27, 28, 29

24 C.F.R. § 972.215 ..................................................................................................... 8

24 C.F.R. § 972.239 ................................................................................................ 33, 8

24 C.F.R. § 982.302 ..................................................................................................... 5

24 C.F.R. §§ 982.1 ....................................................................................................... 5

24 CFR 972.218 ...................................................................................................... 6, 7

24 CFR. 972.218 ........................................................................................................ 34

Defendants Department of Housing and Urban Development ("Department") and Marcia Fudge, in her official capacity as Secretary of Housing and Urban Development ("Secretary" and, with the Department, "Defendants"), by and through undersigned counsel, respectfully oppose the motion for preliminary injunction filed by Plaintiffs Jolene Anderson, Candace Johnson, Kedra James, and Marrero Tenants Organization (collectively, "Plaintiffs") ("Plaintiffs' Motion").[1]

## INTRODUCTION

Plaintiffs' Motion offers the Court two choices.  On the one hand, the Court could enjoin for an indeterminate period the final steps for the conversion of the Acre Road public-housing project—a property that is dangerously infested with mold, adjacent to a sewage treatment plant, and plagued with increasing crime due to approximately 160 out of 200 dwelling units being vacant as a result of a Public Housing Authority process to provide suitable housing alternatives for the residents.  On the other hand, the Court could deny the Motion, allowing the conversion to continue and affording the remaining Acre Road families with assistance—including coveted housing choice vouchers (usable anywhere in the country) and other financial aid—to find and move to homes that not only meet their preferences but are decent, safe, and sanitary and otherwise comply with the requirements of the Housing Act.

As more fully explained below, the proper choice—and the one that truly benefits the remaining residents of Acre Road—is to deny Plaintiffs' Motion.  First, no provisional relief is warranted because no Plaintiff is in eviction proceedings or is otherwise at risk of suffering irreparable harm connected to the alleged unlawful acts.  Plaintiffs speculate that they could any

---

[1]    Plaintiffs submitted a Memorandum of Points and Authorities of Law in support of their Motion.  ECF No. 3-1.  This document is referred to herein as "Plaintiffs' Brief."  Among the documents provided in support of Plaintiffs' Motion are the Declaration of Jolene Anderson, ECF No. 3-4 ("Anderson Decl."); the Declaration of Candace Johnson, ECF No. 3-5 ("Johnson Decl."); and the Declaration of Kendra James, ECF No. 3-6 ("James Decl.").

day be issued notices telling them that eviction proceedings will commence in ninety days, but (a) no such notices have issued; (b) evidence contradicts the "any day" characterization; and (c) even if 90-day eviction notices ever are issued, actual eviction proceedings would not start until at least 90 days thereafter.  Moreover, delaying the implementation of the conversion harms the remaining residents by continuing to subject them to substandard living conditions. Indeed, Plaintiffs have not demonstrated that they will suffer irreparable harm without their requested preliminary relief. Thus, Plaintiffs' Motion should be denied, and this case should be briefed under a normal summary judgment schedule.

As shown below, Plaintiffs also are not likely to succeed on the merits of their claims.  As a threshold matter, they do not have standing either (a) to challenge the Department's approval of the streamlined voluntary conversion application submitted by the Housing Authority of Jefferson Parrish ("Housing Authority") to convert the Acre Road public housing project to the housing choice voucher program, or (b) to challenge the Office of Public and Indian Housing's PIH Notice 2019-05, Streamlined Voluntary Conversions of Last Remaining Projects of Small Public Housing Agencies ("2019 Notice"), https://www.hud.gov/sites/dfiles/PIH/documents/PIH-2019-05.pdf, which waives the requirement that a conversion assessment be conducted for certain public housing projects if small housing authorities seek to convert public housing to housing choice vouchers. In both instances, Plaintiffs' alleged injuries are not traceable to the actions they challenge, and their alleged injuries would not be redressed by requiring the Department to direct the Housing Authority to conduct a full conversion assessment in connection with the Acre Road project conversion or by revoking the 2019 Notice.

In addition, even if Plaintiffs had standing, these decisions are not reviewable under the Administrative Procedures Act ("APA") because they were committed to the Department's

discretion by Congress.  Also, if either challenged decision were reviewable under the APA, as explained below, neither violates relevant law nor was the result of arbitrary and capricious actions by the Department.

Finally, the balance of harms weighs against issuance of a preliminary injunction because the Department acted in the public's interest when it approved the Acre Road conversion plan. Similarly, the Department acted in the public interest and was merely carrying out Congressional objectives when it issued the 2019 Notice providing a streamlined conversion process for certain projects.  As explained in the conversion plan, the Department's approval, and the Department's declarant, the Acre Road housing project suffers from severe mold problems caused by recurrent flooding that creates ongoing health hazards.  In addition, the adjacent sewage treatment plant causes noxious odors that permeate the housing complex.  Moreover, as occupancy rates have dropped, the project has experienced increased safety and security issues.  All these factors fully supported the Housing Authority's request and the Department's approval, which in turn serve the interests of the tenants and enhance their ability to find alternative suitable housing.

Further, preliminary relief that vacates and sets aside the 2019 Notice would harm public housing families nationwide by making it harder for them to transfer from the Public Housing Program to the Voucher Program, a program designed to foster tenant choice and which furthers the Department's goal of deconcentrating poverty and increasing healthy housing opportunities in non-impacted communities.  Vacatur of the 2019 Notice would harm small housing authorities nationwide by limiting their options for conversion to the Voucher Program, which reduces their administrative burden and offers more reliable Congressional funding.  It also serves the public interest to allow the Department to act with the discretion provided by Congress to support local

housing authorities' determinations about how best to allocate limited taxpayer funds for public housing and what is best for their local communities.

## BACKGROUND

### I.     Statutory and Regulatory Framework

The United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* ("1937 Act"), was enacted, in part, "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." *Id.* § 1437(a)(1)(A).  Congress directed the Department to give well-performing Public Housing Authorities "the maximum amount of responsibility and flexibility in program administration." *Id.* § 1437(a)(1)(C).  The 1937 Act authorizes the two largest federally assisted housing programs:   the public housing program under Section 9 (42 U.S.C. § 1437g, "Public Housing Program") and the housing choice voucher program under Section 8 (42 U.S.C. § 1437f(o), "Voucher Program").   In the Public Housing Program, the Department provides federal aid to state and local housing authorities that own, manage, and operate the housing projects where eligible families live.  *See* HUD, HUD's Public Housing Program, https://www.hud.gov/topics/rental_assistance/phprog.   Unlike the Voucher Program, tenants are admitted to a particular public housing project unit and their assistance is tied to that unit; they cannot take it with them and use it to go live somewhere else.  Local public housing authorities certify in an annual plan submitted to the Department, *id.* at § 1437c-1(b), that they will abide by all laws and regulations that apply to their programs, as well as maintain compliance with the Fair Housing Act (42 U.S.C. § 3601 *et seq.*), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), and all other applicable civil rights laws. 42 U.S.C. § 1437c-1(d)(16).

In the Voucher Program, which is also locally administered by housing authorities using federal aid from the Department, housing authorities give program participants Vouchers that help them look for and obtain a rental unit in the private market with a private landlord. 42 U.S.C.

§ 1437f(f)(7), (o); 24 C.F.R. § 982.302(a).  This tenant-based assistance is tied to the tenant, not the unit—Vouchers allow tenants to move and keep their assistance—and Voucher holders can use their Voucher "anywhere in the United States in the jurisdiction of a [housing authority] that runs a Voucher [P]rogram." 24 C.F.R. §§ 982.1(b), 982.302, 982.353(b), 982.354, 982.355.  When a family is first selected to participate in the Voucher Program, the family gets a variety of counseling from the local housing authority, including on "the advantages of areas that do not have a high concentration of low-income families" and a "list of landlords known to the [Public Housing Authority] who may be willing to lease a unit to the family or other resources . . . known to the [Public Housing Authority] that may assist the family in locating a unit. [Public Housing Authorities] must ensure that the list of landlords or other resources covers areas outside of poverty or minority concentration." *Id.* §§ 982.301(a)(1)-(3), (b)(4), (b)(9)-(11), (b)(15).

As part of the Quality Housing and Work Responsibility Act of 1998, Congress amended Section 22 of the 1937 Act (42 U.S.C. § 1437t *et seq.*) and authorized local housing authorities to convert Public Housing to Vouchers,[2] declaring:

> Congress finds that…the interests of low-income persons, and the public interest, will best be served by a reformed public housing program that— vests in public housing agencies that perform well the maximum feasible authority, discretion, and control with appropriate accountability to public housing residents, localities, and the general public.

Veterans Affairs and HUD Appropriations Act, 1998, Pub. L. No. 105-276, 112 Stat. 2461, § 502(a)(5)(C) (1998).

In 2003, the Department promulgated implementing regulations at 24 C.F.R. part 972, subpart B.  *Id.*  The default rule is that a conversion application must include a "conversion

---

[2]  *See* Final Rule, Voluntary Conversion of Developments From Public Housing Stock, 68 Fed. Reg. 54612, 54612 (Sept. 17, 2003), *available at* https://www.govinfo.gov/content/pkg/FR-2003-09-17/pdf/03-23027.pdf.

assessment." 42 U.S.C. § 1437t(b).  Under the statute, a conversion assessment (when required) must include a significant amount of information and analysis, including "a cost analysis, market value analysis, rental market analysis, and an impact analysis on the neighborhood."  2019 Notice. Accordingly, Congress also explicitly provided that:

> At the discretion of the Secretary or at the request of a public housing agency, the Secretary may waive *any or all* of the requirements of paragraph (1) or (3) [regarding conversion assessment] or otherwise require a streamlined assessment with respect to *any public housing project or class of public housing projects*.

