UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOLENE ANDERSON, et al.,

          Plaintiffs,

     v.

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.,

          Defendants.

Civil Action No. 23-1259 (DLF)

**MEMORANDUM OF POINTS AND AUTHORITIES IN
<u>SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Table of Contents

I.    Statutory and Regulatory Framework ........................................................................ 2

    A.   Section 9 Public Housing Program and Section 8 Voucher Program ................................. 2

    B.   Public Housing Program to Voucher Program Conversion Authority ............................... 3

    C.   Notice PIH 2019-05 ................................................................................................... 5

II.   Acre Road Conversion ............................................................................................ 7

    A.   Record Considered .................................................................................................. 7

    B.   Fair Housing Office Consideration ......................................................................... 10

    C.   Granting of Application .......................................................................................... 10

III.    Procedural History .............................................................................................. 11

I.    Conversion Assessment Waiver is Expressly Authorized by Statute ................................ 13

    A.   Conversion Assessment Waiver is Committed to Agency Discretion by Law ................ 16

    B.   Department has Not Changed its Interpretation of the Section 1437t(b)(3) Waiver
    Authority ......................................................................................................................... 18

II.   Approval of Conversion was Not Contrary to Law ..................................................... 19

    A.   Approval was not Contrary to the Broad Mandate to Affirmatively Further Fair Housing
    20

    1.   Affirmatively Further Requirement ....................................................................... 20

    2.   Fair Housing Effects Were Considered ................................................................. 22

    B.   The Department Did Not Act Contrary to Fair Housing Act Section 804 ....................... 24

    C.   Approval of the Conversion Waiver and Underlying Application was not Arbitrary or
    Capricious ....................................................................................................................... 28

III.    PIH Notice 2019-05 is Not Final Agency Action and Should Not Be Reviewed ............ 30

    A.   Legal Standard for Final Agency Action ................................................................. 30

    B.   The 2019 Notice Did Not Mark the Consummation of the Department's Decision-Making
    Process ........................................................................................................................... 31

    C.   No Legal Consequences Flowed from the 2019 Notice ............................................. 35

IV.    Even if PIH Notice 2019-05 is Reviewable, the Claims Against it Still Fail ................... 36

    A.   No Prejudicial Error .............................................................................................. 36

    B.   2019 Notice Does Not Require Notice-and-Comment ............................................... 38

    C.   2019 Notice is Not of General Applicability ............................................................ 41

    D.   The 2019 Notice is Not Contrary to the Affirmatively Further Requirement ................. 43

Table of Authorities

Page(s)

Cases

*Am. Disabled for Attendant Programs Today v. HUD*,
  170 F.3d 381 (3d Cir. 1999) ................................................................................ 17
*AT&T Corp. v. FCC*,
  220 F.3d 607 (D.C. Cir. 2000) ............................................................... 11, 24, 28
*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 31, 35
*Bloch v. Powell*,
  227 F. Supp. 2d 25 (D.D.C. 2002) ....................................................................... 11
*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..................................................................................... 12
*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
  339 F. Supp. 2d 52 (D.D.C. 2004) ................................................................. 38, 39
*Cal. Cmtys. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ...................................................................... 35, 36
*Camp v. Pitts*,
  411 U.S. 138 (1973) ..................................................................................... 11
*Chemical Manufacturers' Association v. EPA*,
  26 F. Supp. 2d 180 (D.D.C. 1998) ................................................................. 31, 35
*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) ........................................................................... 39
*Clifford v. Peña*,
  77 F.3d 1414 (D.C. Cir. 1996) .......................................................................... 17
*Ctr. for Biological Diversity v. Int'l Dev. Fin. Corp.*,
  77 F.4th 679 (D.C. Cir. 2023) ........................................................................... 37
*Davis v. EPA*,
  348 F.3d 772 (9th Cir. 2003) ...................................................................... 40, 42
*Domtar Main Corp. v. FERC*,
  347 F.3d, 311- (D.C. Cir. 2003) ........................................................................ 12
*Duncan v. Walker*,
  533 U.S. 167 (2001) ..................................................................................... 39
*Ethyl Corp. v. E.P.A.*,
  541 F.2d 1 (D.C. Cir. 1976) ............................................................................. 12
*Ex parte Crow Dog*,
  109 U.S. 556 (1883) ..................................................................................... 16
*Fund for Animals v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ...................................................................... 30, 31
*Goodman v. FCC*,
  182 F.3d 987 (D.C. Cir. 1999) .......................................................................... 41
*Grant Med. Ctr. v. Hargan*,
  875 F.3d 701 (D.C. Cir. 2017) .......................................................................... 11

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir.) ............................................................................................. 11
*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................................. 17
*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 13 (D.D.C. 2008) .......................................................................... 11
*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) ......................................................................... 32, 36
*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ................................................................................ 11
*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .................................................................................................. 28
*Mass. Coal. for Reform v. Dep't of Homeland Sec.*,
    *621* F. Supp. 3d 84 (D.D.C. 2022) .................................................................. 32, 36
*McGrath v. HUD*,
    722 F. Supp. 902 (D. Mass. 1989) .......................................................................... 20
*Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................... 11, 24, 30
*Nat'l Fair Hous. All. v. Carson*,
    330 F. Supp. 3d 14 (D.D.C. 2018) .......................................................................... 20
*Nitro-Lift Techs., LLC v. Howard*,
    568 U.S. 17 (2012) .................................................................................................... 16
*Nuclear Data, Inc. v. Atomic Energy Comm'n*,
    344 F. Supp. 719 (N.D. Ill. 1972) ........................................................................... 41
*Orton Motor, Inc. v. Dep't of Health & Hum. Servs.*,
    884 F.3d 1205 (D.C. Cir. 2018) .............................................................................. 16
*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) ................................................................................ 16
*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ......................................................................... 17, 27
*Prohibition Juice Co. v. FDA*,
    45 F. 4th 8 (D.C. Cir. 2022) .................................................................................... 37
*R.J. Reynolds Tobacco Co. v. Dep't of Agric.*,
    130 F. Supp. 3d 356 (D.D.C. 2015) ........................................................................ 16
*Raoof v. Sullivan*,
    315 F. Supp. 3d 34 (D.D.C. 2018) .......................................................................... 17
*Samma v. Dep't of*,
    *Def.*, 486 F. Supp. 3d 240 (D.D.C. 2020) ............................................................. 38
*Shinseki v. Sanders*,
    556 U.S. 396 (2009) .................................................................................................. 37
*Skidmore v Swift & Co*,
    323 U.S. 134 (1944) .................................................................................................. 16
*Slyper v. Att'y Gen.*,
    827 F.2d 821 (D.C. Cir. 1987) ................................................................................ 17
*Small Refiner Lead Phase-Down Task Force v. E.P.A.*,
    705 F.2d 506 (D.C. Cir. 1983) ................................................................................ 12

*United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,*
   920 F.2d 960 (D.C. Cir. 1990) ................................................................ 42
*Valero Energy Corp. v. EPA,*
   927 F.3d 532 (D.C. Cir. 2019) ........................................................ 31, 35
*Valley Reg'l Ctr., LLC v. Dep't of Homeland Sec.,* Civ. A.,
   No. 23-0119 (TNM), 2023 WL 3863637 (D.D.C. June 7, 2023) .................... 32
*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
   5 F.4th 997 (9th Cir. 2021).................................................................... 32

## Statutes

10 U.S.C. § 2006a(b) ...................................................................... 38
21 U.S.C. § 971(f) ......................................................................... 38
26 U.S.C. § 5555(b) ....................................................................... 38
26 U.S.C. § 6114(b) ................................................................... 39, 41
38 U.S.C. § 7261(b)(2) .................................................................... 37
38 U.S.C. § 7655 ........................................................................... 38
42 U.S.C. § 13361 ......................................................................... 39
42 U.S.C. § 1437 ............................................................................ 2
42 U.S.C. § 1437f(f)(7) ..................................................................... 3
42 U.S.C. § 1437f(o) ........................................................................ 2
42 U.S.C. § 1437g ....................................................................... 2, 42
42 U.S.C. § 1437t. .......................................................................... 44
42 U.S.C. § 1437t(b) ................................................................. passim
42 U.S.C. § 1437t(c)(2) ................................................................... 34
42 U.S.C. § 1437t(d) ........................................................................ 4
42 U.S.C. § 238l(d) ........................................................................ 38
42 U.S.C. § 3604 .......................................................................... 24
42 U.S.C. § 3608(e)(5) .................................................................... 20
42 U.S.C. 1437t(b)(1)(A)................................................................... 18
5 U.S.C. § 551(4) .......................................................................... 40
5 U.S.C. § 551(6) .......................................................................... 41
5 U.S.C. § 553 ............................................................................. 39
5 U.S.C. § 701(a)(2) ....................................................................... 16
5 U.S.C. § 704 ............................................................................. 30
5 U.S.C. § 706 ............................................................................. 37
5 U.S.C. § 706(2)(C) ....................................................................... 25
5 U.S.C. § 9809(h)(2) ...................................................................... 38
Pub. L. No. 105-276......................................................................... 3
Section 1437t(c) ........................................................................... 14
Section 1437t(e) ........................................................................... 14

## Regulations

24 C.F.R. § 100.500 .................................................................. 24, 25
24 C.F.R. § 5.151 .......................................................................... 21
24 C.F.R. § 5.152(b) ....................................................................... 22

24 C.F.R. § 5.152(b)(1)(i) ............................................................................................ 22
24 C.F.R. § 903.15(c) .............................................................................................. 21, 22
24 C.F.R. § 972.224(a)(2) ............................................................................................ 34
24 C.F.R. § 982.302(a) .................................................................................................. 3
24 C.F.R. §§ 982.1(b) .................................................................................................... 3
24 C.F.R. 972.218 ......................................................................................................... 4
24 C.F.R. 972.218(c)-(e) ............................................................................................. 15
24 C.F.R. part 972 ......................................................................................................... 3
24 CFR 972.218(d) ...................................................................................................... 34
64 Fed. Reg. 40,240 ..................................................................................................... 42
66 Fed. Reg. 33,616 ..................................................................................................... 43
88 Fed. Reg. 19450 ...................................................................................................... 26

Other Authorities

*Rulemaking Ossification Is Real: A Response to Testing the Ossification Thesis*,
   80 Geo. Wash. L. Rev. 1493 (2012) ....................................................................... 43

Defendants, the Department of Housing and Urban Development ("Department" or "HUD") and Marcia Fudge, in her official capacity as Secretary of Housing and Urban Development ("Secretary"), by and through undersigned counsel, respectfully submit this memorandum of points and authorities in support of Defendants' motion for summary judgment.

