**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOLENE ANDERSON, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT, *et al.*,<br><br>        *Defendants*. | No. 23-cv-1259 (DLF) |

**<u>MEMORANDUM OPINION</u>**

In this Administrative Procedure Act ("APA") case, Jolene Anderson, Candace Johnson, Kedra James, Lakescha Beck, Darin Collins, and the Marrero Tenants Organization (collectively, "Anderson") challenge the U.S. Department of Housing and Urban Development ("HUD")'s decision to authorize the closure of the Acre Road public housing development. Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court will grant both motions in part, deny both motions in part, dismiss some of Anderson's claims as moot, and vacate HUD's decision authorizing the closure of Acre Road.

## I.    BACKGROUND

### A.    Statutory Background

HUD operates two programs that help low-income Americans find housing. Under § 9 of the Housing Act of 1937, it pays local public housing agencies ("PHAs") to develop, maintain, and operate public housing projects. 42 U.S.C. § 1437g(d)–(e). Under § 8 of the Act, it funds vouchers ("tenant-based assistance" or "Section 8 vouchers") that families use to pay rent. *Id.* § 1437f(b).

In 1998, Congress retooled the 1937 Act.  Quality Housing and Work Responsibility Act of 1998, Pub. L. No. 105-276, 112 Stat. 2518 (codified as amended at 42 U.S.C. § 1437 *et seq.*). In relevant part, the 1998 Act provided that "[a] public housing agency" could "convert any public housing project" funded under § 9 "to tenant-based assistance" funded under § 8, "but only in accordance with" the requirements of 42 U.S.C. § 1437t.  42 U.S.C. § 1437t(a).

One such requirement is the "conversion assessment."  Under 42 U.S.C. § 1437t(b)(1), "[t]o convert public housing" to tenant-based assistance, "a public housing agency shall conduct an assessment of the public housing that includes—(A) a cost analysis that demonstrates whether or not the cost (both on a net present value basis and in terms of new budget authority requirements) of providing" Section 8 vouchers would be "less expensive than continuing public housing assistance in the public housing project"; "(B) an analysis of the market value of the public housing project . . . before and after conversion"; "(C) an analysis of . . . rental market conditions" that considers whether the housing project's residents could find "decent and safe dwellings" by using Section 8 vouchers; (D) a discussion of "the impact of the conversion . . . on the neighborhood in which the public housing project is located; and (E) a plan that identifies actions, if any, that the public housing agency would take with regard to converting" its project "to tenant-based assistance." *Id.*  The agency's ability to convert public housing into vouchers turns on the result of this assessment.  "A public housing agency may convert a public housing project . . . to tenant-based assistance only pursuant to a conversion assessment under subsection (b) . . . that demonstrates that the conversion—(1) will not be more expensive than continuing to operate the public housing project . . . as public housing; (2) will principally benefit the residents of the public housing project . . . to be converted, the public housing agency, and the community; and (3) will not adversely affect the availability of affordable housing in such community." *Id.* § 1437t(c).

Two other parts of § 1437t discuss conversion assessments.  In § 1437t(b)(2), Congress directed every public housing agency to "conduct an assessment under paragraph (1) or (3) of the status of each public housing project owned by such agency" on or before October 1, 2001, regardless of whether the agency planned to convert those projects to tenant-based assistance under § 8.  *See* Quality Housing and Work Responsibility Act of 1998 § 503(a) (listing effective date). And in § 1437t(b)(3), it granted the HUD Secretary the authority to provide for "[s]treamlined [a]ssessment[s]."  42 U.S.C. § 1437t(b)(3) (subheading).  "At the discretion of the Secretary or at the request of a public housing agency," § 1437t(b)(3) reads, "the Secretary may waive any or all of the requirements of paragraph (1) or (3) or otherwise require a streamlined assessment with request to any public housing project or class of public housing projects."  *Id.*

Along with a conversion assessment, a public housing agency must prepare a "conversion plan" before converting any project to tenant-based assistance.  *Id.* § 1437t(d).  The HUD Secretary "shall disapprove a conversion plan only if—(1) the plan is plainly inconsistent with the [PHA's] conversion assessment . . . developed under subsection (b); (2) there is reliable information and data available to the Secretary that contradicts that conversion assessment; or (3) the plan otherwise fails to meet the requirements of" 42 U.S.C. § 1437t.  *Id.* § 1437t(e).

## B.    Regulatory Background

In 1999, HUD published a proposed rule implementing 42 U.S.C. § 1437t.  *See Voluntary Conversion of Developments from Public Housing Stock*, 64 Fed. Reg. 40240 (July 23, 1999). With respect to "initial conversion assessments"—*e.g.*, the assessments required before October 1, 2001 for all projects under § 1437t(b)(2)—the proposed rule waived § 1437t(b)(1)'s requirements for projects in good physical condition and narrowed them for certain other projects. *See id.* at 40244 (proposed 24 C.F.R. § 972.207(b)).  But if a public housing agency sought to

3

convert a public housing project to tenant-based assistance, the proposed rule required it to "submit a full conversion assessment (not a streamlined assessment under paragraph (b) of this section)." *Id.* (proposed 24 C.F.R. § 972.207(c)).

In 2001, HUD promulgated a final rule governing initial conversion assessments under § 1437t(b)(2). *Voluntary Conversion of Developments from Public Housing Stock; Required Initial Assessments*, 66 Fed. Reg. 33616 (June 22, 2021) (codified at 24 C.F.R. § 976.206). The final rule waived § 1437t(b)(1)'s conversion-assessment requirements for all public housing projects, not just those in good physical condition. *See id.* at 33616 (preamble) (describing significant differences between proposed and final rules). In lieu of full assessments, it required each PHA to "certify" that it had reviewed each of its projects and considered whether converting them to tenant-based assistance would comport with the cost, principal-benefit, and affordable-housing factors outlined in 42 U.S.C. § 1437t(c) and its implementing regulations—*e.g.*, whether conversion (1) would be less expensive than "continuing to operate the development as public housing," (2) would "[p]rincipally benefit the residents of the public housing development to be converted and the community," and (3) would "[n]ot adversely affect the availability of affordable housing in the community." 24 C.F.R. §§ 972.206(b), 972.224(a).

In 2003, HUD promulgated a final rule governing conversion of § 9 projects into tenant-based assistance under § 1437t(a) and (b)(1). *Voluntary Conversion of Developments from Public Housing Stock*, 68 Fed. Reg. 54612 (Sept. 17, 2003) (codified at 24 C.F.R. §§ 972.200–972.239). Under the rule, "[a] PHA that wishes to convert a public housing development to tenant-based assistance . . . must perform a conversion assessment . . . in accordance with" § 1437t(b)(1)'s implementing regulations. 24 C.F.R. § 972.209(a). Those regulations impose cost analysis, market value analysis, rental-market conditions analysis, impact analysis, and implementation

4

analysis requirements that mirror and elaborate upon § 1437(b)(1)'s.  *See id.* § 972.218.  They also reiterate that a PHA cannot convert a project without checking § 1437(c)'s cost, principal-benefit, and affordable-housing boxes.  *Id.* § 972.224(a).

In 2014, without notice and comment rulemaking, HUD issued Notice PIH 2014-14 (HA).  The Notice offered certain small public housing agencies the opportunity to commence voluntary conversions without full-blown cost analyses under § 1437t(b)(1)(A) and its implementing regulations.  Joint Admin. App'x ("JA") 94, Dkt. 60.  In issuing the Notice, HUD described itself as "exercising its statutory authority to waive the cost analysis described at 42 U.S.C. [§] 1437t(b)(1)(A)."  JA 95.  An appendix to the Notice added that 24 C.F.R. § 972.224(a)(1), which implements § 1437(c)(1)'s requirement that conversion cannot be more expensive than continuing to operate a public housing project as public housing, "[did] not apply" to conversion applications submitted under the Notice.  JA 123.