42 U.S.C. § 1437t(b) (emphasis added).

The Department exercised this waiver authority in 2014 in the Office of Public and Indian Housing's Notice PIH 2014-14 ("2014 Notice"), https://www.hud.gov/sites/documents/PIH2014-14.PDF, and "waive[d] the cost analysis described at 42 U.S.C. 1437t(b)(1)(A)" for certain projects, "[o]ut of a recognition that the regulatory burden on small [Public Housing Authorities] is out of proportion to the federal resources available to them"; and instead made available for those projects "a conversion assessment that streamlines the cost analysis."  2014 Notice at 1-2.

In the 2019 Notice, which Plaintiffs challenge in this litigation, the Department advised its employees and program participants that it "exercise[d] its authority under Section 22(b)(3) of the 1937 Act to waive the conversion assessment for small [Public Housing Authorities] as described at Sections 22(b)(1)(A)-(E) and 24 CFR 972.218(a)-(e)."  2019 Notice at 2.

The 2019 Notice's waiver of the conversion assessment has limited applicability because it applies only if all the following conditions exist:

1)  A small Housing Authority (i.e., 250 units or less);
2)  Has submitted an application for Streamlined Voluntary Conversion; and
3)  Has confirmed its intent to close out its entire public housing program.

2019 Notice at 2.  Small Housing Authorities owned approximately twenty percent (20%) of the public housing units nationwide.  Declaration of Jane Hornstein ¶ 28.[3]  The second and third criteria, however, significantly limit the waiver's scope.

The 2019 Notice provided those particular projects a streamlined assessment (application) process that has some similarities to the full conversion assessment process but is more streamlined and less onerous.  *See* 2019 Notice at 2-6, 8-10.  The 2019 Notice explained the rationales for the waivers, including a "[r]ecognition that small [Public Housing Authorities] typically have reduced staff and limited funding available to conduct a full conversion assessment, even if the conversion to [housing choice voucher] serves the best interests of residents and has no adverse effect on the availability of affordable housing in affected neighborhoods."  *Id.* at 1-2.  The 2019 Notice also noted

> challenges [of] significant capital backlog, combined with regulatory burdens and limited access to private capital. Despite best efforts, [Public Housing Authorities], particularly small [Public Housing Authorities], struggle to preserve their stock of deeply assisted housing. This notice represents one of an array of tools that [the Department] is offering to [Public Housing Authorities] to allow them to voluntarily reposition public housing units to more sustainable funding platforms in order to meet local objectives.

*Id.* at 1; *see* FY 2022 HUD Funding Justifications, Public Housing Fund, at 6-4 (in 2010, growing $26 billion backlog), https://www.hud.gov/sites/dfiles/CFO/documents/9_2022CJ-PHFund.pdf; HUD, A Guide for Small Public Housing Authorities, https://www.hud.gov/sites/dfiles/PIH/documents/Guide_Repositioning_Small_PHAs.pdfa, at 4 (Mar. 2021) (conversion from Public Housing to Vouchers provides: (1) Housing Authorities local control and flexibility to meet local needs; (2) Housing Authorities administrative relief in limiting the types of programs to

---

[3]    The Declaration of Jane Hornstein ("Hornstein Decl.") is attached hereto in support of this Memorandum.  References to Letter Exhibits ("Ex. _") are to the Jane Hornstein Declaration.

administer; (3) predictability and a stable funding platform from vouchers, compared to public housing; (4) the enhanced ability from vouchers compared to public housing to leverage other financial resources).

The 2019 Notice also expressly considered and addressed fair housing issues, including by stating that "[a]s part of the conversion plan and application, [Public Housing Authorities] certify compliance with all applicable civil rights nondiscrimination and equal opportunity requirements," and that "HUD's Office of Fair Housing and Equal Opportunity (FHEO) conducts a civil rights review of conversion plans."  2019 Notice at 8-10. The Uniform Relocation Act ("URA") also may apply to conversions.  *See* 24 C.F.R. § 972.215.  Moreover, the Department's discretion to disapprove a conversion plan is very limited.  It may "disapprove a conversion plan only if—

> (1) the plan is plainly inconsistent with the conversion assessment for the agency developed under subsection (b);
>
> (2) there is reliable information and data available to the Secretary that contradicts that conversion assessment; or
>
> (3) the plan otherwise fails to meet the requirements of this section.

 42 U.S.C. § 1437t(e).  Where the Department has waived a conversion assessment and required a streamlined assessment pursuant to Section 1437t(b)(3), the only permissible basis for the Department to disapprove a conversion plan is prong (e)(3) above.  In that scenario, the Department may only disapprove a conversion plan for failure to provide the streamlined assessment required under Section 1437t(b)(3) or failure to meet the Section 1437t(d) requirements on what a "conversion plan" must contain.  *See also* 24 C.F.R. § 972.239(b)(3) ("[The Department] will disapprove a conversion plan only if [the Department] determines that: … (3) The conversion plan is incomplete or otherwise fails to meet the requirements under § 972.230" regarding "Conversion plan components.").

II.     **Acre Road Conversion**

        In October 2020, the Housing Authority of Jefferson Parish ("Housing Authority"), located

in Marrero, Louisiana, submitted to the Department a Streamlined Voluntary Conversion

application and plan ("Conversion Plan").  Ex. B (Mar. 9, 2023 HUD Conversion Approval

("Approval")) at 1.  The Housing Authority's Streamlined Voluntary Conversion "Plan proposes

to convert 199 public-housing units to Section 8 Housing Choice Voucher [ ] Assistance."  *Id.*  As

part of the Streamlined Voluntary Conversion Plan, the Housing Authority proposed to dispose of

approximately 18 acres of land and the 101 buildings of the Acre Road project.  As of the

Department's March 9, 2023, Approval of the Streamlined Voluntary Conversion application,

145 out of 199 units at Acre Road were vacant, as tenants already had relocated.  *Id.* at 3.  That

was because, "on July 15, 2021, the Department authorized the [Housing Authority] to commence

relocation of residents to mitigate resident safety concerns" using certain Vouchers that the

Housing Authority already had from the normal administration of its Section 8 Voucher program.

*Id*.

        The Department had good reason to approve the Acre Road Conversion Plan (aside from

the Department's limited ability to disapprove and block a conversion).  "[The Housing Authority]

demonstrated that the conversion will principally benefit the residents, [the Housing Authority]

and the community and will not adversely affect the availability of affordable housing."  *Id.* at 9.

The Department's main concern was the health and safety of the residents due to severe infestation

of mold.  *See id.* ("the conversion of the units from public housing and provision of [vouchers] to

the families will address the urgent need to relocate the families from substandard living conditions

brought on by mold infestation").  The Department looked at data showing that "[s]tudies have

concluded that the mold count presents a danger to the health and safety of the residents."  *Id.* at

8; *see also* Ex. C (Initial Mold Report) at 8-9 ("Results of the evaluation indicated significant

indications of fungal growth, active leaking, and elevated airborne spore counts throughout the housing units included in the assessment."); Ex. D (Mold Report: Summary of Worst Cases) at 1-2.

The local government had encouraged the conversion to evacuate residents as soon as feasible for health reasons due to the mold. *See* Ex. B (Approval) at 9. The Department anticipated that, if the conversion and relocation did not progress, the local government might condemn Acre Road and require a disorderly and immediate evacuation that would be worse for the residents than the Housing Authority's planned, orderly relocation. Hornstein Decl. ¶¶ 8-10.

Though more was not needed, the Department also considered that "[The Housing Authority] believes there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based Housing Choice Voucher (HCV) assistance." Ex. B (Approval) at 8. The conversion plan, as well as the conditions imposed on the Housing Authority, supported that conclusion. Among other things, these facts included: The Department required the Housing Authority and Jefferson Parish to conduct mobility counseling, *id.* at 2; it required relocation expenses to be paid under the Uniform Relocation Act, *id.* at 3; the Housing Authority promised that it would engage in landlord outreach, Ex. A at 19-20; the Housing Authority promised that its relocation contractor would help residents to port to the jurisdictions of other housing authorities in order to maximize their choices, Ex. A at 19; the Department assessed that the Housing Authority had consulted with the public on at least ten dates over the course of a year; Ex. B (Approval) at 8; and the Housing Authority had advised that the "demolition of the public housing development and transition of the tenants from public housing to housing choice vouchers will satisfy Objective No. 1 [of Jefferson Parish's Consolidated Plan for its HOME Investment Partnerships Program] by reducing the isolation of

this low income group and acting as the catalyst for the revitalization of this neighborhood", Ex. A at 11.

The Department's Office of Fair Housing and Equal Opportunity ("Fair Housing Office") also reviewed the proposed conversion and advised that it "has no civil rights-related concerns relative to [the Housing Authority's] application," noting the "dangerous risk to the health and safety of the residents" as well as the relocation assistance residents would be provided, and "recommend[ed] approval…of the SAC application." Ex. G. In addition, after the Marrero Tenant Organization sent the Department letters on November 22, 2022, and February 28, 2023 arguing that approving the conversion would raise fair housing concerns, the Department considered the content of these letters and those fair housing concerns prior to the conversion approval. Hornstein Decl. ¶¶ 14-17. This included review by the Department's Fair Housing Office of the information provided by the Marrero Tenants Organization. *Id.* ¶¶ 16-17. The Marrero Tenants Organization's information did not cause the Fair Housing Office to retract its earlier recommendation that the conversion be approved. *Id.* ¶ 17.