In this action under the Administrative Procedure Act ("APA"), Plaintiffs, two of whom are residents of the Acre Road public housing project located in Marrero, Jefferson Parish, Louisiana, challenge the actions of the Department surrounding the approval of an application to convert the Acre Road development from Section 9 Public Housing Project to Section 8 Housing Vouchers. Plaintiffs specifically challenge the waiver of a conversion assessment, the conversion approval itself, and a 2019 notice circulated by the Department as in violation of the APA as arbitrary and capricious and in violation of provisions of the Fair Housing Act.

For the reasons discussed below, the law and the underlying administrative record show that the Department has the authority to waive a conversion assessment and that the conversion approval was not arbitrary and capricious, and that the 2019 notice at issue was not final agency action subject to review under the APA.

Accordingly, the Court should find in favor of Defendants and grant the motion for summary judgment and dismiss this case.

## BACKGROUND

I. **Statutory and Regulatory Framework**

A. **Section 9 Public Housing Program and Section 8 Voucher Program**

The United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* ("1937 Act"), authorizes several federally assisted housing programs, including the two at issue here, the public housing program under Section 9 (42 U.S.C. § 1437g, "Public Housing Program") and the housing choice voucher program under Section 8 (42 U.S.C. § 1437f(o), "Voucher Program").

In the Public Housing Program, the Department provides federal aid to state and local housing authorities that own, manage, and operate the public housing projects where eligible families live.  *See* HUD, HUD's Public Housing Program, https://www.hud.gov/topics/ rental_assistance/phprog.  Tenants in the Public Housing Program are admitted to a particular public housing project unit and their assistance is tied to that unit; they cannot take it with them and go live somewhere else.

In the Voucher Program, which is also locally administered by housing authorities using federal aid from the Department, housing authorities give program participants housing vouchers that help them look for and obtain a rental unit in the private market with a private landlord.  42 U.S.C. § 1437f(f)(7), (o); 24 C.F.R. § 982.302(a).  This tenant-based assistance is tied to the tenant, not the unit—vouchers allow tenants to move and keep their assistance and voucher holders can use their voucher "anywhere in the United States in the jurisdiction of a [housing authority] that runs a Voucher [P]rogram."  24 C.F.R. §§ 982.1(b), 982.302, 982.353(b), 982.354, 982.355.

## B. Public Housing Program to Voucher Program Conversion Authority

As part of the Quality Housing and Work Responsibility Act of 1998 ("1998 Act"), Congress amended Section 22 of the 1937 Act and authorized local housing authorities to voluntarily convert a Public Housing Program to a Voucher Program, declaring:

> Congress finds that . . . the interests of low-income persons, and the public interest, will best be served by a reformed public housing program that— vests in public housing agencies that perform well the maximum feasible authority, discretion, and control with appropriate accountability to public housing residents, localities, and the general public.

Veterans Affs. and HUD Approps. Act, 1998, Pub. L. No. 105-276, 112 Stat. 2461, § 502(a)(5)(C) (1998).  The Department promulgated implementing regulations at 24 C.F.R. part 972, subpart B.

Under the statute, a housing authority may convert a Public Housing Program to a Voucher Program "only as provided in a conversion plan . . . which has not been disapproved by the

Secretary pursuant to subsection (e)."  42 U.S.C. § 1437t(d).  Subsection (e) gives the Department "only" three narrow grounds on which to "disapprove a conversion plan."  *Id.*

Relevant here, the default rule is that a conversion plan must include a "conversion assessment," unless the Department waives or streamlines the conversion assessment as authorized by the statute.  42 U.S.C. § 1437t(b).  A conversion assessment, if required, must include a significant amount of information and analysis, including a cost analysis, market value analysis, rental market analysis, an analysis of impact to the neighborhood, and conversion implementation analysis.  42 U.S.C. § 1437t(b)(1); 24 C.F.R. 972.218.

The Department has broad discretionary authority to waive a conversion assessment:

At the discretion of the Secretary or at the request of a public housing agency, the Secretary may waive *any or all* of the requirements of paragraph (1) or (3) [regarding conversion assessment] or otherwise require a streamlined assessment with respect to *any public housing project or class of public housing projects*.

42 U.S.C. § 1437t(b)(3) (emphasis added).

As of 2005, there were approximately 3,300 housing authorities administering one or more public housing projects.[1]  But in the first sixteen years after the 1998 Act's passage, the Department received only eleven voluntary conversion applications, fewer than one per year.  Administrative Record ("AR") 01933 (Conversion Spreadsheet).  Thus, on June 18, 2014, the Department circulated Notice PIH 2014-14 (the "2014 Notice") proposing to waive the cost analysis and market value components of the conversion assessment requirement for a small number of projects operated by small housing authorities (only about "5% of the public housing inventory" would have been eligible), "recogniz[ing] that small [Public Housing Authorities] would benefit from streamlining authority and regulatory relief" because "the regulatory burden on small [Public Housing Authorities] is out of proportion to the federal resources available to them."  *Id.* at 00347;

---

[1]     GAO, HUD Rental Assist. at 13 (Feb. 2005), https://www.gao.gov/assets/gao-05-224.pdf.

AR 00378.  After five years, the Department only received five streamlined conversion applications, of which two were approved in 2015.  *Id*. at AR 01933 (Conversion Spreadsheet); 00394-408 (2015 streamlined voluntary conversion approvals).

C.     **Notice PIH 2019-05**

On March 21, 2019, the Department circulated Notice PIH 2019-05 (the "2019 Notice" proposing to waive the conversion assessment requirement in a broader fashion and proposing a non-definitive framework for providing eligible applicants a more streamlined assessment that would be particularized to each application (i.e., housing project).  Office of Public and Indian Housing's PIH Notice 2019-05, Streamlined Voluntary Conversions of Last Remaining Projects of Small Public Housing Agencies, at https://www.hud.gov/sites/dfiles/PIH/documents/PIH-2019-05.pdf; AR 00491.

The 2019 Notice itself did not grant a waiver to any particular housing project or housing authority, nor did it purport to.  AR 00492-96.  Rather, the 2019 Notice invited eligible housing authorities to apply for a waiver and streamlined conversion along the lines of what the 2019 Notice described, or along different lines as a housing authority might have proposed in the alternative.  *Id*.  The 2019 Notice solicited public comment, without a deadline, including "alternative[]" proposals.  *Id.* at 00500.  The 2019 Notice described that the Department intended to then review such applications and would potentially require various kinds of additional information as part of determining what would be appropriate to waive or require for a particular project.  *Id*.[2]

---

[2]     The 2019 Notice was previously characterized as having actually granted legally effective waivers to unspecified projects that included the Public Housing Program at issue in this case.  As further described herein, the 2019 Notice was merely informational and non-definitive, and was not final agency action as to any project.

The 2019 Notice recognized that "small [Public Housing Authorities] typically have reduced staff and limited funding available to conduct a full conversion assessment, even if the conversion to [housing choice voucher] serves the best interests of residents and has no adverse effect on the availability of affordable housing in affected neighborhoods." *Id*. at 00491-92.  The 2019 Notice also discussed the potential benefits of conversion from a Public Housing Program to a Voucher Program:

> challenges [of] significant capital backlog, combined with regulatory burdens and limited access to private capital. Despite best efforts, [Public Housing Authorities], particularly small [Public Housing Authorities], struggle to preserve their stock of deeply assisted housing. This notice represents one of an array of tools that [the Department] is offering to [Public Housing Authorities] to allow them to voluntarily reposition public housing units to more sustainable funding platforms in order to meet local objectives.

*Id*. at 00491.[3]

The 2019 Notice also expressly considered fair housing considerations, including (among other things) consideration of the fact that the Department's "Office of Fair Housing and Equal Opportunity conducts a civil rights review of conversion plans," and "[a]s part of the conversion plan and application, [Public Housing Authorities] certify compliance with all applicable civil rights nondiscrimination and equal opportunity requirements."  *Id.* at 00498-00500.

Ultimately, the 2019 Notice has had very limited impact on public housing inventory.  The Department only approves an average of nine streamlined voluntary conversions per year, representing just 00.27% of the approximately 3,300 housing authorities operating one or more public housing projects.[4]

---

[3]    *See also* AR 00409-410 (2017 Funding Justifications) (capital backlog "$26 billion as of 2010 and increasing by an average of $3.4 billion each year").

[4]    *See* AR 01933-35; HUD, Public Housing, https://www.hud.gov/program_offices/ public_indian_housing/programs/ph#:~:text=There%20are%20approximately%201.2%20million ,managed%20by%20some%203300%20PHAs  (~3,300 authorities operate public housing

## II. <u>Acre Road Conversion</u>

On October 23, 2020, the Department received the Housing Authority of Jefferson Parish's ("Housing Authority") Streamlined Voluntary Conversion application and conversion plan for the Acre Road public housing project in Marrero, Louisiana (the "Conversion Plan").  AR 00503-16 (Application); 00806-27 (Conversion Plan).   The Department then sought, obtained, and considered a variety of additional information during its consideration of the Conversion Plan and Application.  *See*, *e.g.*, *id*. at 00828-44; 00848-85l; 00790-92.

### A.   Record Considered

In May 2021, Plaintiff Marrero Tenants Organization ("Marrero Tenants") stated:

> We are in a state of emergency due to mold plus the unsafe and unsanitary conditions in which the Acre [Road] residents [have] been subject to live in for years.  It should have been declared a nuisance and a hazard . . . due to the toxic chemicals that [s]ecrete from the water treatment plant located on Betty Street. These chemicals poison the wombs and cause[] learning deficiencies in our youth.

*Id*. at 01009.  This project, at which residents have been "nearly 100% black," was "built in the mid-to-late 60's" south of New Orleans next to a sewage plant during the height of the Jim Crow era.  *Id*. at 01718-20; *see also id*. at 00827 (identifying a "foreseeable potential issue related to . . . the environmental assessment as it relates to the sewer lift station on Lapalco Blvd. at the rear of the property.").   On October 8, 2021, the Marrero Tenants opined that Acre Road had "deteriorated" such that it is "no longer . . . safe and habitable," is "both a hazard and a nuisance for our tenants," is "substandard," and the conditions "necessitate immediate action."  *Id*. at 01060.

The Department reviewed data that "[s]tudies have concluded that the mold count presents a danger to the health and safety of the residents," presenting an "urgent need to relocate the families from substandard living conditions brought on by mold infestation."  *Id*. at 01890-91; *see*

---

projects).