In 2019, again without notice and comment rulemaking, HUD issued another notice— Notice PIH 2019-05 (HA).  The 2019 Notice "exercise[ed] [HUD's] authority under [42 U.S.C. § 1437t(b)(3)] to waive the conversion assessment requirement" under § 1437t(b)(1) and its implementing regulations entirely for certain small public housing agencies.  JA 179.  It explained that "small PHAs typically have reduced staff and limited funding available to conduct a full conversion assessment, even if the conversion to tenant-based assistance serves the best interest of residents and has no adverse effect on the availability of affordable housing in affected neighborhoods."  *Id.*  The waiver did "not affect other voluntary conversion requirements or procedures under the statute, regulations, directives, or guidance."  *Id.*

C.      Acre Road[1]

Acre Road is a public housing development located in Jefferson Parish, Louisiana.  JA 259, 276.  It contains 200 housing units in 100 semi-detached buildings spread across 18 acres.  JA 260.  The Housing Authority of Jefferson Parish ("HAJP"), a small public housing authority, operates the site.  JA 259, 268.

Acre Road struggles with roaches and mold.  JA 267.  A 2019 survey found indications of visible fungal growth in "nearly all" its units and "very high" mold spore counts in about half of them.  JA 191, 193; *see* JA 194–97.  In 2021, one resident described the project's "unsafe and unsanitary conditions" as a "state of emergency."  JA 573.  Nor was HAJP prepared to fix things.  Resolving the "mold issue" was "estimated to cost hundreds of thousands of dollars," and HAJP itself was "currently in a troubled status due to being in default of its Annual Contributions Contract" with HUD.  JA 267.

On September 21, 2020, HAJP sought permission to convert Acre Road to tenant-based assistance.  JA 259.  Consistent with HUD's 2019 Notice and HAJP's status as a small public housing authority, HAJP did not file a full conversion assessment under § 1437t(b)(1).  Instead, it explained Acre Road's mold problem informally and argued that, by "allowing tenants to find housing on the open market," HAJP could "relocate" them "to cleaner and safer housing."  JA 267.  In follow-on filings, HAJP represented that that it planned to "transfer" the Acre Road property to "a third-party developer" who might "develop a mixed-use development including affordable housing to reinvigorate [the] area."  JA 384.   Because the development would bring in "new affordable housing" along with "low-density commercial uses," it would "positively impact the

---

[1] Consistent with the standard of review applicable to lawsuits under the APA, what follows is drawn from the administrative record in this case.  *See, e.g.*, *Calloway v. Harvey*, 590 F. Supp. 2d 29, 35–36 (D.D.C. 2008).

neighborhood surrounding the Acre Road Project." *Id.*  Given Acre Road's "minimal" density, the new development "could [also] support a higher level of affordable housing" if "developed properly," which would "increase[e] the stock of affordable housing for Jefferson Parish" on net. AR 386.

HUD investigated.  It consulted its New Orleans Field Office, which told HUD that "the local rental market" had "sufficient housing availability" for Acre Road's residents "[b]ased on [its] knowledge of the community," including a "tenant-based assistance utilization rate of 92%." JA 665.  The Field Office also indicated that it agreed with HAJP's "conclusions and determinations" as to "the likely impact of the conversion on the neighborhood(s) in which [Acre Road] is located."  *Id.*  In addition, HUD received input from a regional division of its Office of Fair Housing and Equal Opportunity.  The Office said that it had "no civil rights-related concerns relative to HAJP's application."  JA 308.

Meanwhile, the Marrero Tenants Organization—an "elected tenant council representing the interests of [Acre Road's] residents," JA 628—mobilized against conversion.  On November 22, 2022, it wrote to HUD asking it to "deny HAJP's . . . conversion application."  JA 629. Its letter observed that HAJP had "no timeline for redevelopment of the Acre Road site, nor any concrete plan other than an interest in donating the property to a new non-profit entity and potentially applying for a CNI planning grant."  JA 630.  It argued that conversion would increase residential segregation in Jefferson Parish (and thus violate the Fair Housing Act) because, "[i]n order to remain" in Jefferson Parish, "former Acre Road tenants [would] be forced to move to equally if not more racially segregated areas with higher poverty rates."  JA 632; *see* JA 635–36. It added that HAJP "could have adopted a development plan that would enable residents to live in housing that includes tenant protections similar to those they have been afforded at Acre Road" or

pursued various other options that would have benefited Acre Road's tenants more.  JA 636–37.

And it asserted that, because "the majority of housing providers surveyed in Jefferson Parish [did]

not accept" Section 8 vouchers "at all," closing Acre Road would not "provide[]" its residents

"with additional choices in the housing market."  JA 633; *see* JA 638.

On February 8, 2023, the Organization followed up with another letter.  That letter

reiterated the Organization's residential-segregation concerns and provided additional data

"directly disput[ing]" the New Orleans Field Office's 92%-voucher-utilization figure.  JA 720.

According to the Organization, "only 57% of families issued vouchers" in Jefferson Parish

"actually became program participants."  *Id.*  27% of Section 8 participants "were terminated from

the program because their vouchers expired before they were able to find a unit."  *Id.*  Additionally,

"the average number of days it took" voucher recipients "to find a unit . . . was 135, more than

double the minimum required search time under HUD regulations."  *Id.*

On March 9, 2023, HUD approved HAJP's conversion application.  JA 726.  Its approval

memorandum observed that HAJP had not submitted a full conversion assessment under

§ 1437t(b)(1) but did not find the omission notable, explaining that "PIH Notice 2019-05 waives

the Conversion Assessment . . . and so HAJP did not include one."  JA 732.  Referencing HAJP's

submissions, HUD concluded that "the conversion of the public housing assistance in the 100

buildings at [Acre Road] will improve the neighborhood by allowing . . . HAJP . . . to

redevelopment [sic] of the site as new housing, either through substantially [sic] rehabilitation of

the existing units or demolition of the existing units."  JA 733.  It also reported that "HAJP believes

there is sufficient availability of private rental housing with access to schools, jobs, and

transportation in the New Orleans metropolitan area where families can use their tenant-based

assistance."  *Id.*

HUD's memorandum did not discuss whether maintaining Acre Road would be less expensive than converting it.  Nor did it mention residential segregation, alternative ways of disposing of Acre Road, the Fair Housing Act, or any of the Organization's letters.

**D.    Procedural Background**

On May 3, 2023, Anderson (along with several other tenants and the Organization) sued HUD.  Compl., Dkt 1.  She asked the Court to, among other things, vacate Notice PIH 2019-05 and HUD's approval of the Acre Road conversion.  *Id.* at 28–29.  She also moved for a preliminary injunction.  Dkt. 3.

The Court denied Anderson's request for preliminary relief in July, finding that she had not demonstrated a sufficient risk of irreparable harm.  Tr. of Video Mot. Hr'g at 20:16–21:22 (July 27, 2023), Dkt. 38; *see id.* at 7:16–17 (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016)).  The Court emphasized that its conclusion might "change if circumstances change[d]," however.  *Id.* at 20:20.  It added that it was "willing to prioritize this case to reach a decision on the merits promptly."  *Id.* at 15:25–16:1.

On October 23, 2023, HUD represented that Marianne Nazzaro, the author of the March 9, 2023 approval memorandum, "lacked delegated authority to waive the statutory and regulatory conversion assessment requirements for Acre Road."  JA 834 (citing 80 Fed. Reg. 18645, 18645–46 (Apr. 7, 2015)).  Accordingly, HUD's Richard Monocchio—at the time, its Principal Deputy Assistant Secretary for Public Housing—"independently reevaluated" HAJP's application and "ratif[ied] and affirm[ed]" Nazzaro's waiver of § 1437t(b)(1)'s conversion-assessment requirement.  *Id.*  In ratifying Nazzaro's waiver decision, Monocchio described Notice PIH 2019-05 as "non-binding" guidance that "did not grant a particular waiver to, or impose any particular streamlined assessment requirements on, any project."  JA 833.  Thus, rather than relying on the

9

Notice, Monocchio's decision to ratify turned on his "discretionary judgment that, based on the facts specific to Acre Road, waiving the full conversion assessment requirement . . . was a reasonable and appropriate use of [HUD's] waiver authority."  JA 834.