## STANDARD OF REVIEW

### I.   <u>Preliminary Injunctive Relief</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The movant bears the burden of persuasion to show that the requested relief is due. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). This Circuit has hinted, though not held, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—establishes that "likelihood of irreparable harm" and "likelihood of success" are "independent, free-standing requirement[s]." *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*).

## II.   <u>Administrative Procedures Act</u>

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).  The scope of review is "narrow," and "the court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000); *see also Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008) ("[I]t is not enough for the agency decision to be incorrect— as long as the agency decision has some rational basis, the court is bound to uphold it.").  Deference is especially appropriate in areas that are "complex and highly technical."  *AT&T*, 220 F.3d at 616.

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  The Court must ensure that "the process by which [the

agency] reache[d] [its] result [was] logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). In doing so, however, the Court must "not . . . substitute its [own] judgment for that of the agency." *State Farm*, 463 U.S. at 43. Rather, "[t]he [C]ourt will ordinarily uphold an agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alterations omitted) (quoting *State Farm*, 463 U.S. at 43).

Similarly, an agency decision is supported by substantial record evidence if it finds support in "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004). The substantial evidence test requires "more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Id.* (internal quotation marks omitted). As the D.C. Circuit explained, "[w]hen the arbitrary or capricious standard is performing th[e] function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984).

## ARGUMENT

Plaintiffs' motion for injunctive relief should be denied.  They have not demonstrated that they risk imminent irreparable harm or that they are likely to succeed on the merits of their claim. Moreover, the balance of interests is firmly in favor of the Department, which considered the broader public interest in making the determinations that Plaintiffs seek to challenge.

I.    **Plaintiffs Will Not Suffer Imminent Irreparable Harm In The Absence Of**
      **Injunctive Relief**

Movants for a preliminary injunction must show that they are "likely to suffer irreparable

harm in the absence of preliminary relief." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir.

2014); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("The basis for

injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal

remedies") (cleaned up).   A preliminary injunction may not issue "based only on a possibility of

irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries*

*Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017).   If a party makes no irreparable

injury showing, a court may deny a motion for injunctive relief without considering the other

factors.  *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wis.*

*Gas*, 758 F.2d at 674, 676 (because movants could not establish irreparable harm, the court need

not address any of the other factors).   The injury "must be both certain and great; it must be actual

and not theoretical [and] . . . of such imminence that there is a 'clear and present' need for equitable

relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted); *Doe v. Mattis*,

889 F.3d 745, 782 (D.C. Cir. 2018) (injury must be "certain," "great" and "actual").

A movant must substantiate that the irreparable injury is "likely" to occur in the absence

of relief.   *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, Civ. A. No. 15-1582

(APM), 2016 WL 420470, at *8 (D.D.C. Jan. 22, 2016) ("The movant bears the burden of

substantiating, with evidence, that the injury is certain, imminent, great, and beyond remediation").

The Local Civil Rules underscore the need for the movant to present such proof, requiring that

"[a]n application for a preliminary injunction . . . be supported by all affidavits on which the

plaintiff intends to rely" and prohibiting the filing of "[s]upplemental affidavits" without "permission of the Court."  *See id.* (citing LCvR 65.1(c)).  "Bare allegations of what is likely to occur are of no value" because the district court must make the determination of "whether the harm will *in fact* occur."  *Wis. Gas*, 758 F.2d at 674 (emphasis in original).

Plaintiffs cannot establish imminent risk of irreparable harm in this case because (a) none has received a notice of intent to evict (Anderson Decl. ¶ 5; Johnson Decl. ¶ 5; James Decl. ¶ 5), and in fact, plaintiff Kedra James has already moved out (Hornstein Decl. ¶ 33); and (b) the "Housing Authority said there is no date by which eviction notices will be issued at this time, because the Housing Authority is hopeful that the remaining residents will relocate of their own accord, as have the families who have already relocated," *id.* ¶ 32.  Also, even if 90-day eviction notices ever were issued, an eviction court proceeding would not start until 90 days thereafter. Thus, Plaintiffs have proffered no evidence indicating that any resident is currently in eviction proceedings, much less that anyone is at risk of being evicted from his or her home in the near future.  On the contrary, the Housing Authority has been actively working with residents to help them find alternative housing to avert a scenario in which eviction notices would need to be issued. *Id*. ¶¶ 21, 32.

It is true that some courts have found that the threat of "imminent and actual eviction" is sufficient to establish irreparable harm for a preliminary injunction. *Oliva v. Brookwood Coram I, LLC*, Civ. A. No. 14-2513, 2015 WL 13745439, at *6 (E.D.N.Y. Nov. 30, 2015) (collecting cases), *R&R adopted*, 2016 WL 3637010 (E.D.N.Y. June 30, 2016).  However, when tenants have sought to enjoin possible eviction without an eviction court proceeding pending and an "imminent threat of homelessness," courts generally find no irreparable harm and thus decline to enter a preliminary injunction against potential eviction. *See, e.g., id.* at *6-8 (finding no irreparable harm where "there

is presently no eviction proceeding pending against Plaintiff" and, regardless, "the commencement of those proceedings would not place Plaintiff in imminent threat of homelessness"); *Allen v. N.Y. City Hous. Auth.*, Civ. A. No. 10-0168, 2010 WL 1644956, at *4 (S.D.N.Y. Apr. 20, 2010) ("any harm is far from imminent" because "[n]o Housing Court proceeding is currently pending against Plaintiff and," to terminate plaintiff's residency, Defendant "must first serve him with a notice to vacate, commence a holdover proceeding in Housing Court, and obtain a judgment of possession and a warrant of eviction"); *Moore v. Cap. Realty Grp., Inc.*, Civ. A. No. 21-1099, 2022 WL 2352554, at *3 (W.D.N.Y. June 30, 2022) ("The mere threat of proceedings that might possibly lead to [plaintiff's] eviction at some unknown time in the future therefore does not suffice to show irreparable harm.").

Having failed to demonstrate that they will be subject to an imminent threat of irreparable harm without injunctive relief, Plaintiffs have failed to meet their burden of establishing that they are entitled to a preliminary injunction.

## II.   Plaintiffs Are Not Likely To Succeed On The Merits

### A.   Plaintiffs Lack Standing

Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, *see, e.g., Chi. & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 (1892), standing "is an essential and unchanging" predicate to any federal court's exercise of jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In order to satisfy the "irreducible constitutional minimum of standing," a litigant must demonstrate that it has suffered a "concrete and particularized" injury that is (1) "actual or imminent," *id.*; (2) caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation, *see Allen v. Wright*, 468 U.S. 737, 752 (1984) (abrogated on other grounds); and (3) redressable by the court, *see Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).  This set of criteria implements Article III by limiting judicial

intervention to only those disputes between adverse parties that are "'in a form . . . capable of judicial resolution.'" *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 218 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)).

1.   Plaintiffs Lack Standing to Challenge the Acre Road Conversion Approval

Plaintiffs lack standing to challenge the Department's approval of the Acre Road conversion plan because Plaintiffs cannot carry their burden on traceability or show that there is a "substantial probability" that a favorable outcome would redress their alleged injuries.

The traceability element of standing requires that a plaintiff show "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The injury therefore must be "fairly" traceable to the Defendant's conduct, not to that of a third party.  *Id*.; *see Town of Barnstable v. FAA*, 659 F.3d 28, 31 (D.C. Cir. 2011).  As detailed in Background Part II and Argument Part II.C, approval of the conversion was not traceable to a misapprehension of conversion impacts, rather, the agency's preeminent concern was a health and safety danger that would not have been altered by a conversion assessment.  Thus, Plaintiffs cannot establish that the injuries they claim are "fairly traceable to the" decision to approve the conversion plan without requiring the Housing Authority to conduct a conversion assessment, *Spokeo, Inc. v. Robins*, 578 U.S.C. 330, 337-38 (2016), or that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" to require conversion assessment, *Friends of the Earth, Inc. v. Laidlaw Env't Servs*., 528 U.S. 167, 181 (2000).

Even were the Court to agree that the Department erred by waiving the requirement of a conversion assessment (a decision that is discretionary and unreviewable, *see infra* § II.B), the addition of a conversion assessment would not prevent the Department from approving the Housing Authority's conversion application, and the health and safety concerns guiding the current conversion would likely still result in approving the conversion.  Hornstein Decl. ¶¶ 11, 22-24.

Therefore, Plaintiffs cannot show redressability because there must be a "substantial probability" that a favorable outcome (i.e., requiring the Department to obtain a conversion assessment) would redress the plaintiff's injuries.  *Town of Barnstable*, 659 F.3d at 31.

> Plaintiffs argue that:
>
> A standard conversion review would afford Defendants the benefit of a market analysis of the likely success of using tenant-based assistance in Jefferson Parrish. Defendants likewise would have been able to meaningfully assess whether [the Housing Authority's] conversion plan had foreseeable discriminatory effects. The standard voluntary conversion process, would have alerted the Department to Acre Road residents' difficulty in using their Vouchers to obtain housing and thus avoided the discriminatory results of its approval of [the Housing Authority's Streamlined Voluntary Conversion] plan.