*also id*. at 00524-25 (1st Mold Report) ("Results of the evaluation indicated significant indications of fungal growth, active leaking, and elevated airborne spore counts throughout the housing units included in the assessment."); 00527-28 (2nd Mold Report); AR00744 (Healthy Homes Email) ("[m]old exposure has been shown to exacerbate asthma and other respiratory conditions, especially in young children, the elderly, and immunocompromised persons" presenting "an imminent health and safety risk").  The mold danger is a long-term problem due to recurring environmental conditions such as seasonal flooding and storms and local humidity.[5]

Additionally, the Housing Authority presented evidence that residents "expressed significant interest in obtaining Tenant Protection Vouchers and moving out of the public housing development due to the deterioration of the units." *Id*. at 00846.  The local government (Jefferson Parish Council) supported the conversion as well.  *Id*. at 0189; 00592.

There were further problems with Acre Road.  The Housing Authority struggled to manage multiple different programs and meet both federal- and state-law reporting requirements.  *Id*. at 00703.  Furthermore, the Housing Authority received complaints from Acre Road residents about the project's "mismanagement . . .  over several years." *Id*. at 00808, 814.  The Housing Authority eventually defaulted on its obligations under the Annual Contributions Contract and had to give up its Voucher program to Jefferson Parish as a cure condition.  *Id*. at 00473-76 (Default Letter); 00685 (Cure Letter).

Acre Road was also in serious long-term financial trouble.  The Conversion Plan's

---

[5]     *See also* AR 01060 ("damage from Hurricane Ida has exasperated mold conditions"); 001739-40, 1789-95 (photographs of storm damage); 01884 (noting units "critically damaged by a tornado"); 00518 (1st Mold Report) ("The relative humidity in some units exceeded the ASHRAE recommended indoor air comfort guidelines (30-60%) . . . [which is] associated with the occupant leaving windows open to outside conditions or conservative use of the air conditioning system.").

"Funding Concerns" section showed capital repair needs for the foreseeable future far exceed Congressional appropriations (typifying a larger national problem), and the Housing Authority's Five-Year Action Plan showed that its 2020 and 2022 Public Housing Budget was in the negative (-$50,969.00 and -$337,000.00 respectively).  *Id*. at 01895. For example, the Housing Authority needed about $1.4 million in immediate repairs, $4 million in repairs for years 1-5, and $21 million in total repairs (capital needs) while receiving only $419,038 in Capital Funds for FY19.  *Id*. at 00809-10 (Conversion Plan); 00505 (Application); 00491 (2019 Notice); 00409-411 (2017 Funding Justifications).

Another factor weighing in favor of conversion was that the community at large was losing a substantial amount of its voucher stock (up to 199 vouchers) just to help families get out of Acre Road, and conversion approval would enable the community to receive Tenant Protection Vouchers that restock the vouchers that Acre Road families needed to use.  *Id*. at 01884-86.  As of the March 9, 2023, conversion approval, 145 out of 199 units at Acre Road had been vacated by tenants that had already used Vouchers to relocate.  *Id*. at 01885.  That was because, "on July 15, 2021, the Department authorized the [Housing Authority] to commence relocation of residents to mitigate resident safety concerns" using certain Vouchers that the Housing Authority already had from the normal administration of its Section 8 Voucher program.  *Id*.

Even as the Housing Authority's conversion plan showed that Acre Road is unsafe and residents needed relocation, the Department also considered rental market information and the adequacy of the Housing Authority's proposed relocation supports for the last-remaining Acre Road families.  As Plaintiffs acknowledge, the Conversion Plan was realistic about the shortage of affordable housing in the New Orleans-Metairie Metropolitan area and difficulty associated with relocating.  *Id*. at 00816, 00824; Pl's Prelim. Inj. ("PI") Mem. at 30 n.8, ECF No. 3.

Nevertheless, the Department confirmed that the Housing Authority "believe[d] there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based Housing Choice Voucher assistance." AR 01890. And the Department and its Office of Fair Housing and Equal Opportunity ("Fair Housing Office") confirmed that the Application proposed the necessary supports to help families relocate. *Id*. at 01884-86, 89; 00742-43.

### B.     Fair Housing Office Consideration

The Department's Fair Housing Office also assisted with reviewing and assessing the Marrero Tenants correspondence and the relocation and fair housing concerns raised therein: principally, that a full conversion assessment would show a lack of Housing Choice Voucher program housing in Jefferson Parish, and that families might end up moving to areas that are more segregated and lower income (echoing relocation challenges expressed in the Conversion Plan itself). *Id*. at 01716-37; 01847-51; 01741-44; 00816-24. The Fair Housing Office had supported the conversion, as the "pervasive mold problem presents a dangerous risk to the health and safety of the residents," and the Marrero Tenants letters did not change that conclusion or cause the Fair Housing Office to retract its support for the conversion. *See id.* at 0742-43; 01889; 01741-44.

### C.     Granting of Application

Ultimately, the Department's review culminated in a two-fold March 9, 2023 final determination that: (1) the streamlined assessment particularized for Acre Road that had been created to date was sufficient (no further information was needed), thereby consummating and granting that particularized conversion assessment waiver for Acre Road; and (2) approving the conversion Application based on that streamlined assessment and the other information available to the Department. *Id*. at 01883-91.

It was later identified that the signor of the March 9, 2023 determination lacked delegated

authority to grant that statutory and regulatory waiver for Acre Road.  *Id*. at 02006.  Thereafter, the appropriate Department official undertook an independent review of whether that waiver for Acre Road was an appropriate and good use of the waiver authority, and determined and ratified on October 23, 2023, that it indeed was.  *Id*. at 02006-08; *see generally Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 12 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019).

## III.   **Procedural History**

Plaintiffs filed this action along with a motion for a preliminary injunction on May 3, 2023. ECF Nos. 1, 3.  The Court held a hearing on the motion on July 10, 2023, and for the reasons stated on the record, subsequently denied the motion.  *See* Minute Order July 27, 2023.

## STANDARD OF REVIEW

Summary judgment is the "appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002).  Under the APA, a court only sets aside an agency decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 705 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)).

The court's review on summary judgment is limited to the administrative record.  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  The scope of review is "narrow," and "the court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfgr's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000); *see also Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008) ("[I]t is not

11

enough for the agency decision to be incorrect—as long as the agency decision has some rational basis, the court is bound to uphold it.").

The administrative record need not include explicit discussion of every factor relevant to an agency's decision, so long as the bases for its choices are otherwise clear from the nature and context of the challenged action. *Domtar Main Corp. v. FERC*, 347 F.3d, 311-12 (D.C. Cir. 2003). If an agency's "reasons and policy choices to conform to certain 'minimal standards of rationality,'" the decision must be upheld. *Small Refiner Lead Phase-Down Task Force v. E.P.A.*, 705 F.2d 506, 521 (D.C. Cir. 1983) (quoting *Ethyl Corp. v. E.P.A.*, 541 F.2d 1, 36 (D.C. Cir. 1976) (internal quotation marks omitted). And the court should even "uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (internal citation omitted).

## ARGUMENT

Plaintiffs challenge the Department's 2023 decision to approve the Acre Road conversion Application without requiring a full conversion assessment. First, they assert that the Department lacks authority to waive conversion assessments, and that the Department's contrary view is an arbitrary and capricious change in position. Second, Plaintiffs assert that approving the Acre Road conversion without a full conversion assessment violated the Fair Housing Act and was arbitrary and capricious for failure to consider fair housing issues under the APA. Plaintiffs also challenge the 2019 Notice as being contrary to statute and invalid for lack of rulemaking.

As shown below, none of these contentions has merit. The 2023 streamlined conversion approval was authorized by statute and was not an arbitrary and capricious change in position, was a valid exercise of the waiver authority committed to agency discretion by law, did not violate the Fair Housing Act, and was not an arbitrary and capricious failure to consider fair housing issues.

Further, the 2019 Notice was not a final agency action that had a legal impact on the parties and thus is not reviewable.  In any event, any such deficiency would be irrelevant here, as a project-specific waiver for Acre Road was provided in 2023.

## I.      Conversion Assessment Waiver is Expressly Authorized by Statute

As a threshold matter, the Acre Road conversion assessment waiver complies with Section 1437t because it is expressly authorized by the plain language of Section 1437t(b)(3) ("the Secretary may waive any or all of the requirements of paragraph (1) or (3) or otherwise require a streamlined assessment with respect to any public housing project or class of public housing projects.").  The Department has long exercised the statutory waiver authority provided by Section 1437t(b)(3).  *See*, *e.g.*, AR 01933-35 (Conversion Spreadsheet); 00394-408 (2015 streamlined voluntary conversion approvals); 00347 (2014 Notice).

Section 1437t(b) is titled "Conversion Assessment" and has three paragraphs relating to the process by which a housing authority may seek to convert Section 9 public housing units to the Section 8 program.  The first, "In General," sets forth the general requirement for housing authorities to conduct an assessment that includes certain listed information if they wish "[t]o convert public housing under this section."  42 U.S.C. § 1437t(b)(1).  The second paragraph, "Timing," in essence requires a baseline assessment within two years of the effective date of the statute, and then provides for future assessments as needed.  42 U.S.C. § 1437t(b)(2).  The third paragraph, "Streamlined Assessment," is the paragraph most at issue in this matter as it provides the explicit authorization for the Secretary to waive conversion assessment requirements or otherwise require a streamlined assessment at her discretion.  42 U.S.C. § 1437t(b)(3).  This authorization is notably not time-bound, nor is it in any way limited in its application to the initial baseline assessments conducted pursuant to paragraph (2).  Indeed, because the assessments discussed may be conducted "at any time," the Secretary's authority is available whenever an

assessment is to be conducted.

Plainly, neither Section 1437t(b)(3) nor (b)(1) contains any words limiting the waiver authority to only the initial assessments described in one part of Section 1437t (b)(2).  *Cf.* Pl's PI Mem. at 19; Pl's PI Reply at 7-8, ECF No. 22; Compl. ¶ 153.  Moreover, the independent "or otherwise require a streamlined assessment" language in Section 1437t(b)(3) also does not contain any temporal limitation.  Indeed, Section 1437t(b)(2) describes "an assessment under paragraph (1) or (3)" for the initial assessments and that a Housing Authority "may otherwise undertake an assessment under this subsection [b] at any time for any public housing project[.]"  42 U.S.C. § 1437t(b)(2).  The use in the "at any time" sentence of "an assessment under this subsection [b]"— which includes (b)(3)—instead of "conversion assessment" or "an assessment under paragraph (1)[,]" makes plain that Congress authorized the Department to provide streamlined assessments and waive conversion assessment requirements "at any time."  The plain language of Section 1437t(b)(3) shows that the Secretary has complete discretion to fully waive the conversion assessment or put in place alternative, streamlined assessments prior to approving a conversion plan.