HUD filed a motion for summary judgment on October 23, 2023.  Dkt. 42.  Anderson filed a cross-motion for summary judgment on November 22, 2023, Dkt. 45, and an Amended Complaint on January 12, 2024, Dkt. 54.  On April 10, 2024, HUD informed the Court that only one plaintiff in this action—Darin Collins—still lived at Acre Road.  Defs.' Resp. to Pls.' Status Report at 1, Dkt. 62.  Anderson, however, says that she "did not want to move away from Acre Road" and "would like to return."  Decl. of Jolene Anderson ¶ 22, Dkt. 46-2.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court may grant summary judgment when "there is no genuine dispute as to any material fact and [a party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In challenges to agency action under the APA, "[t]he entire case on review is a question of law."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  "The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be," among other things, (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of statutory jurisdiction, authority, or limitation[]," or (3) "without observance of procedure required by law."  5 U.S.C. § 706(2); *see, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).

In assessing an agency's factfinding and its policy judgments under § 706, the Court cannot "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rather, it asks whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *Id.*

(quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  The Court will uphold "decision[s] of less than ideal clarity if the agency's path may reasonably be discerned," but it cannot justify agency action based on factual findings or policy judgments the agency did not make in its own proceedings.  *Id.* (cleaned up); *see SEC v. Chenery Corp.*, 318 U.S. 80, 93–94 (1943); *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304–05 (D.C. Cir. 2015).

As for actions "not in accordance with law," "in excess of statutory . . . authority," or "without observance of procedure required by law," 5 U.S.C. § 706(2), agencies must comply with the APA and with other statutory restrictions on their powers.  *See, e.g.*, *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 235–36 (1973).  They must also follow their own regulations.  *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

Finally, the Court lacks jurisdiction over moot claims.  *FBI v. Fikre*, 144 S. Ct. 771, 777 (2024).  "Mootness doctrine 'addresses whether an intervening circumstance has deprived [a] plaintiff of a personal stake in the outcome of [her] lawsuit.'"  *Moore v. Harper*, 143 S. Ct. 2065, 2077 (2023) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022)).  Because mootness is jurisdictional, the Court must address it even when litigants do not.  *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1522 (D.C. Cir. 1994).

## III.   DISCUSSION

Anderson asks the Court to hold unlawful and set aside (1) Notice PIH 2019-05 and (2) HUD's approval of the Acre Road conversion application.  HUD defends both on the merits and, in the alternative, seeks remand without vacatur.  For the reasons that follow, the Court will dismiss Anderson's challenge to Notice PIH 2019-05 as moot but will vacate HUD's decision to approve the Acre Road conversion application.

A.     Notice PIH 2019-05

Anderson claims that Notice PIH 2019-05 conflicts with HUD's statutory obligations and that HUD unlawfully promulgated it without notice and comment rulemaking.  The Court will dismiss both claims as moot.  Because Principal Deputy Assistant Secretary Monocchio ratified HUD's conversion-assessment waiver without relying on the 2019 Notice, Anderson no longer has a personal stake in her challenge to it.

A claim becomes moot when, due to intervening events, a plaintiff lacks a "personal stake" in its resolution.  *Moore*, 143 S. Ct. at 2076.  Put differently, "throughout" a case, "the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'"  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

"Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue."  *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982).  For example, when one agency action supersedes another, prospective challenges to the superseded agency action generally become moot.  *See, e.g.*, *Theodore Roosevelt Conserv. P'shp v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011).  In those circumstances, vacating the old agency action will not deliver the plaintiff any relief.  The new agency action, not the old one, is what injures the plaintiff going forward.  *See, e.g.*, *Blue Water Balt. v. Pruitt*, 266 F. Supp. 3d 174, 180–81 (D.D.C. 2017).

Anderson now lacks a personal stake in the validity or invalidity of Notice PIH 2019-05, mooting her challenge to it.  When HUD approved HAJP's conversion application in March 2023, it did so on the premise that the Notice "waive[d]" HAJP's obligation to perform a full conversion assessment.  JA 732.  Thus, at the start of this case, Anderson's interest in blocking Acre Road's

conversion gave her an interest in attacking the Notice—the Court might have vacated HUD's approval of HAJP's conversion application if it had concluded that the Notice did not (or could not) waive HAJP's obligations to perform a full conversion assessment. But circumstances have changed since Anderson filed this case. In October 2023, Monocchio "ratif[ied] and affirm[ed] as [his] own" HUD's March "conversion assessment waiver for Acre Road." JA 834. And he did so after considering the issues afresh, without relying on Notice PIH 2019-05. *Id.* As a result, Anderson no longer has a personal stake in the validity of the Notice. Now, even if the Court vacated the Notice, Monocchio's October 2023 decision would offer "adequate and independent grounds" for HUD's decision to approve HAJP's conversion application. *Steel Manuf. Ass'n v. EPA*, 27 F.3d 642, 649 (D.C. Cir. 1994) (per curiam) (discussing issue in the context of harmless error).

Although Monocchio's characterization of Notice PIH 2019-05 as "non-binding" and "non-definitive" seems questionable, that does not save Anderson's claims from mootness. JA 833; *cf.* JA 179 ("HUD *is exercising* its authority under [42 U.S.C. § 1437t(b)(3)] *to waive* [the 1998 Act's conversion assessment requirements].") (emphasis added). Monocchio did not condition his decision to exercise his waiver authority on his view of what Notice PIH 2019-05 meant. Rather, his judgment turned on "the facts specific to Acre Road," including Acre Road's acute mold problems and HAJP's status as "a small PHA with fewer resources." JA 834. In other words, Monocchio's waiver determination is now the sole basis for HUD's decision to approve HAJP's conversion application without a full conversion assessment. Because the 2019 Notice is now irrelevant to HUD's decision to approve HAJP's conversion application, Anderson no longer has a personal stake in the validity of the Notice.

Nor does it matter that Monocchio may have acted so that HUD could succeed in this case. *Cf.* Pls.' Reply Mem. at 22, Dkt. 58.  Mootness often arises in the shadow of litigation, but that does not make moot cases any less moot.  More fundamentally, the Court must presume that agency officials act regularly and in good faith, a presumption that Anderson has not rebutted. *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978).

Likewise, Monocchio's decision does not fall afoul of *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020).  *Regents* holds that, when an agency purports to "offer a fuller explanation" of its reasons for taking a prior action, a court must assess whether the agency has in fact offered new reasons for that action.  *Id.* at 1907 (quoting *PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990)).  But *Regents*' requirement does not attach when an agency "'deal[s] with [a] problem afresh' by taking *new* agency action instead," a category in which Monocchio's October 2023 memorandum falls.  *Id.* at 1908 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).  Monocchio's memorandum "ratif[ied]" and "affirm[ed]" HUD's "March 9, 2023 conversion assessment waiver without deference," JA 834, a decision that qualifies as new agency action, *see Doolin Sec. Sav. Bank, F.S.B. v. OTS*, 139 F.3d 203, 213 n.11 (D.C. Cir. 1998), *superseded by statute on other grounds*, Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 122 Stat. 2681 (1998), *as recognized in SW Gen., Inc. v. NLRB*, 976 F.3d 67, 70–71 (D.C. Cir. 2015).

The voluntary cessation exception to mootness does not help Anderson either, even assuming without deciding that the Monocchio waiver qualifies as a form of voluntary cessation. True, "voluntary cessation will only moot a case if" (1) "interim relief or events have completely and irrevocably eradicated the effects" of a defendant's conduct and (2) "there is no reasonable expectation that the alleged violation will recur."  *Clean Water Action v. Pruitt*, 315 F. Supp. 3d

72, 87 (D.D.C. 2018) (cleaned up).   Here, however, HUD checks both boxes.   Because Monocchio's waiver gives HUD an independent and adequate basis for approving HAJP's closure of Acre Road without a conversion assessment, it "completely and irrevocably" cures any defect arising out of HUD's initial reliance on Notice PIH 2019-05.   *Id.*   And because HUD is extraordinarily unlikely to wield Notice PIH 2019-05 against Anderson again, Anderson lacks a "reasonable expectation" that HUD's "alleged violation will recur."   *Id.*   Although HUD might rely on the Notice in approving additional conversion applications in the future, Anderson does not represent that she currently resides or plans to reside at another public housing project that seeks conversion to Section 8.   And with respect to Acre Road, HUD has no need to invoke Notice PIH 2019-05 in the future.   Rather, Monocchio's waiver materials independently make clear that— in HUD's view at least—evaluating HAJP's conversion application does not "necessitate[] a full expensive and burdensome conversion assessment."   JA 835.