Pls' Br. at 33.  This argument fails for at least three reasons.

First, the pervasive mold problems and degradation of the units were the preeminent issues for the Department's Public Housing Office reviewers.  Hornstein Decl. ¶ 4.  Even if a conversion assessment showed that residents would have difficulty in using Vouchers in safe, integrated, nearby areas, such evidence likely would not have changed the fact that living in the units was a health and safety danger to the residents.  *See id*. ¶ 11.  The health and safety concerns do not change based on rental market analysis.  Second, the Department was already aware of the difficulty in using the Vouchers at minimum via the Marrero Tenants Organization opposition letters.  *Id*. at ¶¶ 14-17.  The Department already considered the Marrero Tenants Organization letters and did not change its view.  *Id*.  Also, as discussed below, the Department was already aware of this issue from the conversion plan and as reflected in the conversion approval.

Finally, Plaintiffs' argument erroneously presumes that the Department would be required by Section 1437t to change its decision based on the information that Plaintiffs claim would be in the conversion assessment.  As to a conversion assessment, Section 1437t(e) states that "The Secretary shall disapprove a conversion plan only if— (1) the plan is plainly inconsistent with the

conversion assessment for the agency developed under subsection (b); [or] (2) there is reliable information and data available to the Secretary that contradicts that conversion assessment[.]" 42 U.S.C. § 1437t(e).  Plaintiffs' apparent reliance (Pls' Br. at 36) on the second prong of the test (existence of contradictory evidence) is misplaced.  If the Housing Authority were required to conduct a conversion assessment, the Department expects that such an assessment would include "information and data" regarding the availability of affordable housing in the area and other factors identified in the Marrero Tenant Organization's letters (i.e., the "information and data" identified by Plaintiffs).  Thus, Plaintiffs have not identified "contradictory" evidence that would prompt disapproval under the second prong.  Rather, they have identified data and information that the Department considered and decided was outweighed by other factors.

Further, Plaintiffs do not and could not satisfy the first prong of the Section 1437t(e) disapproval criteria (inconsistency between the plan and the conversion assessment), as they have conceded that the conversion plan is consistent (not "plainly inconsistent") with the conversion assessment they hope to obtain.  Plaintiff's Brief states that the Housing Authority's 2020 Conversion Plan "acknowledged the severe lack of affordable housing options for low-income residents in Jefferson Parish," Pls' Br. at 30 n.8, and the Conversion Plan itself states that "[The Housing Authority] is cognizant of the hardships created for certain populations with repositioning and is taking steps to ensure that this process is as worry-free as possible," Ex. A at 11, 19.  Thus, even assuming that the conversion assessment Plaintiffs contemplate were required (i.e., demonstrating the challenge of obtaining affordable housing in the area), it would still be consistent with the first prong of the test—and would not trigger disapproval of the conversion— because the Conversion Plan already considered these factors.

2.      Plaintiffs Lack Standing to Challenge Issuance of the 2019 Notice

Similarly, Plaintiffs cannot establish standing to challenge the Department's issuance of the 2019 Notice because they cannot demonstrate that their alleged injuries are traceable to the 2019 Notice or that rescinding the 2019 Notice is likely to redress these alleged injuries.

As discussed in more detail below (*infra* § II.D), the Department's authority to approve the conversion application derived from 42 U.S.C. § 1437t(b)(3), not the 2019 Notice.  As a result, Plaintiffs cannot establish that the injuries they claim from the decision to approve the Acre Road conversion are "fairly traceable to the" 2019 Notice, *Spokeo*, 578 U.S. at 337-38, or that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" to invalidate the 2019 Notice, *Friends of the Earth*, 528 U.S. at 181.

If the 2019 Notice never existed, Plaintiffs say the Housing Authority would be required to complete a conversion assessment and the Department would be required to review it.  *See* Compl, ¶¶ 158, 161-62; Pls' Br., at 27.  However, as discussed below (*infra* § II.D), Section 1437t(b)(3) would still allow the Department to waive the conversion assessment "[a]t the discretion of the Secretary or at the request of a public housing agency" independently of the 2019 Notice, so the Department could still waive the conversion assessment requirement for Acre Road even if the 2019 Notice is invalidated (or if it never existed).

Therefore, Plaintiffs also cannot establish redressability because there must be a "substantial probability" that a favorable outcome (invalidating the 2019 Notice) would redress Plaintiffs' injuries.  *Town of Barnstable*, 659 F.3d at 31; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (relief that "does not remedy the injury suffered cannot bootstrap a plaintiff into federal court").

**B.     The Discretionary Decision Not to Enforce the Conversion Assessment Requirement for Acre Road Is Unreviewable for Lack of Law to Apply.**

The APA does not provide a cause of action where the agency action is committed to agency discretion by law, such as here when the agency is exercising its enforcement discretion. *See* 5 U.S.C. § 701(a)(2); *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA."); *see also Sluss v. Dep't of Just.*, 898 F.3d 1242, 1251-52 (D.C. Cir. 2018).  The reason for this exception to the APA is simple: a statute committing an action to the discretion of the agency provides no justiciable standards by which a court may review the agency's decision.  *See Webster v. Doe*, 486 U.S. 592, 599-600 (1988).  This is true "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  If "no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretion." *Id.* at 830 (internal quotations omitted).  In looking for a judicially manageable standard with which to interpret the Department's authority and discretion in deciding whether to waive the conversion assessment, the Court should consider the language of the governing statute and structure as well as the nature of the agency decision.[4]

Plaintiffs argue that, because the Department's approval of the Housing Authority's conversion application lacked a conversion assessment, approving the application violated the

---

[4]     *See Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) (to determine whether a statute has committed a matter solely to agency discretion, the court considers "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."); *Stewart v. McPherson*, 955 F.3d 1102, 1104 (D.C. Cir. 2020) (complaint seeking review of agency action "committed to agency discretion by law" fails to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6)).

APA by being contrary to the Fair Housing Act and arbitrary and capricious.  *See* Compl. ¶¶ 158, 161-62; Pls' Br. at 27.  This argument fails because the Department's decision to approve the application without a conversion assessment was left to its discretion by statute and, therefore, is not subject to review under the APA.

While not all Congressional grants of discretion are afforded protection from review under Section 701(a)(2), "[t]he few cases in which we have applied the § 701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation[.]"  *Weyerhaeuser Co. v. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).  Non-enforcement discretion like that which was exercised by the Department in this case, is just that: one of the few contexts where courts have traditionally regarded the agency decisions as unreviewable.  *See Heckler*, 470 U.S. at 831-32 ("an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); *see also Am. Disabled for Attendant Programs Today v. Dep't of Hous. & Urban Dev.,* 170 F.3d 381, 389 (3d Cir. 1999) ("[T]he Supreme Court held in *Chaney* that there is a rebuttable presumption that agency decisions not to enforce are unreviewable. Under the Fair Housing Act, Congress explicitly chose to give discretion to the Department when determining whether to prosecute and investigate").

The D.C. Circuit long ago recognized that waivers are an exercise of non-enforcement discretion.  *Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996) ("waivers [may be] unreviewable [where] they are 'committed to agency discretion by law' (5 U.S.C. § 701(a)(2)), and hence there is 'no law to apply.'").  The court in *Clifford* ultimately found that it could review the agency's action under the APA because, although "[t]he words of the statute appear unrestricted and

undefined . . . over the years the Maritime Administration has supplied a list of factors to guide its . . . judgment [under the statute]" and "[t]he agency's policies have thus provided standards rendering what might arguably be unreviewable agency action reviewable." *Clifford*, 77 F.3d at 1417.  Here, however, Plaintiffs did not and cannot point to any Department regulations or policies governing when the Department may issue Section 1437t(b)(3) waivers like those in the 2019 Notice.  Therefore, there is "no law to apply" to the 2019 Notice waivers including the waiver for Acre Road; those waivers are unreviewable.  That Plaintiffs disagree with how the Department balanced competing interests and priorities and resource allocation considerations does not change that analysis as to whether the decision was reviewable under the APA.

## C.   Approval of the Conversion Approval Was Not Contrary to Law Nor Arbitrary Nor Capricious

Even if the Court finds that it can review the Department's decision to approve the Acre Road Conversion Application, the decision was not arbitrary and capricious or contrary to law.

### 1.   The Conversion Approval Was Not Contrary to the Broad Mandate to Affirmatively Further Fair Housing

Section 808 of the Fair Housing Act states that the Department "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."  42 U.S.C. § 3608(e)(5).  This is a broad mandate to affirmatively further fair housing ("Fair Housing Mandate") that generally is not a vehicle for assessing any one Department decision like this approval in isolation.  *See* Affirmatively Furthering Fair Housing, 88 Fed. Reg. 8516, 8539 (proposed Feb. 9, 2023) ("There is no requirement that each individual action program participants take be in furtherance of the . . . obligation [to affirmatively further fair housing], but rather program participants' actions must collectively affirmatively further fair housing and they may not take actions that are materially inconsistent with their obligation to affirmatively further fair housing. Therefore, it generally

- 23 -

would be insufficient for a complainant to allege that a routine decision made or routine action taken by a program participant does not affirmatively further fair housing.").