That Section 1437t(b)(3) allows conversion assessment waivers is not contradicted by Section 1437t(c) ("Criteria for Implementation of Conversion Plan") or Section 1437t(e)(1)-(2) ("Review and Approval of Conversion Plans"), which mention a "conversion assessment."  Where the Department has waived a conversion assessment pursuant to Section 1437t(b)(3), the conversion assessment provisions in Section 1437t(c) and (e)(1)-(2) simply do not apply anymore. This concept is not novel.  For example, when a tenant moves from a Public Housing program to a Voucher program, the Voucher program requirements thereafter apply, not those of the Public Housing program, but that does not mean the Public Housing requirements have been written out

14

of existence.  Indeed, in 2014 and 2015 the Department explicitly said this is how the voluntary conversion scheme works if a waiver is granted.[6]  And that does not mean the Department necessarily loses all power to disapprove an application and thereby violates the statutory scheme.  Indeed, the Approval still applied its own "principally benefit the residents . . . , the [Public Housing Authority], and the community" and "[w]ill not adversely affect the availability of affordable housing in the community" standards to the conversion plan (even though 972.224(a)(2)-(3) and 1437t(c)(2)-(3) apply those standards only to a "conversion assessment," which was waived here).  AR 01891.

Since 2014, the Department has interpreted the statute to allow post-initial assessment waivers that are not precluded by other provisions that only apply when there is no waiver.  Because the Department's interpretation has been consistent, longstanding (since 2014), and

---

[6]     Appendix B of the 2014 Notice contains a chart detailing which conversion requirements would still apply, not apply, or be modified if a project receives a waiver as described therein. Notably, it shows that where the cost analysis and market value components of a conversion assessment have been waived, the corresponding conversion approval requirements would also be waived or modified accordingly.  *See* AR00376 (§ 972.218 . . . Paragraph (a) does not apply" and "Paragraph (b) does not apply"; "§ 972.224 . . . Paragraph (a)(1) does not apply"); AR00377 ("§ 972.239 . . . Paragraph (10) of the Notice addresses HUD actions with respect to a conversion plan."); *see also* § 972.224(b)(1) (confirming that both components are relevant to the .224(a)(1) "not be more expensive" analysis, and noting the relevant statutory equivalents at 1437t(b)(1)(A)-(B)), (c)(1), and (e)).

        As to 2014 Notice Paragraph 10, its subsection (c) and conclusion reference the requirement at § 972.239(b)(3) (equivalent to Section 1437t(e)(3)) regarding plan completeness and meeting all requirements not waived, but Paragraph 10 does not reference the 972.239(b)(1)-(2) conversion approval requirements (equivalent to Section1437t(e)(1)-(2)) about consistency with a conversion assessment.  Further, the two 2015 streamlined voluntary conversion approvals finally adopted the above waiver framework for two different projects.  AR00394-408.  The 2015 approvals consummated for those projects the waiver of both the cost analysis and market value components of a conversion assessment; only the other "three components" were required (see 24 C.F.R. 972.218(c)-(e); 42 U.S.C. § 1437t(b)(1)(C)-(E)).  *Id.*  And those letters approved those conversions based on plan completeness and meeting all requirements not waived and did not apply the conversion approval requirements regarding "not be more expensive" (§ 1437t(c)(1); 972.224(a)(1)) or consistency with a conversion assessment (§ 1437t(e)(1)-(2); 972.239(b)).  *Id.* Those provisions are not discussed or cited anywhere in those approvals.

authoritative (by Assistant Secretary of the Public Housing Office), the Court should defer to it under *Skidmore v Swift & Co*, 323 U.S. 134 (1944). *See, e.g.*, *Orton Motor, Inc. v. Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1214 (D.C. Cir. 2018) ("FDA guidance documents upon which the Board relied have been operative since 2013, without change to the Center's violation-counting methodology. That the FDA has interpreted the statute consistently buttresses our determination that its reading merits our respect."); *R.J. Reynolds Tobacco Co. v. Dep't of Agric.*, 130 F. Supp. 3d 356, 371 (D.D.C. 2015) ("fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position").

Even if there were a conflict between Section 1437t(b)(3) ("Streamlined Assessment") and Sections 1437t(c), (e) ("criteria" and "approval" for "conversion plans"), the former would control. A specific statutory provision controls over a more general one. *Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 (2012) (noting the "ancient interpretive principle that the specific governs the general"); *Ex parte Crow Dog*, 109 U.S. 556, 570 (1883). Section 1437t(b)(3) expressly provides the Department's conversion assessment waiver and streamlining authority. Sections 1437t(c) and (e) do not discuss "waiver" at all and should not be construed as prohibiting the waivers authorized by 1437t(b)(3).

### A.    Conversion Assessment Waiver is Committed to Agency Discretion by Law

Additionally, the authority of the Secretary to waive the conversion assessment is committed to agency discretion by law and should not be reviewed. The APA does not provide a cause of action where the agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(2); *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an

action cannot state a claim under the APA."). This is true "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). If "no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretion." *Id.* at 830 (internal quotation marks omitted).

Waivers are committed to agency discretion by law where there is no law to apply. *Clifford v. Peña*, 77 F.3d 1414, 1417 (D.C. Cir. 1996) ("waivers [may be] unreviewable [where] they are 'committed to agency discretion by law' (5 U.S.C. § 701(a)(2)), and hence there is 'no law to apply'"); *Slyper v. Att'y Gen.*, 827 F.2d 821, 823 (D.C. Cir. 1987) (waiver decision unreviewable where "[t]he statute contains no standard or criterion upon which the Director is to base a decision to make or withhold a" waiver); *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 41 (D.D.C. 2018). More broadly, an agency's enforcement decisionmaking—about whether, where, and to what extent it may enforce a requirement—is also presumptively unreviewable. *See*, *e.g.*, *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020); *Heckler*, 470 U.S. at 831-32 ("an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise . . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); *Am. Disabled for Attendant Programs Today v. HUD*, 170 F.3d 381, 389 (3d Cir. 1999) (applying *Chaney* in the Fair Housing Act enforcement context).

Here, Section 1437t(b)(3) similarly provides no law to apply. The only "law to apply" identified by Plaintiffs is that the Acre Road waiver is allegedly prohibited by Section 1437t, which, as discussed, is not the case. Pl's PI Reply at 6-9. There is no such law to apply to the 2023 Acre Road waiver (or to what the 2019 Notice had proposed). The 2019 Notice discussed

17

another exercise of the waiver authority and did not set forth any governing policies on when or how the waiver authority may be used in the future.  How the Department exercised its discretion here is unreviewable.

**B.      Department has Not Changed its Interpretation of the Section 1437t(b)(3) Waiver Authority**

Plaintiffs also argue that the conversion assessment waiver for Acre Road was arbitrary and capricious under the APA because it was an unacknowledged and unexplained change from a purported prior HUD policy that Section 1437t(b)(3) only allowed the Department to waive the initial conversion assessments (that were required of housing authorities within the first two years after Section 1437t's enactment), and only where no actual conversion was sought.  Pl's PI Mem. at 19-21; Pl's PI Reply at 14-15.  In fact, the Department has never changed its interpretation of the waiver authority under Section 1437t.

The Department has long exercised its authority to waive the full conversion assessment for voluntary conversion applications and did so on thirty-five different occasions prior to the waiver for Acre Road.  AR 01933-35; 00394-408; 00347.  For example, the 2014 Notice and 2015 streamlined conversion approvals show the Department has long interpreted Section 1437t(b)(3) as allowing waivers post-initial assessment and where actual conversions are sought.  The 2014 Notice (at 1-2) stated: "Purpose. To offer small PHAs a streamlined cost analysis and process for the voluntary conversion of public housing to Housing Choice Vouchers . . . . The statute allows HUD to waive the conversion assessment, . . . or to require a streamlined conversion assessment," and "HUD is exercising its statutory authority to waive the cost analysis described at 42 U.S.C. 1437t(b)(1)(A)."  "Streamlined Voluntary Conversion Notice (PIH Notice 2014-04) Frequently Asked Questions (FAQs)" at 1, https://www.hud.gov/sites/documents/STRMLINEVOLCONV NOTICEFAQS.PDF ("The [ Streamlined Voluntary Conversion] Notice provides [Public Housing

Authorities] with a streamlined cost assessment to provide Section 8 vouchers to public housing residents.").

Plaintiffs concede that the 2014 Notice outlined a "waiver" for housing authorities seeking "conversion."  Pl's PI Mem. at 20 n.5; Pl's PI Reply at 14.[7]  Plaintiffs argue that the Acre Road waiver was a change in position compared to the waiver proposed in 2014 (and adopted in 2015) because the former waiver was broader than the latter waiver.  Pl's PI Mem. at 19-21; Pl's PI Reply at 14-15.  But those were merely discrete exercises of the waiver authority that the Department consistently has understood Section 1437t(b)(3) to provide.  Nothing in the 2014 Notice or the 2015 approvals says that those were the only types of waiver allowed by the statute.

Plaintiffs' reliance on the 2001 waiver for initial assessments (and mischaracterization thereof) fails for the same reason.  PI Memo at 19-20, 25-26.  That too was just a different exercise of the same statutory waiver authority, and nothing in the 2001 waiver said that was the only type of waiver allowed by the statute.  Plaintiffs also mischaracterize the other Department guidance they cite.  See PI Memo at 20.  They rely on references to the conversion assessment requirement that applies absent a waiver.  Similarly, the 2019 Notice describes the conversion assessment requirement that exists absent a waiver.  AR 00491.  None of the guidance cited either speaks to or prohibits post-initial assessment waivers.

## II.    Approval of Conversion was Not Contrary to Law

Even if the conversion approval were reviewable, the decision was not arbitrary and

---

[7]    Plaintiffs try to minimize the scope of that waiver by suggesting the Department itself had already performed all the analysis waived, but that is inaccurate.  As discussed above, the Department had also waived the market value analysis, which involves getting an appraisal.  *See* 2014 Notice at 1-2 ("nor do they need to conduct an analysis of market value (24 CFR 972.218(b))").  And the Department did not perform that for housing authorities.  *See generally* AR 00347, 00394, 00401.

capricious or contrary to law, specifically as not in violation of either Section 808 or 804 of the Fair Housing Act.

### A.    Approval was not Contrary to the Broad Mandate to Affirmatively Further Fair Housing

Count IV alleges that approving the conversion without a full conversion assessment "fails [the Department's] duty to affirmatively further fair housing in the administration of programs and activities relating to housing and urban development." Compl. ¶ 163. A provision of the Fair Housing Act (the "Affirmatively Further Requirement") states that the Department "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5) (also referred to as "Section 808").