For similar reasons, Anderson cannot rely on the mootness exception for actions "capable of repetition yet evading review."   *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).   To show that an action is "capable of repetition," there must be "a reasonable expectation that the same complaining party [will] be subjected to the same action again."   *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quoting *Weinstein*, 423 U.S. at 149).   Here, because Anderson does not reside at a new project that might attempt conversion and because HUD is highly unlikely to invoke Notice PIH 2019-05 at Acre Road again, she lacks such a reasonable expectation.

One final point merits discussion.   Courts ordinarily treat agency ratification defenses as going to the merits rather than to mootness.   *Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019).   In this case, however, HUD did not ratify Notice PIH 2019-05.   Rather, it ratified the specific agency

decision that gives Anderson a personal stake in this litigation while forgoing any reliance on the Notice. Thus, unlike in *Guedes*, Monocchio's ratification decision does not render the 2019 Notice's (alleged) defects harmless in general. *Id.* at 13–14 (describing scenario in which agency ratified sole action under review). Instead, it renders Anderson's challenge to the 2019 Notice moot because an order vacating the 2019 Notice would no longer redress Anderson's injuries. *Kemna*, 523 U.S. at 7–8.

For these reasons, the Court will dismiss Anderson's challenge to the 2019 Notice as moot.

**B.      Acre Road's Conversion Application**

That leaves HUD's decision to approve HAJP's conversion application for Acre Road. The Court finds that HUD's decision conflicted with the antidiscrimination provisions of the Fair Housing Act, 42 U.S.C. § 3604(a), and with the 1998 Act's substantive conversion provisions, *id.* §§ 1437t(c), (e). It will reject Anderson's arguments that HUD did not affirmatively further fair housing under the Housing Act, *id.* § 3608; that it approved HAJP's application without a full conversion assessment under the 1998 Act, *id.* § 1437t(b)(1); and that it arbitrarily departed from its own conversion assessment regulations. Finally, the Court will vacate HUD's decision rather than remand it without vacatur.

1.      Housing Discrimination (42 U.S.C. § 3604(a))

The Fair Housing Act makes it "unlawful" to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Because HUD does not argue otherwise, *see United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020), the Court assumes without deciding that HUD "ma[de]" a "dwelling" "unavailable" under § 3604(a) when it authorized HAJP to close Acre Road.

Section 3604 contemplates disparate impact theories of liability.  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 534 (2015).  To establish disparate impact liability under the Housing Act, a plaintiff must show that a policy entrenches residential segregation or disproportionately harms a protected class.  *Boykin v. Gray*, 986 F. Supp. 2d 14, 17–18 (D.D.C. 2013); *see 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 681 (D.C. Cir. 2006).  She must also show that these disparate impacts lack an adequate justification.  "Governmental or private policies are not contrary to the disparate-impact requirements unless they" pose "artificial, arbitrary, and unnecessary barriers" to integrated living or minority success.  *Tex. Dep't of Hous.*, 576 U.S. at 534 (cleaned up).

In deciding whether HUD acted arbitrarily or beyond the limitations prescribed by § 3604, the Court defers to HUD's factfinding and to its reasonable policy decisions.  *State Farm*, 463 U.S. at 43.  But HUD cannot defend its actions based on judgments of fact or policy that do not appear in the administrative record.  *Chenery*, 318 U.S. at 94; *Canonsburg Gen. Hosp.*, 807 F.3d at 304.

These principles doom HUD's defense to Anderson's § 3604 claims.  In November 2022, the Marrerro Tenants Organization warned HUD that closing Acre Road would segregate Jefferson Parish and disproportionately burden African Americans.  JA 632, 720.  It also described those effects as unnecessary, contending that HUD could accomplish its goals just as well if it rejected HAJP's conversion application.  *Id.*  HUD did not respond that closing Acre Road would be integrative or that different racial groups would bear its burdens.  Nor did it acknowledge disparate impacts but characterize them as necessary evils.  Instead, when HUD approved HAJP's application, it said nothing at all about disparate impact.  Thus, HUD failed to make the factual findings or policy judgments necessary to defend against disparate impact liability in its administrative proceedings, and it cannot correct the error now.  *Chenery*, 318 U.S. at 94.

It is true that HUD's Office of Fair Housing and Equal Opportunity reviewed HAJP's application and found "no civil rights-related concerns."  JA 308; *see also* JA 732 (noting the Office's approval).  Even so, the Office did not explain which civil rights statutes it had considered or why it found that HAJP's application complied with them.  JA 308.  Nor did it discuss the Marrero Tenants Organization's contrary position, much less the empirical evidence the Organization offered to support it.  *Id.*  Indeed, it offered no reasons at all to support its no-concern conclusion.  *Id.*  And while the record contains an email exchange suggesting that at least one Office official reviewed the Tenants Organization's letters to HUD and the "fair housing concerns" they raised, HUD has redacted that exchange in its entirety.  JA 653–66.  In short, even if the Office considered and rejected Anderson's civil-rights arguments on their merits, the Court "lack[s] an explanation . . . from the record" why it did so.  *Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury*, 857 F.3d 913, 927 (D.C. Cir. 2017).

So too, it is true but irrelevant that—as a matter of fact—HAJP's and Acre Road's problems may have made conversion necessary for HUD to accomplish substantial, nondiscriminatory goals. HUD did not state as much on the available record when it approved HAJP's conversion application, and the Court cannot rely on "counsel's *post hoc* rationalizations" to plug the hole. *Nat'l Fed'n of Fed. Emps., Local 1669 v. FLRA*, 745 F.2d 705, 708 (D.C. Cir. 1984).  Nor were HUD's options so obvious that its "path may reasonably be discerned" without a written record. *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Syst.*, 419 U.S. 281, 286 (1974)).  Granted, HUD needed to do *something* about conditions at Acre Road.  But in its November letter, the Marrero Tenants Organization proposed alternatives to HAJP's conversion plan that might also have improved Acre Road's safety and habitability.  *See* JA at 636–37.  It also argued that, if HAJP closed Acre Road, many of its residents would be left without housing—a

problem worse than being exposed to mold or other unsanitary conditions.  JA 636.  HUD may well have had good reasons for discounting the Organization's concerns, but it failed to "cogently explain" them or even broach them "within the ambit of [its] existing standard[s]." *State Farm*, 436 U.S. at 48, 51.

For these reasons, the Court finds that HUD's approval of HAJP's conversion application fell short of its obligations under § 3604(a).

### 2.    Conversion Criteria (42 U.S.C. § 1437t(c), (e))

The Court also finds that HUD approved HAJP's conversion application in violation of the substantive conversion provisions of the 1998 Act.  42 U.S.C. § 1437t(c), (e).  Despite its statutory obligation to do so, HAJP failed to provide a conversion assessment demonstrating that conversion of Acre Road would "not be more expensive than continuing to operate [it] . . . as public housing." *Id.* § 1437t(c)(1).  In addition, although the question is closer, HUD failed to adequately assess whether "reliable information and data available to [it] . . . contradict[ed]" HAJP's assurance that conversion would "principally benefit the residents of [Acre Road], the public housing agency, and the community" and would "not adversely affect the availability of affordable housing in such community." *Id.* § 1437t(c)(2)–(3), (e)(2).

Under the 1998 Act, "[a] public housing agency may [only] convert [a] public housing project . . . in accordance with the requirements of" 42 U.S.C. § 1437t.  *See* 42 U.S.C. § 1437t(a).  42 U.S.C. § 1437t(c) describes one of those requirements: "[a] public housing agency may convert a public housing project . . . to tenant-based assistance only pursuant to a conversion assessment . . . that demonstrates that the conversion—(1) will not be more expensive than continuing to operate the public housing project . . . as public housing; (2) will principally benefit the residents of the public housing project . . . , the public housing agency, and the community;

and (3) will not adversely affect the availability of affordable housing in such community." HUD "shall" block conversion "only if . . . reliable information and data available to [it] . . . contradict[]" an agency's assessment or if the agency's plan for converting its project "otherwise fails to meet" § 1437t's requirements. *Id.* § 1437t(e).