Rather, as the Department has defined the Fair Housing Mandate for the Department's program participants, it "means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws." 24 C.F.R. § 5.151. The Department has further defined "Meaningful Actions" to mean "significant actions that are designed and can be reasonably expected to achieve a material positive change that affirmatively furthers fair housing by, for example, increasing fair housing choice or decreasing disparities in access to opportunity." *Id*.

To the extent any past case law to the contrary (especially from other circuits) could be interpreted to say otherwise, it is not controlling and is inapplicable in light of the Department's interpretation. If there is any doubt or ambiguity, the definitions in the Department's regulation interpreting 42 U.S.C. 3608(e)(5) should be given *Chevron* deference, as the Department is the agency charged with administering the Fair Housing Act. Where a statute is silent or ambiguous on a particular issue, and an agency is authorized to promulgate regulations to implement the statute, a court defers to the agency's reasonable interpretation of the statute. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see, e.g., Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).

The Department fulfills the broad Fair Housing Mandate in various ways, such as requiring program participants to engage in fair-housing planning (which has consisted of the Analysis of Impediments to Fair Housing Choice and the Assessment of Fair Housing), collecting

certifications from program participants, designing its notices of funding opportunity to further Fair Housing Mandate goals, requiring affirmative fair housing marketing and advertising , and enforcing site and neighborhood standards. *See* Affirmatively Furthering Fair Housing, *available at* https://www.hud.gov/AFFH#_How_does_hud (last visited May 22, 2023).

Here, in any event, the Department's decision to approve the Acre Road conversion also furthered fair housing goals. Plaintiffs' Brief views the Department's approval as simply a decision to remove public housing and fails to consider the context of that decision—namely, the unsafe conditions of the housing at issue, the Department's review of fair housing concerns, and the assistance provided by the Department and the housing authority in relocating tenants.

Contrary to Plaintiffs' arguments, the Department's decision regarding the Acre Road conversion considered fair housing issues and furthered the Mandate. Specifically, the Department's Fair Housing Office reviewed the proposed conversion and advised that it "has no civil rights-related concerns relative to [the Housing Authority's] application," noting the "dangerous risk to the health and safety of the residents" and the relocation assistance that they'd be provided, and "recommend[ing] approval . . . of the SAC application." Ex. G at 1. In addition, the Department considered the letters sent by the Marrero Tenants Organization and the fair housing concerns raised prior to approving the conversion. Hornstein Decl. ¶¶ 16-17. This included review of the Marrero Tenants Organization's information by the Department's Fair Housing Office. *Id.* The Marrero Tenants Organization's information did not cause the Fair Housing Office to retract its earlier recommendation to approve the conversion. *Id.*

Second, as explained above, the Department was concerned about resident health and crime. Affirmatively furthering fair housing includes addressing "disparities in housing needs and in access to opportunity" and "replacing segregated living patterns with truly integrated and

balanced living patterns." 24 C.F.R. § 5.151. Keeping low-income, primarily minority, residents in an unsafe environment where they and their children are exposed to mold, noxious odors, and high crime is the antithesis of affirmatively furthering fair housing. Instead, providing these residents with assistance and subsidies that will allow them to find safe and affordable housing fulfills the Department's obligation to affirmatively further fair housing.

Third, the Housing Authority stated that "there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based Housing Choice Voucher [ ] assistance." Ex. B (Approval) at 8. The Department assessed many facets and conditions of the conversion in support of this conclusion. The Department required the Housing Authority and Jefferson Parish to conduct mobility counseling. *Id.* at 2. The Department required the Housing Authority and Jefferson Parish to comply with the Uniform Relocation Act. *Id.* This requirement includes several duties, such as offering comparable housing in terms of location. 42 U.S.C. § 1437t(d)(4)(A)(ii)(II) (a Public Housing Authority shall submit a plan that "each family displaced by such action . . . be offered comparable housing. . . that is located in an area that is generally not less desirable than the location of the displaced person's housing."). The Uniform Relocation Act also requires the payment of relocation expenses. Ex. B (Approval) at 3.

The Housing Authority also promised that it could engage in landlord outreach. Ex. A (October 2020 Conversion Plan) at 19-20. It promised that its relocation contractor would help residents to port to the jurisdictions of other housing authorities to maximize their choices. *Id.* at 19. The Housing Authority consulted with the public on at least ten occasions over a year. Ex. B (Approval) at 8. The Housing Authority also advised that "demolition of the public housing development and transition of the tenants from public housing to housing choice Vouchers will

satisfy Objective No. 1 [of Jefferson Parish's Consolidated Plan for its HOME Investment Partnerships Program] by reducing the isolation of this low income group and acting as the catalyst for the revitalization of this neighborhood."  Ex. A (Conversion Plan) at 11.

Thus, even though the Fair Housing Mandate does not provide a basis to sue the Department here, in any event the Department clearly considered civil rights implications in its decision to approve the conversion application, and the decision is not contrary to law.

2.    The Department Did Not Violate 5 U.S.C. § 706(2)(C) or Act Contrary to Section 804 of the Fair Housing Act

Plaintiffs also allege at Count IV that the Department's decision to approve the conversion application violated the APA because it failed to consider whether the decision disparately affected a protected class and perpetuated segregation, contrary to the Department's obligations under the Fair Housing Act, 42 U.S.C.  § 3604 ("Section 804").  Compl. ¶¶ 161-62.  Plaintiffs concede that they can only assert Fair Housing Act claims against the Department via the APA.  Pls' Br. at 32 n.11.  Hence, Count IV contends that the approval was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C).  Compl. ¶ 164.

Due to the Department's legally sufficient justification, the approval was not contrary to Section 804, and thus, all claims of disparate impact and perpetuation of segregation must fail.  As to Section 804, Department regulations provide that "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent."  24 C.F.R. § 100.500.  "Discriminatory effect" is defined as existing "where [a practice] actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  *Id.*  However, a practice with a discriminatory effect "may still be lawful if supported by a legally sufficient justification."  *Id.*

- 27 -

The regulation goes on to state that "[a] legally sufficient justification exists where the challenged practice . . . [i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect." *Id.* "A legally sufficient justification must be supported [by the defendant with] evidence and may not be hypothetical or speculative." *Id.* Then the plaintiff has the burden of "proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

Here, the conversion approval was not contrary to Section 804 because approval was "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," namely the physical health and safety of the residents. *See* 24 C.F.R. § 100.500(b)(i); Ex. B (Approval) at 9. The Department considered studies concluding that "the mold count presents a danger to the health and safety of the residents." Ex. B (Approval) at 8. The mold infestation was due to the predictable flooding in the areas. Hornstein Decl. ¶ 4. The Department also considered the fact that as of the March 9, 2023 Approval, 145 out of 199 units at Acre Road were vacant. *See* Ex. B (Approval) at 3. Thus, the Department was concerned that many abandoned residential units in an isolated and concentrated area at Acre Road foreseeably may lead to higher crime. *Id.* at ¶ 8.

The Department also has an interest in enabling families to relocate away from the noxious odors and nuisance caused by the sewage treatment plant adjacent to Acre Road. Hornstein Decl. at ¶ 6. Finally, due to all these structural and immutable problems with the Acre Road site (recurring flooding leading to mold, adjacent to sewage plant, extreme isolation from the rest of the community, and crime from abandoned units), the Housing Authority in collaboration with the Department determined that it would not be reasonable to continue to invest more funds to rehabilitate Acre Road, but rather would be more reasonable to reposition scarce resources from

public housing in the area, which has a growing backlog of capital funding needs, toward the stable funding platform that is the Voucher Program, which offers more options to the residents, who can port to any public housing authority nationwide that administers Vouchers, and which imposes the burden on private-sector landlords to physically maintain the properties.  Hornstein Decl. ¶ 23.

Plaintiffs have not carried their burden of establishing that these legitimate and substantial health and safety interests could be served by the purportedly less discriminatory alternative that Plaintiffs seek (24 C.F.R. § 100.500(c)(3))—i.e., the full onerous conversion application process. See Pls.' Br. at 33.  Plaintiffs' Motion merely says that "[t]he Notice fails to substantiate" that "small [Public Housing Authorities] typically have reduced staff and limited funding available to conduct a full conversion assessment, even if the conversion to [Housing Choice Vouchers] serves the best interests of residents and has no adverse effect on the availability of affordable housing in affected neighborhoods".  *Id.*; 2019 Notice at 2.  First, Plaintiffs bear the burden on that element, not the Department; and their motion did not present any evidence to disprove the rationale for the waiver.  Second, the notion that smaller housing authorities have less staffing and resources is straightforward on its face.  And third, there is ample additional support for why the waiver was necessary.  Hornstein Decl. ¶¶ 4-9, 18-19, 23-24; *see also* Guide for Small Public Housing Authorities, at 27 ("the associated methodology and cost test [for full conversion applications] has proven extremely challenging for PHAs to execute, especially for small PHAs.").  Plaintiffs' proposed solution would have prolonged and aggravated the dire health, safety, and other concerns.  Hornstein Decl. ¶ 10.  Thus, the Department's decision was not "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," specifically, the Fair Housing Act's prohibition on actions that have a disparate impact on protected classes or that perpetuate segregation.