### 1.    Affirmatively Further Requirement

Section 3608(e)(5) imposes "an obligation to do more than simply refrain from discriminating." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 25 (D.D.C. 2018) (citation omitted). But the "FHA does not define, however, the precise methods by which HUD is obligated to affirmatively further fair housing and does not require HUD to adopt certain procedures over others." *Id*. at 21. "HUD has broad discretion to choose between alternative methods of achieving" Section 3608 compliance "and the Court may not substitute its judgment for HUD's in determining the best way of doing so." *Id.* at 62 (cleaned up); *see also McGrath v. HUD*, 722 F. Supp. 902, 908 (D. Mass. 1989) ("HUD has broad discretionary powers with which to implement its policies and fulfill its affirmative obligation to support fair housing"; "Title VIII does not mandate specific actions or remedial plans which [the Department] should undertake") (cleaned up). Section 3608(e)(5) does not require each discrete Departmental decision to affirmatively further fair housing nor does it require the Department to analyze the extent to which each decision

20

could possibly contribute toward the Department's mandate to affirmatively further fair housing, provided the Department's decisions are collectively affirmatively furthering fair housing.

As part of the Secretary's undertaking to administer the programs of the Department consistent with a mandate to affirmatively further fair housing, the Department has promulgated regulations, which define for grantees and other program participants that "Affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws." 24 C.F.R. § 5.151. The Department further defined "Meaningful Actions" to mean "significant actions that are designed and can be reasonably expected to achieve a material positive change that affirmatively furthers fair housing by, for example, increasing fair housing choice or decreasing disparities in access to opportunity." *Id*.

The Complaint does not allege that the Department has failed to take "meaningful actions" in the overall administration of the Department's programs and activities.[8] Instead, Plaintiffs rely on a regulation about how "HUD will provide technical assistance to program participants in various ways, including by . . . [m]aking HUD-provided data and informational resources available, including about how to voluntarily engage in fair housing planning, such as [in part]

---

[8]    The Department fulfills the broad Affirmatively Further Requirement in a variety of ways, such as requiring program participants to engage in fair-housing planning (which has consisted of the Analysis of Impediments to Fair Housing Choice and the Assessment of Fair Housing), collecting certifications from program participants, designing notices of funding opportunities to further Affirmatively Further Requirement goals, requiring affirmative fair housing marketing and advertising and enforcing site and neighborhood standards. *See, e.g.*, AR 01904-16; 24 C.F.R. § 903.15(c) (imposing on housing authorities requirements to affirmatively further fair housing).

analyzing fair housing data" and "taking no action that is materially inconsistent with the obligation to affirmatively further fair housing[.]"  Pl's PI Reply at 17 (citing 24 C.F.R. § 5.152(b)(1)(i)); *see also id.* § 903.15(c)(3)(B) ("A [Public Housing Authority's] certification under § 903.7(o) will be subject to challenge by HUD where it appears that [an Authority] . . . [t]akes action that is materially inconsistent with its obligation to affirmatively further fair housing").

Plaintiffs' reliance on the "materially inconsistent" language in the Department's Interim Final Rule ignores that this language helps demonstrate how the Department fulfills the broad Section 3608 mandate through a variety of actions, including technical assistance to support program participants in navigating their own obligation to affirmatively further fair housing. 24 C.F.R. § 5.152(b).  And the Complaint does not allege that the Department failed to provide required technical assistance.  Indeed, the challenge to the waiver here is wholly unrelated to whether the Department provided technical assistance.  The waiver modified what information the Housing Authority had to provide the Department and had nothing to do with the Department providing technical assistance (data and information) to the Housing Authority.

Even if the proper analysis for this case centered on whether the approval was "materially inconsistent" with Section 3608(e)(5), the Complaint does not allege that the conduct complained of here materially takes out of existence or makes unmeaningful the other specific meaningful actions that the Department is taking to fulfill the broad Section 3608(e)(5) mandate.

2.    <u>Fair Housing Effects Were Considered</u>

In any event, the Department did consider fair housing effects in reaching its determination to approve the Acre Road conversion application.  First, the Fair Housing Office reviewed the proposed conversion and advised that it "has no civil rights-related concerns relative to [the Housing Authority's] application," noting "dangerous risk to the health and safety of the residents"

22

and the relocation assistance that they would be provided, and "recommend[ing] approval . . . of the [] application."  AR 00742-43.  Second, the Department, including its Fair Housing Office, considered letters sent by the Marrero Tenants and the fair housing concerns raised therein prior to approving the conversion.  *Id.* at 01741-44.  The Marrero Tenants' information did not cause the Fair Housing Office to retract its earlier recommendation.

The Department was concerned about reported health and safety problems at this project where residents were "nearly 100% black" and placed next to a sewage plant in units with recurring mold infestation.  *Id.* at 01720; 00744 (finding "[m]old exposure has been shown to exacerbate asthma and other respiratory conditions" presenting "an imminent health and safety risk"); *see also* AR 00827 (identifying a "foreseeable potential issue related to . . . the environmental assessment as it relates to the sewer lift station . . . at the rear of the property."); *Id.* at 01009 ("We are in a state of emergency due to mold").  Disapproving the conversion and trying to keep families at Acre Road, then, would not further Section 3608(e)(5)'s goals.

The Fair Housing Office and the Department were also satisfied with the relocation opportunities and assistance that the Housing Authority described.  The Housing Authority stated that "there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area where families can use their tenant-based Housing Choice Voucher [ ] assistance."  *Id.* at 01890.  The Department's New Orleans Field Office concluded "that the local rental market has sufficient housing availability for these residents, including residents with disabilities that may require accessible units."  *Id.* at 01782.

To help Acre Road residents use their Voucher assistance, the Department assessed that the Housing Authority and Jefferson Parish would provide mobility counseling.  *Id.* at 01884.  The Housing Authority and Jefferson Parish would provide for relocation consistent with the Uniform

Relocation Act. *Id.* That would include various support, such as offering comparable housing in terms of location, and financial assistance with relocation costs. *See* 42 U.S.C. § 1437t(d)(4)(A)(ii)(II) (Public Housing Authority shall submit a plan that "each family displaced by such action . . . be offered comparable housing. . . that is located in an area that is generally not less desirable than the location of the displaced person's housing."); *see also* AR 01885.

The Housing Authority also promised that it would engage in landlord outreach. *Id.* at 00824-25. It promised that its relocation contractor would help interested residents port to the jurisdictions of other housing authorities to maximize their choices. *Id.* at 0824. It consulted with the public on at least ten occasions over a year. *Id.* at 01890. It also advised that transition of the Acre Road tenants from public housing to housing choice Vouchers would reduce the "isolation of this low-income group and act as the catalyst for the revitalization of this neighborhood." *Id.* at 00816.

In short, the Department considered fair housing effects, and Plaintiffs' claim that approving the conversion without a full conversion assessment was arbitrary and capricious for failure to consider fair housing effects is baseless. The Department did not "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Under the applicable highly deferential standard of review, which "presumes the validity of agency decisions," *AT&T*, 220 F.3d at 616, the Department acted properly, and Plaintiffs' claim fails.

## B.     The Department Did Not Act Contrary to Fair Housing Act Section 804

Plaintiffs separately claim that approving the conversion without a full conversion assessment was discrimination (disparate impact and perpetuation of segregation) under the Fair Housing Act, 42 U.S.C. § 3604 and 24 C.F.R. § 100.500 (also known as "Section 804"). Compl. ¶¶ 159-64; Pl's PI Mem. at 28-34. Plaintiffs acknowledge that they can only assert Fair Housing Act claims against the Department via the APA. *Id* at 32 n.11. Hence, Count IV contends that the

approval was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C).  Compl. ¶ 164.  This discriminatory effect claim fails because the Department had substantial, legitimate, nondiscriminatory health and safety interests—which Plaintiffs do not dispute, *see* Pl's PI Reply at 18—in acting the way it did, and Plaintiffs cannot carry their burden of establishing that those interests could have been achieved by another practice that has a less discriminatory effect.[9]

The Housing Authority demonstrated additional important interests that would be served by conversion—namely, that it would: (1) address Housing Authority long-term and structural "Funding Concerns" where capital repair needs far exceed what Congress appropriates (typifying a larger national problem); (2) address the difficulty the small Housing Authority was having with managing multiple different programs (which residents were complaining about); and (3) help the community replenish with Tenant Protection Vouchers the substantial portion of its voucher stock (up to 199 vouchers) that the community has been losing to help families leave Acre Road.  *See* AR 00808-810, 815 (Conversion Plan); 00473-76 (Default Letter); 00491 (2019 Notice); 00409-411 (2017 Funding Justifications); 01885-86 (Approval).

Plaintiffs assert that the nondiscriminatory interests could be served by certain allegedly less discriminatory alternatives – namely, that the Department should have required the Housing Authority to: (1) conduct a full conversion assessment; (2) repair and remediate the conditions at

---

[9]     "Liability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent."  24 C.F.R. § 100.500.  But a practice with a discriminatory effect may "be lawful if supported by a legally sufficient justification," which exists "where the challenged practice . . . [i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect."  *Id.*  The plaintiff has the burden of "proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  *Id.*

Acre Road, or construct replacement housing at Acre Road; and/or (3) provide even more relocation support (such as even more robust mobility counseling and relocation cost assistance, applying for higher payment standards, and more engagement with and financial incentives for landlords in high-opportunity areas to accept vouchers).   Pl's PI Mem. at 33-34; Pl's PI Reply at 18-19.

Plaintiffs cannot carry their burden because such alternatives are infeasible and/or would not serve the above legitimate interests.   First, as for requiring a full conversion assessment, Plaintiffs argued that that would have prevented the conversion approval, in which case none of the above safety or other legitimate interests would be achieved.   Pl's PI Mot. at 33; *see generally* AR 00913 ("the associated methodology and cost test [for full conversion applications] has proven extremely challenging for PHAs to execute, especially for small PHAs."); *id.* at 01933-35.

Second, as for repairing or redeveloping housing at Acre Road, this proposed alternative is not feasible given that the Housing Authority cannot afford to complete the necessary repairs.   Not only does the Housing Authority lack funds to pay for such an undertaking initially, the Housing Authority also does not have the means to continually remediate or redevelop the site long-term where the problems, such as mold, are recurring.   By the same token, attempting such challenging rehabilitation or redevelopment would impose further stress on the Housing Authority's already-existing financial and administrative struggles, not serve the interests of alleviating them.   *See* Reinstatement of Discriminatory Effects Standard, 88 Fed. Reg. 19450, 19491 (Mar. 31, 2023) ("this rule does not allow plaintiffs to impose untenable policies upon defendants"; "HUD notes that an unreasonable alternative practice that creates an undue burden on defendant would not satisfy plaintiff's three-step burden").   And due to the environmentally recurring nature of the

mold, the notion that the Department should find ways to keep families at Acre Road directly undermines the safety interest.