Taken together, these provisions limit conversions in at least two ways. If a public housing agency's assessment does not "demonstrate[]" that conversion would satisfy § 1437t(c)'s three criteria, it does not "accord[] with" § 1437t regardless of what HUD thinks. *Id.* § 1437t(a), (c). Further, if "reliable information and data available to [HUD] . . . contradicts" the agency's assessment, HUD may (or perhaps must) disapprove conversion notwithstanding the agency's assessment under § 1437t(c)'s three criteria. *Id.* § 1437t(e).

Both limitations undermine HUD's approval decision in this case. *First*, HAJP did not submit an assessment "demonstrat[ing]" that closing Acre Road would "not be more expensive than continuing to operate" it. *Id.* § 1437t(c)(1). Although HAJP's application estimated the cost of relocating Acre Road's residents ($1 million), it did not calculate the total costs of converting Acre Road to Section 8 vouchers. JA 262. Similarly, although HAJP's application told HUD that remediating Acre Road's mold problems would cost "hundreds of thousands of dollars," it did not sum those costs with others to estimate Acre Road's total operating costs. JA 267. Nor do HAJP's other submissions to HUD close the gap. *See, e.g.*, JA 374 (estimating a subset of Acre Road's operating costs, but without comparable consideration of conversion costs). Because it failed to compare the cost of closing Acre Road to the cost of keeping it open, even with back-of-the-napkin math, HAJP did not "demonstrate" compliance with § 1437t(c)(1)'s cost criterion.

*Second*, assuming without deciding that HAJP "demonstrated" that conversion would "principally benefit the residents of" Acre Road alongside HAJP and the broader community,

HUD did not ask whether "reliable information and data available to [it] . . . contradicted that . . . assessment." 42 U.S.C. § 1437t(c)(2), (e)(2).  Granted, some evidence suggested that closing Acre Road would benefit its residents.  According to both HAJP and HUD's New Orleans Field Office, New Orleans contained adequate, low-cost rental housing.  *See, e.g.*, JA 433, 665.  As a result, if Section 8 vouchers replaced Acre Road, its residents could find better lodgings elsewhere.  The Marrero Tenants Organization saw things differently, however.  It argued that Section 8 vouchers were "virtually unusable in Jefferson Parish" and that conversion would leave residents worse off in consequence.  JA 719; *see, e.g.*, JA 632–33.  Although HUD had every right to trust its own field office's numbers over the Organization's, it needed to say why.  *Cf. FCC v. Prometheus Radio Project*, 582 U.S. 414, 425–26 (2021).

*Third*, again assuming without deciding that HAJP "demonstrated" that closing Acre Road would not "adversely affect the availability of affordable housing" in Jefferson Parish, HUD failed to consider whether "reliable information" showed otherwise.  42 U.S.C. § 1437t(c)(3), (e)(2).  HAJP did promise to build "mixed-use development including affordable housing" at Acre Road after conversion, JA 384, and HUD agreed that "conversion" of Acre Road "[would] improve the neighborhood by allowing the HAJP . . . to redevelopment [sic] the site as new housing," JA 733.  Never, however, did HUD find that converting Acre Road would increase the housing supply on net.  The conclusion did not go without saying, either.  Because HAJP lacked "concrete plan[s]" for redevelopment, JA 630 (Marrero Tenants Organization's letter), closing Acre Road might have led to fewer houses rather than more.  Trading one hundred moldy buildings for the hope of future redevelopment may have promoted affordable housing on balance, but the record does not confirm that HUD thought so.  *Cf. Epsilon Elecs.*, 857 F.3d at 927.

Contrary arguments fail.  At the outset, decisions to grant a conversion application are not unreviewable as "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *cf.* Defs.' Mem. in Supp. of Summ. J. at 17, Dkt. 42-1 (arguing that HUD's decision to *waive* conversion assessment requirements under 42 U.S.C. § 1437t*(b)(3)* are so committed).  A statute precludes review under § 701(a)(2) when it calls for judgments traditionally committed to agency discretion or is "drawn in such broad terms" that it gives courts "no law to apply."  *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting *Overton Park*, 401 U.S. at 410).  Neither category fits here.  As the discussion above suggests, ample law with clear requirements governs conversions under the 1998 Act.  Nor do decisions to close public housing projects look like decisions traditionally committed to agency discretion.  True, agency enforcement decisions are traditionally unreviewable, but Anderson does not challenge a HUD decision to let violations of § 1437t lie.  She challenges its affirmative choice to "approve" HAJP's conversion application. JA 726; *cf. Regents*, 140 S. Ct. at 1906 ("[A]n affirmative act of approval[] [is] the very opposite of a refusal to act.") (cleaned up).

Further, although HUD explained its reasoning somewhat when it approved HAJP's conversion application, it did not "provide an adequate basis for judicial review."  *Camp v. Pitts*, 411 U.S. 138, 138 (1973) (per curiam).  In relevant part, HUD (1) noted that HAJP "propose[d] the conversion of [Acre Road] due to infestation of mold," (2) observed that "[s]tudies have concluded that the mold count presents a danger to the health and safety of the residents," (3) concluded from those facts that "the conversion of [Acre Road] will improve the neighborhood by allowing the HAJP . . . to redevelop[] . . . the site as new housing," and (4) added that "HAJP believes there is sufficient availability of private rental housing . . . where families can use their" Section 8 vouchers.  JA 733.  While better than nothing, that explanation does not show that HUD

considered the statutory requirements of 42 U.S.C. § 1437t(c) or its authority to disapprove HAJP's plan under § 1437t(e).  Still less does it demonstrate that HUD exercised its discretion in applying those provisions based on rational and lawful reasons.  The Administrative Procedure Act requires more.  *Cf. Overton Park*, 401 U.S. at 417–18.

In a similar vein, it does not help that § 1437t(e)—which says that HUD "shall disapprove a conversion plan only if," among other things, "reliable information and data . . . contradict[]" a conversion assessment's conclusions—may permit HUD to disapprove contradicted conversion plans rather than oblige it to disapprove them.  *Compare In re Application of the U.S. for an Order Directing a Provider of Elec. Comm'ns Servs. to Disclose Records*, 620 F.3d 304, 316 (3d Cir. 2010) (reading analogous "shall . . . only if" construction to grant permission rather than impose obligations), *with In re Application of the U.S. for Historical Cell Site Data*, 724 F.3d 600, 607 (5th Cir. 2013) (reading identical language to impose obligations), *and Carpenter v. United States*, 585 U.S. 296, 305–06 (2018) (abrogating both decisions on unrelated grounds).  For one thing, even if § 1437t(e) permits HUD to disapprove conversion plans when reliable information or data contradicts their supporting conversion assessments, HUD did not purport to exercise such discretion in this case.  *Chenery*, 318 U.S. at 94.  For another, setting § 1437t(e) aside, HAJP's application materials failed to "demonstrate[]" that converting Acre Road would "not be more expensive than continuing to operate [it] . . . as public housing" for purposes of § 1437t(c)(1).

Finally, although 42 U.S.C. § 1437t(b)(3) gives HUD authority to "waive any or all of the requirements of paragraph (1) or (3) or otherwise require a streamlined assessment with respect to any public housing project or class of public housing projects," it does not grant HUD the power to waive compliance with the substantive conditions contained at § 1437t(c).  Start with the text.  Section 1437t(c) is not "paragraph (1) or (3)" of § 1437t(b), the subsection containing

§ 1437t(b)(3).  *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law* 144 (2012) ("A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."); *Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 460 (D.D.C. 2020) (applying the canon in a similar context).  Nor do waivers of § 1437t(c) "otherwise" provide for "streamlined assessment[s]."  42 U.S.C. § 1437t(b)(3).  As the section headings to § 1437t make clear, only § 1437t*(b)* imposes "assessment" requirements.  *Id.* § 1437(b) (heading) ("Conversion [A]ssessment"); *see Cannon v. Watermark Retirement Communities, Inc.*, 45 F.4th 137, 144 (D.C. Cir. 2022) ("Titles offer clues as to statutory meaning.").  Section 1437t(c), by contrast, lays out "criteria" that a public housing agency must satisfy.  42 U.S.C. § 1437t(c) (heading) ("Criteria for [I]mplementation of [C]onversion [P]lan").  In other words, unlike § 1437t(b), § 1437t(c) does not require public housing agencies to conduct assessments that include specific components.  Rather, it creates additional, substantive prerequisites that a public housing agency must satisfy before it converts a project to tenant-based assistance.