3.     The Department's Decision Neither Arbitrary Nor Capricious

Plaintiffs' argument that the Department's decision to approve the conversion application was arbitrary and capricious also lacks merit.  The "arbitrary and capricious" standard of review is highly deferential to the agency and "presumes the validity of agency decisions."  *AT&T*, 220 F.3d at 616.  This standard basically requires that the agency make a rational decision after considering all the relevant factors.  To meet this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43.  The agency decision generally will be upheld when the agency has considered all the "relevant factors" and has not committed a "clear error of judgment."  *Id.*  Examples of a "clear error of judgment" would be reliance upon "factors with Congress has not intended," failure to consider "an important aspect of the problem," or an "explanation for its decision that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

Here, the Department relied on its expertise, considered the relevant evidence, and had good reason to approve the conversion (as noted above, Congress also gave the Department limited ability to disapprove and block a conversion).  The Department's preeminent concern was the health of the residents due to infestation of mold.  *See* Ex. B (Approval) at 9; Hornstein Decl. ¶¶ 4, 11.  The Department reviewed data showing that "[s]tudies have concluded that the mold count presents a danger to the health and safety of the residents."  *Id.* at 8.  Also, the Department was concerned that many abandoned residential units in an isolated and concentrated area at Acre Road foreseeably may lead to higher crime.  Hornstein Decl. ¶ 8.  The Department also has an interest in enabling families to relocate away from the noxious odors and nuisance caused by the sewage treatment plant adjacent to Acre Road.  *Id.* ¶ 6.

The Housing Authority had also stated that "there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based Housing Choice Voucher (HCV) assistance."  Ex. B (Approval) at 8.  As explained above in the context of the Department's assessment that the conversion would affirmatively further fair housing, it assessed many facets and conditions of the conversion in support of the conclusion that there would be sufficient alternative housing for the Acre Road tenants.  *See supra* § II.C.1.

Second, in terms of nationwide policy, the Department has no compelling reasons to disapprove the conversion of public housing to Vouchers.  There is a growing backlog of unmet needs in the public-housing portfolio.  *See* FY 2022 HUD Funding Justifications, Public Housing Fund, at 6-4, *available at* https://www.hud.gov/sites/dfiles/CFO/documents/9_2022CJ-PHFund.pdf (last visited on June 2, 2023).  Due to scarce appropriations from Congress, there are not enough funds to properly ensure the physical maintenance of public housing.  *See* 2019 Notice § 2.  Conversion from public housing to Vouchers is one tool for what the Department  calls repositioning of scarce resources, whereby, a "[Public Housing Authority] evaluates what regulatory platform is best suited for the [Public Housing Authority] to meet the long-term affordable housing challenges in its specific community, considering the needs of the residents, the condition of the real estate portfolio, and the objectives of the [Public Housing Authority] and other community leaders."  Guide for Small Public Housing Authority, at 4 (Mar. 2021), https://www.hud.gov/sites/dfiles/PIH/documents/Guide_Repositioning_Small_PHAs.pdf.

Conversion of public housing to Vouchers as a repositioning tool provides: (1) local control and flexibility to meet local needs; (2) Public Housing Authorities administrative relief in limited the types of programs to administer; (3) predictability and a stable funding platform from Vouchers,

compared to public housing; (4) the enhanced ability from Vouchers compared to public housing to leverage other financial resources. *Id.* Finally, the Department's Fair Housing Office reviewed the proposed conversion and advised that it "has no civil rights-related concerns relative to [the Housing Authority's] application," noting the "dangerous risk to the health and safety of the residents" and the relocation assistance that they'd be provided, and "recommend[ing] approval…of the SAC application." Ex. G.

Also, the Marrero Tenants Organization's letters in late 2022 and early 2023 were considered by the Department (including by its Fair Housing Office) prior to the conversion approval. The Marrero Tenants Organization's letters did not cause the Fair Housing Office to withdraw its earlier recommendation to approve the conversion. Ex. J; Hornstein Decl. ¶ 17. Because the Department conducted a comprehensive analysis, its decision to approve the conversion was not arbitrary and capricious. *See State Farm*, 463 U.S. at 43, 52 (the Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" and approval "was the product of reasoned decisionmaking") (cleaned up).

### D. Issuance of the 2019 Notice Was Not Subject to Notice and Comment Rulemaking, Is Not Reviewable, and, in Any Event, Was Neither Arbitrary Nor Capricious Nor Contrary to Law

Section 1437t(b)(3) expressly authorized the waivers in the 2019 Notice and did so without requiring regulatory rulemaking to issue one or more waivers. A waiver inherently is a nimble and flexible tool for responding to particular situations and is not a lengthy regulatory rulemaking that must undergo public notice and comment process. Additionally, the 2019 Notice waivers constitute discretionary non-enforcement decisions that are unreviewable under 5 U.S.C. § 701(a)(2) and *Heckler v. Chaney* and its progeny (discussed above); and the 2019 Notice states reasonable grounds for the waivers such that they aren't arbitrary and capricious in any event.

1.    Waiver of Conversion Assessments Does Not Violate Section 1437t
Because It Is Expressly Authorized by Section 1437t(b)(3)

As a threshold matter, waiver of a conversion assessment complies with Section 1437t because it is expressly authorized by the plain language of Section 1437t(b)(3) ("the Secretary may waive any or all of the requirements of paragraph (1) or (3) or otherwise require a streamlined assessment with respect to any public housing project or class of public housing projects.").[5]

Plaintiffs argue that such waivers are nevertheless actually prohibited by Section 1437t(c) because that section requires a "conversion assessment" to "demonstrate" certain things.  Pl's Br. at 23.  Plaintiffs also argue that the waiver authority in Section 1437t (b)(3) cannot be squared with Section 1437t(e) because prongs (e)(1) and (2) refer to a "conversion assessment", and a conversion plan without a conversion assessment would "otherwise fails to meet the requirements of this section" under prong (e)(3).  But there is no conflict between Sections 1437t(b)(3) and 1437t(c) or (e).   Where the Department has waived a conversion assessment and required a streamlined assessment pursuant to Section 1437t(b)(3), the provisions on conversion assessments in Section 1437t(c) and (e)(1) and (2) have no application, and a conversion plan could still be disapproved under prong (e)(3) for failure to provide the streamlined assessment required under Section 1437t(b)(3) or failure to meet the Section 1437t(d) requirements on what a "conversion plan" must contain.  *See* 24 C.F.R. § 972.239(b)(3).

Even were Sections 1437t(c) and (e) in conflict with Section 1437t(b)(3), the latter would control.  It is well-settled that a specific statutory provision controls over a more general one.  *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21 (2012) (the "ancient interpretive principle" *generalia specialibus non derogant* dictates that 'the specific governs the general'"); *see also Ex*

---

[5]    Paragraph (1) of the statutory subsection sets out the requirements for a conversion assessment.

*parte Crow Dog*, 109 U.S. 556, 570 (1883).  Here, as to Department's conversion assessment waiver authority, Section 1437(b)(3) expressly addresses that and answers that the Department does have such authority.  Sections 1437t(c) and (e) do not discuss "waiver" at all.[6]

### 2.   Congress Expressly Authorized the Department to Waive Conversion Assessments Without Requiring Formal Rulemaking

Plaintiffs argue that if the 2019 Notice waivers were allowed by Section 1437t(b)(3), the Department was required to issue such waivers via the lengthy regulatory rulemaking process (instead of by notice).  Pls' Br. at 12-13; Compl. ¶ 148.  But the language of Section 1437t(b)(3), which expressly authorizes the Department to waive conversion assessments, does not require the Department to go through the regulatory rulemaking process to issue one or more waivers. 42 U.S.C. § 1437t(b)(3) ("At the discretion of the Secretary or at the request of a public housing agency, the Secretary may waive any or all of the requirements of paragraph (1) [Conversion Assessment General Requirements] or (3) or otherwise require a streamlined assessment with respect to any public housing project or class of public housing projects.").   Plaintiffs rely on inapposite case law in arguing that agencies must use notice and comment rulemaking to promulgate new across-the-board regulatory requirements, but that is a different situation than here, where an agency has exercised statutory waiver authority in limited circumstances.

Congress also knows how to require that something be done via regulation when it wants to and, in the absence of such requirement (as with Section 1437t(b)(3)), it should be presumed that Congress intended for the Department to be able to exercise its waiver authority without

---

[6]     As reflected in the 2019 Notice, the Department relied on its Section 1437t(b)(3) waiver authority to waive the corresponding conversion assessment regulations, too. 2019 Notice at 2 ("[The Department] is exercising its authority under Section 22(b)(3) of the 1937 Act to waive the conversion assessment for small [Public Housing Authorities] as described at Sections 22(b)(1)(A)-(E) and 24 CFR. 972.218(a)-(e).").

promulgating regulations. *Samma v. Dep't of Def.*, 486 F. Supp. 3d 240, 277 (D.D.C. 2020) ("The inclusion of a time-in-service requirement in § 1439 shows that Congress knows how to establish such a requirement when it wants to, and the lack of a time-in-service requirement in § 1440 suggests that Congress did not intend for one to apply there."); *Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) ("Where Congress knows how to say something but chooses not to, its silence is controlling.") (citation omitted).  Here, Congress authorized the Department to waive the conversion assessment without requiring formal rulemaking.  In contrast, Congress knows how to require an agency to act via regulation.  *See e.g.*, 42 U.S.C. § 13603(b)(1) ("The Secretary shall, by regulation, establish criteria for selection of tenants for occupancy in federally assisted housing and lease provisions for such housing"); 42 U.S.C. § 13661 (authorizing the Department to "require the applicant, as a condition of admission to the program or to federally assisted housing, to submit to the public housing agency or owner evidence sufficient (as the Secretary shall by regulation provide) to ensure that the individual or individuals in the applicant's household who engaged in criminal activity[.]").