Third, as for requiring the Housing Authority to provide even more relocation support, the Housing Authority proposal contained plans to provide robust support (as described above), which satisfied the Department, including the Fair Housing Office.[10]   The Department cannot control what kind of application a housing authority submits, so Plaintiffs' argument effectively is that the Department should have denied the application for lack of the extra relocation assistance Plaintiffs seek.  Again, that would not achieve any of the legitimate interests described above.  Further, the Department does not violate the Fair Housing Act when it approves a conversion plan that does not contain every conceivable support that a housing authority could provide.  Where to draw a line in requiring "more" from a particular housing authority (including how much of the Department's resources to devote to a particular situation) is precisely the kind of enforcement discretion that is unreviewable.  *See Physicians for Soc. Resp.*, 956 F.3d at 642 ("The paradigmatic example of presumptively unreviewable agency action is 'a decision not to institute enforcement proceedings'").

Additionally, there is no evidence that the Housing Authority had the means to fund additional relocation supports without impacting other operational and capital needs.   The Administrative Record shows the opposite—that the Housing Authority is grossly underfunded. AR 01895 (showing that its 2020 and 2022 Public Housing Budget was in the negative, -

---

[10]    The Housing Authority's relocation budget of $998,784 (with $6,528 in mobility counseling and relocation costs per family) is more than reasonable.  As a frame of reference, a similar mobility program in Houston anticipates a per-family budget of $1,700 in "program cost per successful move" and $2,500 in "participant financial supports" for a total of $4,200 (or $2,328 less than Acre Road).   *See* Housing Mobility Programs in the U.S. 2022, at 29, available at https://www.prrac.org/pdf/prracHousingMobilitySurvey2022.pdf.

$50,969.00 and -$337,000.00, respectively); *see also id.* at 00809-10.   Finally, to the extent Plaintiffs seek to use the Fair Housing Act to achieve a programmatic overhaul of the relocation support required for Section 22 conversions, that is not a permissible use of APA litigation.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (APA not intended to "seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.").

### C. Approval of the Conversion Waiver and Underlying Application was not Arbitrary or Capricious

Nor was approval of the application arbitrary and capricious.   The "arbitrary and capricious" standard of review is highly deferential to the agency and "presumes the validity of agency decisions."  *AT&T*, 220 F.3d at 616.  The agency decision generally will be upheld when the agency has considered all the "relevant factors" and has not committed a "clear error of judgment."  *Id.*  Examples of a "clear error of judgment" would be reliance upon "factors with Congress has not intended," failure to consider "an important aspect of the problem," or an "explanation for its decision that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

Here, as discussed in detail above, the Department relied on its expertise, considered the relevant evidence, and had good reason to approve the conversion (as noted above, Congress also gave the Department limited ability to disapprove and block a conversion).  The Department's preeminent concern was the health of the residents due to infestation of mold.  AR 01891.  The Department reviewed data showing that "[s]tudies have concluded that the mold count presents a danger to the health and safety of the residents."  *Id.* at 01890-91.

The Housing Authority had also stated that "there is sufficient availability of private rental housing with access to schools, jobs, and transportation in the New Orleans metropolitan area

where families can use their tenant-based Housing Choice Voucher assistance." *Id*. at 01890.  As shown above in the context of the Department's assessment that conversion would affirmatively further fair housing, it assessed many facets and conditions of the conversion in support of the conclusion that there would be sufficient alternative housing for the Acre Road tenants.

Second, there is a growing backlog of unmet needs in the public-housing portfolio. *See* FY 2022 HUD Funding Justifications, Public Housing Fund, at 6-4, https://www.hud.gov/sites/dfiles/CFO/documents/9_2022CJ-PHFund.pdf.   Due to scarce appropriations from Congress, there are not enough funds to properly ensure the physical maintenance of public housing.  AR 0491.  Conversion from a Public Housing Program to a Voucher Program is a tool for repositioning scarce resources, whereby a "[Public Housing Authority] evaluates what regulatory platform is best suited for the [Public Housing Authority] to meet the long-term affordable housing challenges in its specific community, considering the needs of the residents, the condition of the real estate portfolio, and the objectives of the [Public Housing Authority] and other community leaders." *Id*. at 0890.

Conversion of public housing to Vouchers as a repositioning tool provides: (1) local control and flexibility to meet local needs; (2) Public Housing Authorities administrative relief in limited the types of programs to administer; (3) predictability and a stable funding platform via Vouchers, as compared to public housing; (4) enhanced ability from Vouchers compared to public housing to leverage other financial resources. *Id.*  Finally, the Fair Housing Office reviewed the proposed conversion and advised that it "has no civil rights-related concerns relative to [the Housing Authority's] application," noting the "dangerous risk to the health and safety of the residents" and the relocation assistance that they'd be provided, and "recommend[ing] approval . . . of the . . . application." *Id*. at 00742-43.

Also, the Department (and the Fair Housing Office) considered the Marrero Tenants Organization's letters in late 2022 and early 2023 before approving the conversion. The letters did not cause the Fair Housing Office to withdraw its earlier recommendation to approve the conversion. *See id*. at 00742-43; 01889; 01741-44. Because the Department conducted a comprehensive analysis, its decision to approve the conversion was not arbitrary and capricious. *See State Farm*, 463 U.S. at 43, 52 (the Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" and approval "was the product of reasoned decisionmaking") (cleaned up).

Ultimately, the Administrative Record makes clear that the Department did not arbitrarily or capriciously approve the conversion from Section 9 Public Housing to Section 8 Voucher Program. The Court should decline to set aside the approval of the conversion.

## III.   PIH Notice 2019-05 is Not Final Agency Action and Should Not Be Reviewed

Plaintiffs seek a ruling that the Acre Road Conversion Approval is unlawful because it was dependent on a conversion assessment waiver that was unlawfully granted in the 2019 Notice. Compl. ¶¶ 150, 153-55. Plaintiffs argue that the 2019 Notice itself is unlawful because it did not go through rulemaking and violated the broad Affirmatively Further Requirement. Compl. ¶¶ 2-3, 145-46, 148, 155. The focus on the 2019 Notice is misplaced, fundamentally because the 2019 Notice was not reviewable final agency action, nor was it the actual waiver of the conversion assessment requirement for Acre Road; even if it were reviewable, it was not required to go through notice-and-comment rulemaking, nor did it violate the law.

### A.   Legal Standard for Final Agency Action

Review under the APA is limited to "final agency action." 5 U.S.C. § 704. "Whether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable." *Fund for Animals v.*

*U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18-20 (D.C. Cir. 2006).  "An agency action is final if two independent conditions are met: (1) the action marks the consummation of the agency's decisionmaking process and is not of a merely tentative or interlocutory nature; and (2) it is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019) (cleaned up) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  "[T]he failure to satisfy either prong means that the challenged action is nonfinal." *Id.*

"Much of what an agency does is in anticipation of agency action.  Agencies prepare proposals . . . and engage in a wide variety of activities that comprise the common business of managing government programs." *Fund for Animals*, 460 F.3d at 19-20.  "Agencies propose all kinds of programs" and judicial review of such proposals "would wreak havoc with the normal operations of agencies and the executive branch". *Id.*

**B.     The 2019 Notice Did Not Mark the Consummation of the Department's Decision-Making Process**

In *Chemical Manufacturers' Association v. EPA*, 26 F. Supp. 2d 180 (D.D.C. 1998), the court concluded that a settlement policy put in place by the EPA did not "conclude EPA's involvement with any particular case, and it does not represent one agency's final declaration about the legality of action proposed by a separate agency . . . the settlement policy is a starting point that states principles intended to guide future agency action." *Id.* at 183.  The court noted the non- "definitive" nature of the document there and that it "merely announced principles that may or may not be used in specific circumstances at some time in the future." *Id.* at 184.  "[O]nly when it decides *whether* and *how* to apply the policy's principles to a specific disposal site and the parties involved will the agency conclude such process." *Id.* at 183.

Here too, the 2019 Notice was just that—a notice—and did not mark the consummation of any agency decision making process. *See also Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) ("The Manual state[d] that the violations for which warning letters are issued 'may lead to enforcement action if not promptly and adequately corrected,' not that they inevitably will."); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021) (instruction manual describing how agency would implement an environmental statute was not a consummation of the decision-making process because "the Manual is not itself a decision that any particular [agency] action requires . . . . Any guidance that could be attributed to the Manual would be subsumed in any final rule issued by [the agency] on a particular matter."); *Mass. Coal. for Immigr. Reform v. Dep't of Homeland Sec.,* 621 F. Supp. 3d 84, 95 (D.D.C. 2022) (agency's "Instruction Manual 'establish[es] the policy and procedures [the agency] follows to comply with' [a statute]" but explains that agency "components decide what level of [statutory] analysis is appropriate" (cleaned up)); *Del. Valley Reg'l Ctr., LLC v. Dep't of Homeland Sec.*, Civ. A. No. 23-0119 (TNM), 2023 WL 3863637, at *5 (D.D.C. June 7, 2023) (concluding that the answer on agency's website was not final agency action because the website answer "merely explains a preliminary step it takes in adjudicating a petition," and the manual served a similar informational function).

The 2019 Notice proposed particular ways for the Department to utilize its waiver authority, solicited "Public Comments" thereon (as well as on "alternatives") without a deadline to comment, AR 00500, and invited the submission of applications to be reviewed and determined at a later date after receipt. *Id*. at 00497. Any prospective applicant, then, could request a different or modified process for a particular project.

Further, even without any public comments, the proposed principles themselves are not

definitive and instead are subject to different kinds of variance.  For example, Section 5 advises

that the Department "may require additional information from [Public Housing Authorities] about

[a] conversion plan."  *Id*. at 00497.  Section 5 also states that "[a] longer process may be required

where [the Department's] review of the plan raises questions that require further discussion with

the [housing authority]."  *Id*.  Section 4(I) provides: "Field Offices may require additional

information from [housing authorities] as part of their review of the Form HUD-5837."  *Id*. at

00496.  That form concerns a housing authority's plan and ability to close out its public housing,

which the Department evaluates, and that is one of the proposed criteria to even be eligible to apply

for the 2019 Notice's proposed streamlined assessment.  *Id*. at 492; *see also* Form HUD-5837,

https://www.hud.gov/sites/dfiles/OCHCO/documents/5837.pdf.