Context reinforces this reading.  It would be strange to read § 1437t(b)(3), a paragraph referencing and contained within § 1437t(b), to apply across § 1437t as well as to § 1437t(b).  It would be stranger still to read § 1437t(b)(3)'s catchall "otherwise" clause that way, as the clause follows and is hence limited by another phrase ("paragraphs (1) and (3)") specifically tied to § 1437t(b).  *See, e.g.*, *United States v. Alford*, 89 F.4th 943, 952 (D.C. Cir. 2024) ("[W]hen a general term follows a specific one, the general terms should be understood as a reference to subjects akin to the one with specific enumeration.") (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008)).  Last but not least, § 1437t(c) plays a central role in § 1437t.  Along with two clauses of § 1437t(d), it provides the only substantive standards that regulate when an agency may convert a public housing project to Section 8 vouchers.  *See* 42 U.S.C. § 1437t(d)(4)(A)(ii)

24

(requiring a public housing agency to notify residents of a conversion plan providing that "each family displaced by" conversion "will be offered comparable housing"); *id.* § 1437t(d)(4)(C) (providing that, if a project "is used as housing after . . . conversion," a conversion plan must permit residents "to remain in their dwelling unit" and use Section 8 vouchers "toward rent for that unit"). If Congress authorized HUD to waive the core, substantive requirements of § 1437t as well as § 1437t(b)'s procedural prerequisites to conversion eligibility, it would have spoken more clearly than it did in § 1437t(b)(3). *Cf. MCI Telecom. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229–31 (1994).

Confirming the point further is the paucity of arguments in the other direction. Although HUD observes that "[a] specific statutory provision controls over a more general one" in the event of conflict, HUD's Mem. in Opp. to Summ. J. at 16, § 1437t(b)(3) does not conflict with § 1437t(c). Rather, as the Court will explain, § 1437t(b)(3) permits HUD to waive the procedural requirements contained at § 1437t(b)(1) and to substitute new ones in their place. *See infra* III.B.4. Nothing about that power means that HUD must *also* be able to waive § 1437t(c)'s three substantive requirements. For example, § 1437t(c)(1) requires a public housing agency to show that closing a project would not cost more money than keeping it open. But to discharge that duty, the agency need not provide a full-blown "cost analysis . . . on a net present value basis and in terms of new budget authority requirements . . . for the remaining useful life of the project," much less "an analysis of the market value of the public housing project both . . . before and after conversion." 42 U.S.C. 1437t(b)(1)(A)–(B). A simpler analysis could suffice.

HUD also emphasizes that, in its 2014 guidance, it purported to waive compliance with its regulations implementing § 1437t(c)(1). *See* JA 123 (citing 24 C.F.R. § 972.224(a)(1)). But the 2014 waiver does not inspire confidence, much less deference under *Skidmore v. Swift & Co.* 323

U.S. 134, 139–40 (1944).  HUD issued the waiver, which applies on its face to HUD's regulations rather than § 1437t(c)(1) itself, more than fifteen years after Congress passed the 1998 Act and more than ten years after HUD issued implementing regulations thereunder.  It offered no legal reasoning to support the waiver and buried it in an appendix rather than in the 2014 guidance itself. *Compare* JA 95–96, *with* JA 234.  And nothing else gives the waiver obvious persuasive power. *Skidmore*, 323 U.S. at 140.  The same conclusion holds for HUD's 2019 guidance, which does not discuss § 1437t(c) or any of its implementing regulations.  JA 178–90.

One issue remains.  Anderson seems to assume that HUD cannot waive compliance with § 1437t(b)(1) without also abandoning § 1437(c) and (e).  *See, e.g.*, Pls.' Mem. in Support of Summ. J. at 24–25, Dkt. 45-1.  As a result, her briefing focuses primarily on whether HUD may waive the requirements of § 1437t(b)(1).  But it is not obvious that Anderson has forfeited her arguments for vacatur under § 1437(c) and (e) as a result—Anderson does raise both sections in passing, *see, e.g.*, Pls.' Reply Mem. in Support of Mot. for Summ. J. at 4 ("Defendants thus concede that the 2019 Notice's wholesale waiver of a conversion assessment is not consistent with the provisions of Sections 1437t(c) and (e)."), and her argument that HUD cannot comply with § 1437(c) and (e) without also requiring adherence to § 1437(b)(1) puts both of those provisions in the Court's sights.  In any event, the Court has the power to forgive any forfeiture.  *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991) ("[T]he court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").  Here, because remand is necessary anyway under the Fair Housing Act and because addressing § 1437t in full "will reduce the likelihood of future litigation," the Court discusses all of § 1437t even though Anderson arguably did not.  *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 14 (2009) (plurality opinion).

For these reasons, the Court finds that HUD's approval of HAJP's application to close Acre Road fell short of its obligations under § 1437t.

3.    Affirmatively Furthering Fair Housing (42 U.S.C. § 3608)

Anderson's remaining arguments are less successful.  The Court starts with Anderson's claims under the Fair Housing Act's "affirmatively furthering fair housing" provisions, codified at 42 U.S.C. § 3608.  Under those provisions, "all executive departments and agencies" must "administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further the purposes of" the Fair Housing Act.  *Id.* § 3608(d); *see also id.* § 3608(e)(5) (repeating the instruction for HUD).  Section 3608 directs HUD to promote "open, integrated residential housing patterns and to prevent the increase of segregation."  *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 25 (D.D.C. 2018) (quoting *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973)).

However laudable § 3608's goals may be, HUD need not pursue them "at all costs."  *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) (cleaned up).  Rather, "HUD maintains discretion in determining how [it] will fulfill its" fair-housing duties.  *Carson*, 330 F. Supp. 3d 25.  For example, in some cases and at least some of the time, HUD may legitimately prioritize saving money over promoting fair housing.  *Id.* at 58–62.  For reviewing courts, the key question is whether HUD "offer[ed] a satisfactory explanation" in setting its priorities as it did.  *Thompson v. HUD*, 348 F. Supp. 2d 398, 457 (D. Md. 2005).  *Compare Carson*, 330 F. Supp. 3d at 61–62, *with Shannon v. HUD*, 436 F.2d 809, 822–23 (3d Cir. 1970).

Additionally, as HUD argues and as Anderson all but concedes, some agency action under § 3608 is "committed to agency discretion by law" and thus unreviewable under the APA. 5 U.S.C. § 701(a)(2).  In particular, although courts can review claims that an agency "has failed

generally and programmatically to fulfill" § 3608's "mandate," they cannot consider lawsuits that "seek[] review" of "particular" agency choices. *Jones v. OCC*, 983 F. Supp. 197, 203 (D.D.C. 1997); *see* Pls.' Reply Mem. in Supp. of Summ. J. at 7–8 (accepting this framing).  For example, although this Court can assess whether the Office of the Comptroller of the Currency has taken adequate steps "overall" to enforce the Fair Housing Act during bank mergers, it cannot decide whether it should have disapproved specific mergers under the Act.  *Jones*, 983 F. Supp. at 203. Similarly, although the Court can decide whether HUD has administered its block grant programs to promote integration on the whole, it cannot hear challenges to HUD's denial of specific grant applications.  *Compare NAACP v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 158–59 (1st Cir. 1987) (Breyer, *J.*), *with Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

Given these standards, Anderson's claims under § 3608 fail.  *First*, HUD's decision to approve HAJP's conversion application is a particular decision rather than a programmatic one. *Cf. Jones*, 983 F. Supp. at 203 (approval of bank acquisition).  As a result, the Court cannot review it under § 3608.  *Id.*  Section 3608 allows HUD to balance its fair housing priorities against other goals when it approves conversion applications, and judicial review of HUD's balancing decisions in individual cases simply could not be meaningful.  *Cf. Vigil*, 508 U.S. at 192–93; *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 303–04 (2d Cir. 1971).