There are numerous examples of Congressionally authorized waivers not requiring regulatory rulemaking.  *See, e.g.*, *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 124 (D.D.C. 2007) (agency waived NEPA, the Arizona–Idaho Conservation Act, and eighteen other laws with respect to a construction project under the authority granted to the DHS secretary by the REAL ID Act of 2005 merely by "publish[ing] a notice in the Federal Register"); *see also Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 248-49 (D.D.C. 2019).  Similarly, in another statute generally discussing the Department's authority to waive a regulation, Congress only required that the Department "notify the public" and that "[t]he notification shall be included in a notice in the Federal Register published not less than quarterly."  42 U.S.C. § 3535(q).  Indeed, notices that

waive regulations for categories of persons without requiring notice and comment rulemaking are fairly common, and making suddenly unlawful such notices by the Department[7] and other federal agencies[8] would have disruptive and problematic effects.[9]

To the extent Plaintiffs believe there is a conflict between 42 U.S.C. § 1437t(b)(3)'s waiver authority and the APA rulemaking requirements of 5 U.S.C. § 553, Section 1437t(b)(3) would control as the later enacted and more specific statute from Congress.  It is well-settled that a specific statutory provision controls over a more general one.  *Nitro-Lift Techs.,*, 568 U.S. at 21 (the "ancient interpretive principle" *generalia specialibus non derogant* dictates that "the specific governs the general."); *see also Crow Dog*, 109 U.S. at 570; *Nw. Bank Minn. Nat'l Ass'n v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002).  And a more recent, later-enacted statute controls over an older one.  *United States v. Est. of Romani*, 523 U.S. 517, 530-31 (1998).  Here, Section 1437t is more recently enacted than 5 U.S.C. § 553 and more specific to this particular waiver authority for the Department.

---

[7]     *See, e.g.,* PIH 2021–14 (HA) (relying on CARES Act that authorized the Department to waive or establish alternative requirements for numerous statutory and regulatory requirements for the Public Housing Program and others to offer administrative flexibilities to provide relief); The Department's quarterly regulatory waivers are located at: https://www.federalregister.gov/documents/search?conditions%5Bagencies%5D%5B%5D=housing-and-urban-development-department&conditions%5Bterm%5D=quarterly+regulatory+waiver+report.

[8]     *See, e.g.*, Ctrs. for Medicare & Medicaid Servs., COVID-19 Emergency Declaration Blanket Waivers for Health Care Providers (last updated Oct. 13, 2022), https://www.cms.gov/files/document/covid-19-emergency-declaration-waivers.pdf (notice that CMS was waiving many requirements that would otherwise apply to health care providers)

[9]     Plaintiffs' reliance on *AFL-CIO v. NLRB*, 57 F.4th 1023 (D.C. Cir. 2023) (Pls' Br. at 13), does not advance their position.  First, in contrast with the broad discretion afforded to the Department under Section 1437t(b)(3), Congress did not grant the agency in that case broad authority to waive a statutory requirement.  Second, unlike in *AFL-CIO*, the Department here does not assert that the Notice constitutes a procedural rule exempting it from notice and comment.  Rather, the Department asserts that, had Congress intended that the waivers of the conversion assessment go through notice and comment, Section 1437t(b)(3) would have said so.

3.     Waivers Inherently Need to Be Nimble to Respond to Particular
Challenges and Are Not Lengthy Regulatory Rulemakings.

Even if Section 1437t(b)(3) did not control over 5 U.S.C. § 551 *et seq.*, the select 2019 Notice waivers here would, at most, be "adjudications" (or "orders") for those particular projects under 5 U.S.C. § 551(6)-(7) and still would not be a "rule" or "rule making" under 5 U.S.C. § 551(4)-(5) that require notice and comment and the promulgation of new regulations.  *See, e.g.*, *Goodman v. FCC,* 182 F.3d 987, 994 (D.C. Cir. 1999) ("Neither does the petitioners' observation that the Implementation Order affected a large number of licensees carry much weight: Just as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large group of individuals without becoming a rulemaking.") (cleaned up); *see also Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013) (FCC order classifying the operations of Plaintiff and "similarly situated providers" was "a neither a legislative nor an interpretive rule," but "an interpretation in the course of an informal adjudication."); *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 765–66 (1969) ("Adjudicated cases may and do, of course, serve as vehicles for the formulation of agency policies" and "generally provide a guide to action that the agency may be expected to take in future cases.").

While full notice and comment can be beneficial in many circumstances, it is generally not required.  Waiver authority is typically granted to agencies so that they may respond to unexpected and emergent challenges.  For example, the Department recently relied on waivers authorized by the CARES Act to waive or establish alternative requirements for numerous statutory and regulatory requirements to deal with the COVID-19 pandemic. *See, e.g.*, PIH 2021–14 (HA); Notice: PIH 2021–34.  In 2017, the Administrative Conference of the United States provided "recommendations offer[ing] best practices and factors for agencies to consider regarding their waiver and exemption practices and procedures," which suggestions "are not intended to disturb

or otherwise limit agencies' broad discretion to elect how to best use their limited resources." *See* Administrative Conference of the United States, Administrative Conference Recommendation 2017-7: Regulatory Waivers and Exemptions (Dec. 15, 2017), https://www.acus.gov/sites/default/files/documents/Recommendation%202017-7%20%28Regulatory%20Waivers%20and%20Exemptions%29_0.pdf. Among the "recommendations" was that "Agencies should consider soliciting public comments before approving waivers or exemptions" in the interest of "transparency." *Id.*; *see also* Administrative Conference of the United States, *Waivers, Exemptions, and Prosecutorial Discretion: An Examination of Agency Nonenforcement Practices*, at 59 (2017) (it may not be "realistic to open up a decision whether to waive . . . to full public notice and comment.").

Indeed, it cannot be that waivers are only effectuated through regulatory rulemaking given that rulemaking takes years, and many proposed rules never make it to the final rule (or even proposed rule) stage given how many rules are in the queue. *See* Richard J. Pierce, Jr., *Rulemaking Ossification Is Real: A Response to Testing the Ossification Thesis*, 80 Geo. Wash. L. Rev. 1493, 1496 (2012) ("most rulemakings were actually completed within six to eight years") (cleaned up). If rulemaking were required to effectuate use of waivers such as the one at Section 1437t(b)(3), agencies' ability to respond to dynamic or exigent situations would be significantly impaired.

The 2019 Notice waivers in particular were for a few projects meeting all three of the following conditions:

1) A small Housing Authority (i.e., 250 units or less);
2) Has submitted an application for Streamlined Voluntary Conversion; and
3) Has confirmed its intent to close-out its entire public-housing program.

2019 Notice at 2. As explained above, small housing authorities only owned approximately twenty percent (20%) of the public housing units nationwide to begin with. Hornstein Decl. ¶ 26. The number of qualifying projects was diminished significantly by the second and third criteria. To

date, the Department has waived the conversion assessment requirement for approvals of just 36 applications.  *Id.* ¶ 25.  Those 36 applications come from around just 1.09% of the 3300 housing authorities nationwide, *see id.*, which shows the limited applicability of the 2019 Notice.

And, as explained above, the 2019 Notice articulated why the limited waivers were needed for those particular projects.  Further, federal compliance requirements create challenges for small housing authorities in maintaining and operating physically healthy properties. *Id.* at ¶ 26. Small housing authorities that own these units have limited options to preserve their housing and may be unable to take advantage of other repositioning mechanisms used by larger housing authorities. *Id.*  Recognizing these challenges, the Department waived certain requirements for small housing authorities. The waiver gives these housing authorities flexibility to make repositioning decisions to preserve affordable housing and better meet the needs of their local communities while reducing their reporting burden.  *Id.*  Requiring rulemaking to implement such a waiver would, as a practical matter, likely mean the waivers would just not get issued, which would increase the administrative and financial burden on small housing authorities by reducing their options to reposition their inventory while, for example, the physical condition of their inventory deteriorates or the community changes.

Thus, even if 5 U.S.C. § 551 *et seq.* applied to this waiver authority, the 2019 Notice waivers would at most be adjudications or orders for which a lengthy rulemaking is not required.

4.      The 2019 Notice Waivers Also Constituted Enforcement Discretion That Is Not Reviewable.

As with the approval of the Acre Road conversion, Plaintiffs' challenges to the 2019 Notice's waivers for certain projects are similarly foreclosed by 701(a)(2) for lack of "law to apply" or "judicially manageable standards" (*see supra* § II.B).  Those waivers too constituted the exercise of non-enforcement discretion that is unreviewable under *Heckler*.

As discussed above, a key factor in determining whether a discretionary action is reviewable under the APA is whether statutory or regulatory limits on the discretion exist.  Here, Section 1437t(b)(3) does not hamper that non-enforcement discretion in any way – it does not provide any "law to apply" or "judicially manageable standards."  As discussed above, Plaintiffs did not and cannot point to any Department regulations or policies governing when or how the Department may issue a Section 1437t(b)(3) waiver—be it applied to an individual housing project or a class of housing projects.  Therefore, there is "no law to apply."  *See Clifford*, 77 F.3d at 1417 ("waivers [may be] unreviewable [where] they are 'committed to agency discretion by law' (5 U.S.C. § 701(a)(2)), and hence there is 'no law to apply.'").  Nor does the Fair Housing Act contain any judicially manageable standards or requirements on when the Department is or is not permitted to not enforce a requirement.  Thus, the Department's waiver (non-enforcement) of the conversion assessment requirement for particular projects is an exercise of non-enforcement discretion that has long been held unreviewable under 5 U.S.C. § 701(a)(2).