Section 6 advises that future Tenant Protection Voucher "guidance may place constraints

on the voluntary conversion approval process under this notice, which may . . . limit[] the number

of units that HUD will approve for voluntary conversions in a given fiscal year, or temporarily

suspend[] the voluntary conversion approval process until [Voucher] resources are determined to

be sufficient[.]"  AR 00497.  Section 9(B) advises that "[o]n a case-by-case basis, [the Department]

may require other reporting information."  *Id*. at 00498.  Thus, no prospective applicant (or the

Department) could know what specific streamlined requirements (or waivers) might be utilized for

a particular project at the time the 2019 Notice was circulated and in advance of any application

even being submitted.

Indeed, the Administrative Record shows that during Department review of the Acre Road

Conversion Application, the process of determining what kind of streamlined assessment (and

waivers) would be appropriate for Acre Road—and determining the extent to which the 2019

Notice's principles (or other principles) should be applied to Acre Road, and if so, how—was fluid

and fact-specific—e.g., in several emails from January 27, 2021, until February 13, 2021, the Department sought more information from the Housing Authority.  *Id*. at 00828-44; 00848-85. For instance, on January 27, 2021, the Department required a variety of additional information from the Housing Authority.  *Id*. at 00790-92.  As one example, Question 11 directed the Housing Authority to "provide information regarding the unit mix to be developed" and "the terms of the disposition (at Fair Market Value or less). If the [Housing Authority] proposes to dispose of the property at [Fair Market Value], please provide a current appraisal."  *Id*. at 00792.  Those requirements came from the Department's discretionary application review and are not in the 2019 Notice.

As a second example, "[p]ursuant to 24 CFR 972.218(d)" and "to comply with this requirement," Question 5 directed the Housing Authority to provide additional information about the likely impact of the conversion on the neighborhood.  *Id.* at 00791.  Notably, that regulation is a conversion assessment provision that the 2019 Notice had proposed waiving/streamlining, subject to all the various caveats therein.  *Id*. at 0491.  Third, the Application included a Form HUD-5837 about the Housing Authority's plan and ability to close out its public housing program (and thus eligibility to apply for the proposed waiver, which the Department later reviewed and vetted. *Id.* at 01888.  And fourth, whereas the 2019 Notice proposed applying a "principally benefit the residents, the [housing authority], and the community" standard (borrowed from 24 C.F.R. § 972.224(a)(2) and 42 U.S.C. § 1437t(c)(2)) to just the "disposition [future use of property*]* proposed as part of a conversion plan," *Id*. at 00492, the March 9, 2023 determination applied that standard to the conversion plan/application as a whole.  *Id*. at 01883.

In other words, after the Department received the Acre Road Application in 2020, it sought and obtained from the Housing Authority additional information to supplement the Application

and create a particularized, streamlined assessment appropriate to Acre Road.  That process was only consummated on March 9, 2023, when, in addition to determining that it met the previously-proposed close-out ability and unit cap criteria to even be eligible to seek a waiver, *see id.* at 01883, 01888; 001492, the Department concluded that the particularized streamlined assessment that had been created for Acre Road warranted a waiver (without need for any further information) and approval of the conversion Application based on that assessment.

### C.      No Legal Consequences Flowed from the 2019 Notice

Plaintiffs' challenges to the 2019 Notice must also independently fail because no legal consequences flowed from the notice, also rendering it not agency action.  Agency action does not have legal effect and fails the second prong of the *Bennett* test where:

> (1) the guidance imposed no obligations, prohibitions, or restrictions; (2) it put no party to the choice between costly compliance and the risk of a penalty of any sort; (3) [the agency] acknowledged at oral argument that the guidance had no independent legal authority; and (4) that the Act provided regulated parties a statutory mechanism by which to challenge any [agency] action that was premised on the statutory interpretation that the guidance advanced.

*Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (citing *Valero Energy*, 927 F.3d at 532); *see also Bennett*, 520 U.S. at 177-78.  Indeed,

> [a] contrary conclusion would have the undesirable consequence of discouraging agencies from issuing clarifying documents like this one. [The agency] . . . wished to "ma[k]e its views public" "as a matter of good governance and transparency[.]" "Treating such [interpretations] as final and judicially reviewable agency action would discourage their use, 'quickly muzzl[ing] [those] informal communications between agencies and their regulated communities ... that are vital to the smooth operation of both government and business.' "

*Valero Energy*, 927 F.3d at 538 (internal citations omitted); *see also Chem. Mfrs. Ass'n*, 26 F. Supp. 2d at 185 ("settlement policy does not fashion binding rules but rather enunciates principles that can be tailored to particular fact-bound situations"; it "merely developed principles that carried no force in the abstract, and could determine rights or obligations only in prospective situations");

*Mass. Coal.*, 621 F. Supp. 3d at 96 (cleaned up) ("Its general instructions do not bind [the agency] or any of its components to a particular decision."); *Holistic Candlers*, 664 F.3d at 944 (holding that "[a]lthough a warning letter 'communicates the agency's position on a matter,' it is only 'informal and advisory' and 'does not commit [the agency] to taking enforcement action'").

Here too, the 2019 Notice merely proposed a fluid framework that could be utilized in fact-specific situations later and invited public comment thereon; it "imposed no obligations, prohibitions, or restrictions." *Cal. Cmtys. Against Toxics*, 934 F.3d at 637. It "put no party to the choice between costly compliance and the risk of a penalty of any sort." *Id*. It created no independent legal authority beyond that which was already in law; the waiver and streamlined assessment authority comes from 42 U.S.C. § 1437t(b)(3), not the 2019 Notice. Further, to the extent the 2019 Notice contains mandatory language, it either references requirements already in law or merely proposes new streamlined assessment requirements for consideration. *See, e.g.,* AR 00495. ("Provide a summary of information concerning the relocation plan required by 24 CFR 972.230(g)"). And if the waiver authority here were not committed to agency discretion by law, a party would be able to seek situation-specific judicial review of the final waiver determination for a particular project, whether the 2019 Notice applied to the decision or not.

In sum, the 2019 Notice is not final agency action reviewable under the APA, and Counts I and II challenging the 2019 Notice accordingly should be dismissed.

## IV.    Even if PIH Notice 2019-05 is Reviewable, the Claims Against it Still Fail

Even if the Court concludes that the 2019 Notice is subject to review, the claims against it still do not survive.

### A.    No Prejudicial Error

As discussed at length above, no legal consequences flowed from the 2019 Notice. As such, the Court may properly decline to review the claims surrounding the 2019 Notice for lack of

prejudicial error. The APA states that "[i]n making the foregoing determinations, . . . due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. A court's APA review must incorporate this "prejudicial error" rule, under which the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 19 (D.C. Cir. 2022) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 407, 409, 413 (2009) (the APA and 38 U.S.C. § 7261(b)(2) contain the "same" standard, which serves to prevent "courts from becoming impregnable citadels of technicality"; rejecting claim where plaintiff "has not explained . . . how the notice error to which he points could have made any difference") (cleaned up); *see also Prohibition Juice*, 45 F.4th at 25 ("assum[ing] without deciding that the FDA erred," plaintiffs' claim fails because they "cannot identify how they were harmed from FDA's failure to consider essentially the same measures it had rejected previously," and so "no harm flowed from the asserted" error); *Ctr. for Biological Diversity v. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690-91 (D.C. Cir. 2023) (rulemaking claim failed for lack of prejudicial error where plaintiff's position was independently foreclosed by statute).

Here, Plaintiffs claim that the Acre Road conversion approval should be invalidated because it was predicated upon a conversion assessment waiver that the Department granted in its 2019 Notice which is allegedly invalid for failure to follow rulemaking procedures. Pl's PI Mem. at 1-2; Pl's PI Reply at 5. But, as explained at length above, the waiver for Acre Road was granted in 2023 on its own merit; the 2019 Notice was not determinative or binding on the actual Housing Authority application, waiver, or eventual approval in 2023. Even were the Court to conclude the 2019 Notice itself constituted a second additional granting of a waiver for Acre Road, its invalidation would have no impact; the 2023 conversion approval would still stand as-is based on the individualized March 9, 2023 waiver for Acre Road.

B.      **2019 Notice Does Not Require Notice-and-Comment**

The 2019 Notice is not rulemaking that would require notice-and comment.  Even if the

Court were to construe the 2019 Notice as effecting a waiver of the Conversion Assessment for

conversion applications, such waivers generally, nor here, do not require notice-and-comment rule

making in any event.

The plain text of 42 U.S.C. § 1437t(b)(3) authorizes waivers for a "project or class of public

housing projects" without any requirement that they be done by regulation or rulemaking.  "Where

Congress knows how to say something but chooses not to, its silence is controlling."  *Brendsel v.*

*Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) (citation omitted);

*Samma v. Dep't of Def.*, 486 F. Supp. 3d 240, 277 (D.D.C. 2020) ("The inclusion of a time-in-

service requirement in § 1439 shows that Congress knows how to establish such a requirement

when it wants to, and the lack of a time-in-service requirement in § 1440 suggests that Congress

did not intend for one to apply there.").

There are numerous examples showing that Congress knows well how to require that a

waiver be done via regulation when it wants to—it does so by using the phrase "by regulation."

*See*, *e.g.*, 38 U.S.C. § 7655 ("The Secretary may, by regulation, waive the requirement for the

performance of the service for which the individual is obligated"); 21 U.S.C. § 971(f)(2)–(3) ("The

Attorney General may by regulation waive the 15-day notification requirement"); 5 U.S.C.

§ 9809(h)(2) (allowing Administrator to "by regulation provide for the partial or total waiver or

suspension of any obligation of service or payment incurred by an individual"); 26 U.S.C.

§ 5555(b) ("the Secretary may by regulation waive, in whole or in part, such requirement when he

deems such requirement to no longer serve a necessary purpose"); 42 U.S.C. § 238l(d) (allowing

Secretary of Health and Human Services to "waive the recovery rights of the United

States . . .  under such conditions as the Secretary may establish by regulation"); 10 U.S.C.

§ 2006a(b) ("The Secretary of Defense may, by regulation, authorize the use of educational assistance").

Here, the absence of that "by regulation" phrase in 42 U.S.C. § 1437t(b)(3) demonstrates that Congress did not intend for a "by regulation" requirement to apply to Section 1437t(b)(3) waivers—i.e., "its silence is controlling." *Brendsel*, 339 F. Supp. 2d at 65.  Notably, Congress also used the "by regulation" phrase elsewhere in the 1998 Act that created the current Section 1437t conversion statute, *see, e.g.*, 42 U.S.C. § 13361, but it did not use that phrase in Section 1437t.