*Second*, Anderson has not raised a viable programmatic challenge to HUD's administration of its conversion program more generally.  She complains of HUD's decision to promulgate PIH Notice 2019-05, but she lacks a personal stake in her challenge to the Notice.  And to the extent that Anderson challenges Principal Deputy Assistant Secretary Monocchio's October 2023 decision to ratify HUD's prior waiver of HAJP's conversion-assessment obligations, that decision was particular rather than programmatic.  As Monocchio explained, it rested on his "discretionary

judgment that, based on the facts specific to Acre Road, waiving the full conversion assessment requirement" for HAJP's conversion application "was a reasonable and appropriate use of [HUD's] waiver authority."  JA 834.

Anderson does not meaningfully respond.  She cites several cases reviewing HUD's activities for compliance with § 3608, but most of those decisions attack large-scale HUD programs rather than individual HUD decisions.  *See, e.g.*, *NAACP*, 817 F.2d at 151–52 (programmatic challenge to HUD's administration of its block grant program); *Thompson*, 384 F. Supp. at 406–07 (programmatic challenge to HUD's pattern of public housing construction in Baltimore).  Others do not consider whether courts may review individual HUD decisions for compliance with § 3608, perhaps because the defendants in those cases did not press the issue. *See, e.g.*, *Carson*, 330 F. Supp. at 61–62; *Otero*, 484 F.2d at 1134; *see also NAACP*, 817 F.2d at 158 (explicitly declining to decide the question).  Only one case, *Shannon*, affirmatively holds that HUD's compliance with § 3608 with respect to its decisions to open or close specific housing projects is reviewable under the APA.  436 F.2d at 818.  Anderson does not defend this part of *Shannon*'s holding, however, and time has passed it by.  *Cf. Am. Disabled for Attendant Programs Today v. HUD*, 170 F.3d 381, 388 (3d Cir. 1999) (observing that *Shannon* was "decided approximately 15 years before the Supreme Court's . . . decision" in *Heckler v. Chaney*, 470 U.S. 821 (1985), which clarified the standard for non-reviewability).

For these reasons, the Court will reject Anderson's claims under 42 U.S.C. § 3608.

4.      Conversion Assessments (42 U.S.C. § 1437t(b)(1))

The Court will also reject Anderson's claim that HUD approved HAJP's conversion application without a full conversion assessment pursuant to 42 U.S.C. § 1437t(b)(1).[2]  Because HUD lawfully waived HAJP's § 1437t(b)(1) obligations under § 1437t(b)(3), a full conversion assessment was not necessary.

Under § 1437t(b)(1), a public housing agency must "conduct an assessment" of a public housing project before converting it.  42 U.S.C. § 1437t(b)(1).  The assessment must have five components—a cost analysis, a market-value analysis, a rental-market analysis, an impact analysis, and a conversion plan—that all agree HAJP's application did not contain.  *Id.*  Under § 1437t(b)(3), however, HUD may "waive any or all of the requirements of paragraph (1) or (3) or otherwise require a streamlined assessment with respect to any public housing project or class of public housing projects."  *Id.* § 1437t(b)(3).  Anderson's claim under (b)(1) therefore fails if (b)(3) authorizes HUD to waive compliance with (b)(1).

Paragraph (b)(3) does authorize HUD to waive compliance with (b)(1)'s five components, meaning Anderson's claim under § 1437t(b)(1) fails.  Start (again) with the text.  Section 1437t(b)(3) allows "waiv[ers]" of "any or all of the requirements of paragraph (1)," and it is difficult to understand what "paragraph (1)" could mean if it does not mean paragraph § 1437(b)(1).  Section 1437t(b)(1) is the nearest "paragraph (1)," indeed the only "paragraph (1)," that comes before § 1437t(b)(3) in § 1437t.  *See, e.g.*, *Genus Lifesciences*, 486 F. Supp. 3d at 460 (discussing nearest reasonable antecedent rule); *see also Nielsen v. Preap*, 139 S. Ct. 954, 964 (2019); *Valdius Reins., Ltd. v. United States*, 19 F. Supp. 3d 225, 227 (D.D.C. 2014) (interpreting

---

[2] Anderson presents this claim as a challenge to Notice PIH 2019-05, Pls.' Mem. in Support of Summ. J. at 22–28, but it applies equally to HUD's decision to approve HAJP's conversion application itself.

similar language).  In addition, § 1437t does not contain another "paragraph (1)" to which § 1437t(b)(3) could plausibly apply.  For example, it would quite odd if § 1437t(b)(3) allowed HUD to waive § 1437t*(c)*(1) and (3) but not (c)(2).

Context confirms that "paragraph (1)" means "paragraph (1) of § 1437t(b)" as well.  Sections 1437t(c) and (e) refer to conversion assessments "under subsection (b)" rather than paragraph (b)(1) alone, suggesting that conversion plans can come in many forms besides that of (b)(1) and thus that HUD can relax (b)(1)'s requirements under (b)(3).  42 U.S.C. § 1437t(c), (e)(1).  Paragraph (b)(1)'s heading also refers to conversion assessments "[i]n general," whereas (b)(3)'s heading describes "[s]treamlined assessment[s]."  *Id.* § 1437t(b)(1), (3) (headings).  The natural inference is that (b)(1) states what conversion assessments require in general but that HUD can "streamline[]" those requirements under (b)(3).  *Id.*

Anderson offers a contrary reading of § 1437t(b)(3), contending that it applies only to the *initial* assessments that § 1437t(b)(2) obliged agencies to carry out before 2001.  By its terms, however, § 1437t(b)(3) applies to assessments carried out under "paragraph[] (1)" of § 1437t(b), not only to assessments under § 1437t(b)(2).  Anderson does not suggest that this reference to paragraph (1) is a scrivener's error, *see Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1040–44 (D.C. Cir. 2001) (per curiam), and the Court cannot otherwise rewrite "paragraphs (1) or (3)" to say "paragraph (2)."  Granted, it is very strange that (b)(3)'s reference to "the requirements of . . . paragraph (3)" makes the paragraph self-referential.  But replacing "paragraph (1)" with "paragraph (2)" would compound rather than resolve *that* ambiguity.[3]

---

[3] The Court need not decide what § 1437t(b)(3)'s reference to "paragraph (3)" means in reference to § 1437t(b)(3), and the plausible possibilities do not impact its holding.  One possibility is scrivener's error—Congress may have meant to authorize HUD to waive the requirements of "paragraph (1)" for conversion assessments and of "paragraph *(2)*" for initial, pre-2001 assessments.

Nor do Anderson's follow-on arguments against (b)(1) waivers have merit.  It is true that § 1437t(a) says public housing agencies can "only" convert projects "in accordance with" § 1437t's "requirements," but (b)(3) helps articulate what "the requirements" of § 1437t are—it says that they do not always include full, (b)(1)-style conversion assessments.  Similarly, although § 1437t(c) requires "a conversion assessment under subsection (b)," a streamlined conversion assessment under paragraph (b)(3) counts as a "conversion assessment under subsection (b)" just like a full-dress assessment under (b)(1) does.   Still less does (b)(3)'s history cut against (b)(1) waivers.  *See* Pls.' Mem. in Support of Summ. J. at 27 (citing S. Rep. No. 105-21 (1997)). A Senate Report discussing a predecessor to (b)(1) said that HUD could use its (b)(3) waiver authority to reduce public housing agencies' burdens in conducting initial assessments under (b)(2), but the report never suggested that HUD could not also use that authority to help public housing agencies seeking conversion.  S. Rep. No. 105-21 at 27 ("HUD may provide a waiver or provide a streamlined assessment to PHAs that are not planning to convert, are small PHAs, *or* are large PHAs where conducting an assessment for each of its projects would constitute an unnecessary burden.") (emphasis added).  Similarly, HUD did not use (b)(3) to waive (b)(1)'s requirements in its 2001 or 2003 regulations, but it hardly follows that HUD thought it could not have done so.