     5.    The 2019 Notice Was Neither Arbitrary Nor Capricious Nor Contrary to Law

Even if the Department's issuance of the 2019 Notice were reviewable by this Court, it was not arbitrary and capricious or contrary to law.  Plaintiffs claim that the 2019 Notice is arbitrary and capricious because it was a change from previous policy and the Department failed to offer an explanation.  Compl. ¶ 155.  This argument fails for at least two reasons.

First, the Department was not changing its interpretation of a statute.  The 2019 Notice was merely announcing an exercise of waiver authority that the Department has always had under Section 1437t(b)(3).  *See* 42 U.S.C. § 1437t(b)(3).  In fact, the Department had previously exercised its discretion to waive all or part of the conversion assessment as it did in 2014.  *See* 2014 Notice at 1-2 ("The statute allows [the Department] to waive the conversion assessment,

however, or to require a streamlined conversion assessment for 'any public housing project or class

of public housing projects.'"; "[the Department] is exercising its statutory authority to waive the

cost analysis described at 42 U.S.C. 1437t(b)(1)(A)" for certain projects, "[o]ut of a recognition

that the regulatory burden on small [Public Housing Authorities] is out of proportion to the federal

resources available to them," and instead made available for those projects "a conversion

assessment that streamlines the cost analysis.").

Second, even if the 2019 Notice was a change in the Department's interpretation of

applicable law, the 2019 Notice explains its reasonable, non-arbitrary rationale.  Specifically, the

2019 Notice states:

> [The Department] and [Public Housing Authorities] remain committed to providing
> deeply subsidized rental assistance to the nation's most vulnerable populations,
> including the elderly, disabled and formerly homeless families. Meeting this
> commitment has been challenged by significant capital backlog, combined with
> regulatory burdens and limited access to private capital. Despite best efforts,
> [Public Housing Authorities], particularly small [Public Housing Authorities],
> struggle to preserve their stock of deeply assisted housing. This notice represents
> one of an array of tools that [the Department] is offering to [Public Housing
> Authorities] to allow them to voluntarily reposition public housing units to more
> sustainable funding platforms in order to meet local objectives

2019 Notice at 1.  Thus, far from arbitrarily eliminating a requirement to safeguard residents of

the Housing Authority, the 2019 Notice thoughtfully articulates the Department's decision to

exercise its waiver discretion in light of an array of variables that challenge access to safe housing

for those eligible for housing assistance.[10]  In addition, issuance of the 2019 Notice is not contrary

to the Department's duty to affirmatively further fair housing under the Fair Housing Act.  *See*

Pl's Br. at 26-28; Compl. ¶ 154.  As discussed above (*supra* § II.C.1), the broad Fair Housing

---

[10]     The 2019 Notice further includes a "[r]ecognition that small [Public Housing Authorities]
typically have reduced staff and limited funding available to conduct a full conversion assessment,
even if the conversion to [housing choice voucher] serves the best interests of residents and has no
adverse effect on the availability of affordable housing in affected neighborhoods."  *Id*. at 2.

Mandate affords the Department flexibility in how to fulfill it. *See McGrath v. HUD*, 722 F. Supp. 902, 908 (D. Mass. 1989) ("Title VIII does not mandate specific actions or remedial plans which [the Department] should undertake") (citations omitted).

In any event, fair housing issues were indeed considered in the design of the 2019 Notice. The 2019 Notice expressly considered and addressed fair housing considerations by, among other things, requiring the housing authorities to comply with the duty to affirmatively further fair housing. *See* 2019 Notice (discussing certification that plan and application "will affirmatively further fair housing"). Further, the 2019 Notice (among other things in the "Civil Rights" section) advises that "HUD's Office of Fair Housing and Equal Opportunity (FHEO) conducts a civil rights review of conversion plans." 2019 Notice at 9. Moreover, the 2019 Notice, while waiving the conversion assessment requirement, does not restrict the Department from requesting more information than required by the Streamlined Voluntary Conversion, quite the opposite. The 2019 Notice notifies the public that the Department, despite the streamlined process, may still ask for more information from a housing authority such as rental market analysis.

Thus, the 2019 Notice is not contrary to the Fair Housing Act's duty to affirmatively further fair housing.

## III.    <u>The Public Interest and the Equities Strongly Favor the Department</u>

The final two factors required for preliminary injunctive relief—a balancing of the harm to the opposing party and the public interest—merge when the Government is the opposing party. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015); *Pursuing Am.'s Greatness*, 831 F.3d at 511 ("[T]he government's interest is the public interest."). Courts are to give the government "the widest possible latitude in the dispatch of its own affairs." *Sampson v. Murray*, 415 U.S. 61, 83 (1974).  Courts must "pay

particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).[11]

As to the preliminary relief sought against the Acre Road conversion in particular, granting the preliminary injunction would immediately harm the community by exacerbating the current dangerous state of Acre Road being a project that is mostly vacant and subject to crime that threatens the other families who live and work in the area, as described above.  Hornstein Decl. ¶¶ 8, 10.  There are structural and immutable problems with the Acre Road site (recurring flooding leading to mold, adjacent to sewage plant, extreme isolation from the rest of the community, and crime from abandoned units) that rehabilitation or redevelopment would not fix.  *Id*. ¶ 23.  As to preliminary relief sought against the 2019 Notice: because such preliminary relief that vacates and sets aside the 2019 Notice may remain in effect for years during the pendency of the suit, including through the appeals process, such relief could adversely affect families assisted by the Department and housing authorities nationwide, the Department, and other federal agencies in multiple ways.

First, such relief may prevent the Department from approving conversion plans without streamlined conversion assessments.  This would impede the ability of families across the country to move from the Public Housing Program to the Voucher Program through streamlined voluntary conversions, including where dire health and safety concerns are present.  Hornstein Decl. ¶ 27. As described in the 2019 Notice, small housing authorities may not apply for a conversion where they lack the administrative capacity to undertake the onerous process of preparing a conversion

---

[11]     Also, "it is in the public interest to deny injunctive relief when the relief is not likely deserved under law." *Hubbard v. United States,* 496 F. Supp.2d 194, 203 (D.D.C. 2007) (quoting *Qualls v. Rumsfeld,* 357 F. Supp.2d 274, 287 (D.D.C. 2005)); *see also Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, . . . is inextricably linked with the merits of the case."). As demonstrated above, Plaintiffs are not likely to succeed on the merits.

assessment.  2019 Notice § 2; Hornstein Decl. ¶ 29.  Particularly where Public Housing projects may be located in a high-poverty/segregated areas, such relief would therefore also deny "small [Public Housing Authorities] greater flexibility to respond to local needs, [which] allows them to pursue private financing, and provides greater housing choice and mobility to assisted households."  2019 Notice at 1; Hornstein Decl. ¶ 29.  It could also cause uncertainty for the thousands of families who have already moved via a streamlined conversion (and uncertainty for the affected housing authorities, private Voucher landlords, and any purchasers after public-housing disposition).    Hornstein Decl. ¶¶ 25, 28.

Second, such relief adds to the administrative burdens on resource-strapped housing authorities (and the families they serve) across the country that want to utilize a streamlined voluntary conversion.  Hornstein Decl. ¶ 30.  Streamlined voluntary conversions may allow a small housing authority that is struggling with the burdens of administering multiple programs to close out its Public Housing program, so it can better focus on and administer its Voucher program.  *Id*. ¶ 30.  Streamlined voluntary conversions also help small housing authorities' financial health, in that Congressional funding for Vouchers is a more stable funding stream than Public Housing funding, and Vouchers allow housing authorities to leverage other financial resources.  *See* HUD, A Guide for Small Public Housing Authorities, at 4 (Mar. 2021); Hornstein Decl. ¶ 30.

Third, such relief could harm taxpayers by causing more scarce Public Housing dollars to be expended on unsafe/failed Public Housing projects across the country like Acre Road that could otherwise undergo streamlined voluntary conversions that would be less costly than rehabilitating the Public Housing projects.   Hornstein Decl. ¶ 31.

Fourth, such relief would harm other federal agencies besides the Department (and those they serve) by calling into question their own statutory rights to exercise waiver authority without

undergoing regulatory rulemaking.   The concept of Congress granting an agency waiver authority is by no means unique to the Department.  And it would similarly breed chaos and confusion for those affected by waivers that have already been exercised by other federal agencies without regulatory rulemaking.

Accordingly, Plaintiffs have not met their burden of establishing "that the balance of equities tips in [their] favor, and that an injunction is in the public interest" and therefore, Plaintiffs' motion should be denied. *See Winter*, 555 U.S. at 20.

## CONCLUSION

For the foregoing reasons, the Department respectfully requests that the Court deny Plaintiffs' Motion.

Dated: June 2, 2023
        Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____ */s/ Sian Jones* _____
        SIAN JONES, D.C. Bar # 1024062
        Assistant United States Attorney
        601 D Street, NW
        Washington, D.C., 20530
        (202) 252-2578

*Attorneys for the United States of America*