Plaintiffs argue that the APA controls here and that it requires waivers to be done by rulemaking.  Pl's PI Reply at 10-12 (citing 5 U.S.C. § 553).  But if that were so, then each time Congress wrote "by regulation" would be surplusage with no operative legal effect.  Plaintiffs' interpretation is improper under the rule against surplusage.  *City of Portland v. EPA*, 507 F.3d 706, 711 (D.C. Cir. 2007) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Additionally, in an IRS waiver statute that is similar to Section 1437t(b)(3), Congress specifically amended 26 U.S.C. § 6114(b) to remove the phrase "by regulations" and explained that the removal "clarifies that the Secretary may, by means other than regulations (e.g., by revenue procedure), provide classes of cases with respect to which the treaty-based return position reporting requirements will be waived."  H. Rep. No. 101-894, 101st Cong., 2d Sess., 27 (Oct. 17, 1990).  In other words, Congress changed the language to not require rulemaking because silence as to rulemaking in a waiver statute means no rulemaking is required, even when the waiver is provided "to classes of cases." 26 U.S.C. § 6114(b).  If the APA really dictated that silence means

the APA always requires rulemaking, then Congress would have amended the IRS statute to expressly state that such waivers do not require rulemaking.

> *Davis v. EPA*, 348 F.3d 772, 785 (9th Cir. 2003), is similarly instructive:
>
> Nothing in [the statute] requires the EPA to determine whether to grant a waiver application by means of rulemaking. Absent express congressional direction to the contrary, agencies are free to choose their procedural mode of administration. . . . It is clear that Congress knew how to impose rulemaking requirements under the Clean Air Act when it wanted to do so. . . . It did not do so here.

*Id* (citing *Pfaff v. HUD*, 88 F.3d 739, 747 (9th Cir. 1996) (recognizing, as an established principle of administrative law, that the choice between rulemaking and adjudication lies in the first instance within the agency's discretion) (internal citations omitted).

Guidance from the Administrative Conference of the United States is also instructive. It published "recommendations offer[ing] best practices and factors for agencies to consider regarding their waiver and exemption practices and procedures," which were "not intended to disturb or otherwise limit agencies' broad discretion to elect how to best use their limited resources." Administrative Conference Recommendation 2017-7: Regulatory Waivers and Exemptions (Dec. 15, 2017), https://www.acus.gov/sites/default/files/documents/ Recommendation%202017-7%20%28Regulatory%20Waivers%20and%20Exemptions%29_0. Among the recommendations was that "Agencies should consider soliciting public comments before approving waivers or exemptions" in the interest of "transparency." *Id*. The Administrative Conference would not be recommending as a best practice mere consideration of notice and comment for waivers where possible for transparency's sake, if notice and comment rulemaking for waivers was already legally required by the APA.

Even if the APA did control here (and even if the 2019 Notice were final agency action), such limited/selective waivers would at most be "adjudications" (or "orders") under the APA for those particular projects, rather than a "rule" that required rulemaking. 5 U.S.C. § 551(4)-(7).

Plaintiffs erroneously contend that such waivers could not be "orders" and would have to be a "rule" because they had future and prospective effect. Pl's PI Reply at 12. That reasoning fails because the definition of "order" includes "licensing," which the APA defines to include a "statutory exemption or other form of permission" and is prospective in effect. 5 U.S.C. § 551(6), (8)-(9). Indeed, at least one court has previously concluded that a waiver *is* a "license" (not a "rule"). *Nuclear Data, Inc. v. Atomic Energy Comm'n*, 344 F. Supp. 719, 723-24 (N.D. Ill. 1972). Here, the Court need not decide whether the 2019 Notice would be a license, or merely "akin" to a license; the underlying point is that it is incorrect to suggest that any agency action with prospective effect is a rule requiring rulemaking.

### C.     2019 Notice is Not of General Applicability

Plaintiffs also erroneously contend that the 2019 Notice is a rule because it purportedly has general applicability. Pl's PI Reply at 12-13. First, it is not the law that an adjudication for a class or group of similarly situated recipients renders it a "rule" requiring rulemaking. *See*, *e.g.*, 26 U.S.C. § 6114(b) (not requiring rulemaking for waivers for "classes of cases."); *see also, e.g.*, *Goodman v. FCC,* 182 F.3d 987, 994 (D.C. Cir. 1999) ("Neither does the petitioners' observation that the Implementation Order affected a large number of licensees carry much weight: Just as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large group of individuals without becoming a rulemaking.") (cleaned up).

The 2019 Notice's proposal has had very limited reach. Its eligibility criteria proposed limiting the process to (1) public housing projects operated by small housing authorities, (2) who submit a suitable application for a streamlined conversion, with intent and ability to close out its public housing program. AR 00492. That first criterion already limited the 2019 Notice's proposed scope to at most a small subset of all public housing projects. *Id.* at 00315 (small housing

authorities only operate around 18% of all public housing units).  The proposed "intent to close-out its public housing program" criterion is also a serious and weighty limitation because, pursuant to 42 U.S.C. § 1437g(g)(3), a housing authority's decision to zero out its public housing program is permanent; a housing authority cannot change its mind later.  *See, e.g.*, *id.* at 00425.  The 2019 Notice was also proposed after two decades where housing authorities showed virtually no interest in streamlined voluntary conversions, even accounting for the 2014 Notice that tried, and failed, to change the lack of applications.

Sure enough, since the 2019 Notice was circulated, the average number of streamlined voluntary conversions per year has been only nine, or approximately 00.27% of projects.  *See*, *e.g.*, *id.* at 01933-35.  Put differently, if there were only 100 projects, and the Department did a waiver for one or two of them, it would be hard to call action affecting 1-2% at most a generally applicable rule.  The 2019 Notice has had even less applicability than that.

With respect to adjudications and rules generally, while an agency may still voluntarily elect to go through notice-and-comment rulemaking for policy reasons for a matter that would otherwise qualify as an adjudication, "courts have always accorded agencies broad discretion in choosing between rulemaking and adjudication as a means of addressing issues."  *United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 964 (D.C. Cir. 1990) (citing cases); *Davis*, 348 F.3d at 785.  Indeed, in 1999 (and 2001) the Department chose notice-and-comment rulemaking regarding a proposed waiver for the initial assessments where the Department already was undertaking rulemaking to set various other requirements implementing the newly-amended voluntary conversion statute.  *See* Proposed Rule, Voluntary Conversion of Developments From Public Housing Stock, 64 Fed. Reg. 40,240, 40,245 (July 23, 1999) (proposing, among other things, a "required methodology for th[e] cost analysis," a "requirement

for significant participation by residents," and a "requirement for consultation with public officials."); Final Rule, Voluntary Conversion of Developments From Public Housing Stock; Required Initial Assessments, 66 Fed. Reg. 33,616 (June 22, 2001). At the rate the Department was doing rulemaking, there was reason to voluntarily include the initial assessment waiver in that process; but nothing in that rulemaking states that rulemaking is required for Section 1437t(b)(3) waivers.

Agencies having the flexibility (where not proscribed by Congress) to exercise waiver authority without going through rulemaking is a long-standing, widespread, and critically important facet of agency administration. As the Administrative Conference correctly identified, it is not always "realistic to open up a decision whether to waive . . . to full public notice and comment." ACUS, Waivers, Exemptions, and Prosecutorial Discretion: An Examination of Agency Nonenforcement Practices, at 59 (2017). In fact, because "most rulemakings were actually completed within six to eight years," many rulemaking endeavors already never make it to the final rule (or even proposed rule) stage given how many rules are in the queue. *See* Richard J. Pierce, Jr., *Rulemaking Ossification Is Real: A Response to Testing the Ossification Thesis*, 80 Geo. Wash. L. Rev. 1493, 1496 (2012) (cleaned up). This Court should reject Plaintiffs' bold invitation to depart from the long line of authorities showing that the APA does not require that waivers (or group/class waivers) always proceed via rulemaking.

### D.    The 2019 Notice is Not Contrary to the Affirmatively Further Requirement

In any event, even if the 2019 Notice were subject to review, the 2019 Notice was not arbitrary or capricious or contrary to law, in particular the duty to affirmatively further fair housing. In particular, circulation of the 2019 Notice was not materially inconsistent with the Affirmatively Further Requirement. *See* Compl. ¶ 154. As discussed at length above, Section 3608 affords the Department flexibility in how to fulfill the broad mandate. Fair housing issues were indeed

43

considered in the design of the 2019 Notice.  The 2019 Notice expressly considered and addressed fair housing considerations by, among other things, proposing that streamlined conversion applications would have to comply with the duty to affirmatively further fair housing.  AR 00498-99 (discussing certification that plan and application "will affirmatively further fair housing"). Further, the 2019 Notice (among other things in the "Civil Rights" section) advises that "HUD's Office of Fair Housing and Equal Opportunity conducts a civil rights review of conversion plans." *Id.* at 00499.  And the 2019 Notice advised that the Department may still require additional information such as a rental market analysis.  *Id.* at 00497.[11]

Ultimately, the 2019 Notice is not final agency action that is subject to review under the APA.  Even were the Court to conclude the 2019 Notice is subject to review, it is not "rulemaking" that would require notice and comment, was harmless error even if error is identified, and was not issued arbitrarily or capriciously or contrary to law.

\* \* \*

---

[11]    Additionally, contrary to Plaintiffs' claim that the 2019 Notice is a change from previous policy, *see* Compl. ¶ 155, for the reasons discussed above, this is not true; the Department has always interpreted 42 U.S.C. § 1437t to authorize waivers of a conversion assessment.  The 2019 Notice is not invalid on this ground, either.

**CONCLUSION**

The Department did not act contrary to law or arbitrarily or capriciously in approving the

application for conversion of the Acre Road housing project from Section 9 public housing to

Section 8 housing vouchers, nor did it do so in issuing Notice PIH 2019-05, nor did it violate any

fair housing mandates or laws in doing so.  Accordingly, the Court should grant summary judgment

to Defendants and dismiss this case.


Dated:   October 23, 2023                    Respectfully submitted,

                                             MATTHEW M. GRAVES
                                             D.C. Bar #481052
                                             United States Attorney

                                             BRIAN P. HUDAK
                                             Chief, Civil Division

                                             By:  /s/ Michael David Wagner
                                                  MICHAEL DAVID WAGNER
                                                  Special Assistant United States Attorney
                                                  601 D Street, NW
                                                  Washington, D.C. 20530
                                                  (202) 252-2435
                                                  Michael.Wagner3@usdoj.gov

                                             *Attorneys for the United States of America*