Finally, for reasons the Court has already given, the Court's reading of § 1437t(b)(3) does not make a mess of § 1437t(c) and (e).  HUD can easily make the judgments required by § 1437t(c) and (e) without a full-fledged conversion assessment under § 1437t(b)(1).  Deciding whether

---

Another possibility is that Congress, inelegantly, meant to grant HUD two layers of waiver authority—one layer for the requirements of (b)(1), another for "streamlined" requirements promulgated by regulation under (b)(3).  In other words, HUD can waive "any or all of the requirements of paragraph (1)," and it can also waive any streamlined "requirements" it promulgates under its (b)(3) authority.  Because § 1437t(b)(2) authorizes assessments under (b)(3), this reading would not disrupt HUD's authority to streamline initial assessments under (b)(2).

closing a public housing project would be cheaper than or as expensive as keeping it, for example, does not require full cost or market-value assessments. *Compare* 42 U.S.C. § 1437t(b)(1)(A)–(B), *with id.* § 1437t(c)(1).

For these reasons, the Court will reject Anderson's claims under § 1437t(b)(1).

###### 5.    HUD's Regulations

Finally, the Court will reject Anderson's argument that HUD waived HAJP's obligation to file a full (b)(1) conversion assessment after arbitrarily departing from its own regulations.[4] In general, if an agency promulgates rules after notice and comment, it may depart from those rules only after repealing or amending them through the notice and comment process. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Additionally, whenever an agency changes position, it must "ordinarily . . . display awareness that it is changing position" and offer "good reasons for [its] new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis deleted).

HUD did not arbitrarily or unlawfully change positions in this case because it did not change positions at all. In 2014 and again in 2019, HUD recognized that it could "waive . . . or require a conversion assessment for 'any public housing project or class of public housing projects'" under 42 U.S.C. § 1437t(b)(3). JA 94, 179. On both occasions, it recognized that waivers can be particularly appropriate for small public housing authorities, as they carry a "regulatory burden" that "is out of proportion to the federal resources available to them." *Id.* HUD's decision to waive HAJP's conversion assessment obligations sounded the same notes—

---

[4] Once again, Anderson presents this claim as a challenge to Notice PIH 2019-05 rather than HUD's approval decision and/or Monocchio's waiver. Pls.' Mem. in Support of Summ. J. at 28–30. The Court addresses it because her argument applies equally to HUD's approval decision (including Monocchio's waiver) and because not addressing it could unnecessarily complicate any future litigation following remand.

HUD granted HAJP's waiver after explaining that HAJP "was a small PHA with fewer resources, was struggling financially, . . . had been in default," and faced "dangerous conditions at Acre Road." JA 844. Far from reflecting a changed direction, that explanation follows naturally from HUD's 2014 and 2019 statements.

Anderson replies that HUD's position since 2014 contradicts its 2003 rules, which say that an agency seeking "to convert a public housing development . . . must perform a conversion assessment . . . in accordance with" requirements mirroring those of (b)(1), and therefore required notice and comment ruling to consummate. 24 C.F.R. § 972.209(a); *see id.* § 972.218. Anderson's position overreads the rules, however. Although HUD's 2003 regulations set ground rules for the conversion assessment process in general, they do not discuss or purport to limit HUD's waiver authority. The reality that HUD did not mention its waiver powers when it promulgated its 2003 regulations does not mean that it gave those powers away. *Cf. Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 962–64 (D.C. Cir. 1990) (finding that agency could waive mine-safety rule without notice and comment when rule, by its terms, applied to "any" mine and did not discuss waivers).

Anderson adds that HUD's 2001 rules *do* waive public housing agencies' obligations to conduct full initial assessments under (b)(2), suggesting that the 2003 rules' failure to execute a similar waiver for conversion assessments under (b)(1) was intentional. 24 C.F.R. §§ 972.206(b), 972.224(a). But the maxim that *expressio unius est exclusio alterius*—the premise on which this argument relies—applies only "in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002); *see Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022). Here, however, HUD's 2001 rules support no such inference. Like the 2003 rules, the 2001 rules discuss public housing agencies'

initial assessment obligations in general terms.  Thus, at most, the 2003 rules' comparative failure to discuss HUD's waiver authority shows that HUD did not wish to offer general, prospective waivers for public housing agencies seeking to convert their projects into Section 8 vouchers.  It does not support an additional inference that HUD *also* sought to foreclose itself from granting waivers in the future on a case-by-case basis.  *Int'l Union*, 920 F.2d at 964 (emphasizing agencies' "broad discretion in choosing between rulemaking and adjudication").

Finally, it does not help Anderson that HUD's proposed 1999 rules would have required public housing agencies "[to] submit a full conversion assessment" rather than a "streamlined" one if they wished to convert their projects.  64 Fed. Reg. at 40244.  HUD's final rules depart from its 1999 proposals in many ways, making it difficult to tell whether the final rules incorporate this feature of HUD's 1999 draft.   In any event, HUD's discussion of waivers in 1999 is not most naturally read to preclude HUD from exercising its statutory waiver authority in the future via individualized, case-by-case assessments for the reasons the Court has given.

For these reasons, the Court will reject Anderson's contention that HUD arbitrarily departed from its own regulations.

### 6.   Vacatur

The Court must now decide whether to vacate HUD's approval decision or remand it without vacatur.  "'Vacatur is the normal remedy' under the APA," but the Court may remand without vacatur "in limited circumstances."  *Am. Great Lakes Port Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (quoting *Allina Health Servs. v. Sibelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  The choice depends on two factors: "the 'seriousness of the [action's] deficiencies' and the likely 'disruptive consequences' of vacatur."  *Allina Health*, 746 F.3d at 1110 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Although the question is close, this case is not so "exception[al]" that it warrants remand without vacatur. *Cf. Shultz*, 962 F.3d at 512 ("[R]emand without vacatur is the exception rather than the rule."). As to the first factor, HUD "may be able readily to cure" the defects identified in the Court's opinion, a possibility that "counsels remand without vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *see Allied-Signal*, 988 F.2d at 151. Given Acre Road's mold problems, it is "not unlikely" that HUD could find that HAJP had adequate reasons for converting Acre Road to tenant-based assistance notwithstanding any disparate racial impacts of the decision. *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003). For similar reasons, HUD could find on remand that closure of Acre Road satisfies the conditions enumerated in § 1437t(c).

As to the second factor, however, vacatur would not be "so disruptive as to justify a departure from [the Court's] normal course." *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023). Although almost all of Acre Road's tenants have already left the project, HUD does not argue that vacatur would cut off their Section 8 vouchers or require them to return for some other reason. (Some tenants may voluntarily return, Decl. of Jolene Anderson ¶ 22, but that possibility is hardly disruptive.) Because Jefferson Parish has not sold Acre Road or demolished the homes there, vacatur will not require HUD to "unravel a past transaction" or otherwise reconstitute an "egg" that has already "be[en] scrambled." *Shultz*, 962 F.3d at 519. And because the Court will reject Anderson's challenges to Notice PIH 2019-05, vacatur does not threaten disruption to HUD's voluntary conversion program writ large.

Balancing the two factors, HUD has not shown a "substantial likelihood of disruptive effect" after vacatur. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019). And while a "strong showing" of one vacatur factor "may obviate the need to find a

similar showing of the other," *id.*, HUD's path on remand is not so obvious to the Court that it warrants remand without vacatur absent a meaningful possibility of disruption, *cf. Cboe*, 77 F.4th at 982.  Accordingly, the Court will vacate HUD's approval of HAJP's conversion application for Acre Road.

**CONCLUSION**

For these reasons, the Court will grant HUD's motion for summary judgment in part and deny it in part, grant Anderson's motion for summary judgment in part and deny it in part, dismiss Anderson's claims challenging Notice PIH 2019-05 as moot, and vacate HUD's March 9, 2023 decision approving HAJP's conversion application for Acre Road.  A separate order accompanies this memorandum opinion.

April 19, 2024

DABNEY L. FRIEDRICH
United States District Judge